Erin E. Byrnes (#021015)
**BERKE LAW FIRM, PLLC**
1601 North 7th Street, Suite 360
Phoenix, Arizona  85006
Phone:  (602) 254-8800
Facsimile: (602) 254-8808
Email: erin@berkelawfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Sinan Fazlovic, | Case No.  2:09-cv-01151-PHX-DKD |
| Plaintiff, | |
| v. | |
| Maricopa County, a political subdivision; Maricopa County Sheriff's Office; Joseph Arpaio, individually and in his official capacity as Sheriff of Maricopa County and Jane Doe Arpaio, husband and wife; David Hendershott, individually and in his official capacity and Jane Doe Hendershott, husband and wife; Scott Freeman, individually and in his official capacity and Jane Doe Freeman, husband and wife; Tiffani Shaw, individually and in her official capacity and John Doe Shaw, husband and wife; Timothy Overton, individually and in his official capacity and Jane Doe Overton, as husband and wife; Mary Ellen Sheppard, individually and in her official capacity and John Doe Sheppard, husband and wife, | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** **(Oral Argument Requested)** |
| Defendants. | |

Pursuant to Rule 56, Fed. R. Civ. P., the remaining Defendants Maricopa County, Sheriff Arpaio, David Hendershott, Scott Freeman, Tiffani Shaw, Timothy Overton, and MaryEllen Sheppard (collectively "Defendants") move this Court for summary judgment on all of Plaintiff's claims.  This Motion is supported by Defendants' Separate Statement of Facts and the following Memorandum of Points and Authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND:**

1    Plaintiff Sinan Fazlovic is Muslim and believes his religion compels him to wear a

2    full beard.[1]   (Dkt. #1, ¶16).   On May 26, 2005, he applied to the Maricopa County

3    Sheriff's Office ("MCSO") to work as a detention officer.  (Defendants' Statement of

4    Facts ("DSOF") ¶1).  At the time he applied and was hired, Plaintiff was wearing a full-

5    length beard that extended below his chin.  (DSOF ¶83).

6    Maricopa County's jail system is one of the largest in the U.S., consisting of six jail

7    facilities and the "Food Factory," a large warehouse adjacent to the Lower Buckeye Jail

8    ("LBJ"), where all the food and food trays for all jails in the MCSO system are prepared

9    and packed for delivery.   (DSOF ¶¶2-3).   MCSO's average inmate population reached

10   over 11,000 several years ago, and is now between 7,500-7,800.   (DSOF ¶4).   The jails

11   are staffed by detention officers 24/7.   (DSOF ¶5).   MCSO is a paramilitary organization,

12   and its needs, particularly in the jails, fluctuate frequently; therefore the need for

13   flexibility in staffing is particularly acute.   (DSOF ¶8).   Yet MCSO experiences a chronic

14   shortage of detention officers.   (DSOF ¶6-7).   At the time of Plaintiff's employment with

15   MCSO, the jails were operating with 66% of the detention officers needed.  (DSOF ¶112).

16   The primary responsibility of detention officers is the care, custody, and control of

17   MCSO's inmates.  (DSOF ¶9).  At the time he applied with MCSO, Plaintiff understood

18   his primary responsibility would be the "welfare of the inmates …," and his most

19   important job function to ensure the safety and security of both the inmates, and other

20   MCSO employees, and those in the jails.  (DSOF ¶10).  MCSO's jail facility commanders

21   have established a list of essential job tasks for detention officers.  (DSOF ¶11).  Essential

22   Job Task L provides that detention officers must be capable of performing the following

23   task, 100% of the time on duty:

24       Respond quickly to emergency situations that may include physically
         restraining combative inmates, lifting & carrying inmates during a medical
25       crisis or putting on an air pack for a fire emergency.  This includes entering
         smoke-filled areas appropriately by stooping or crawling, selecting and
26       opening fire extinguishers/hoses & physically removing inmates from
         danger which may include dragging unconscious victims.  (Average 180

27   _____

28   [1] For the purposes of this Motion only, Defendants do not contest that Plaintiff has
     a sincerely held religious belief that his religion requires him to wear a full beard.

                                      2

lbs.)  This also includes escorting inmates up & down stairs to evacuate areas while wearing emergency equipment.

(DSOF ¶12).  Task L requires all full duty[2] detention officers to be capable of donning a self-contained breathing apparatus ("SCBA") with a tight-fitting facepiece/mask, which is a specific type of respirator, in the event emergency response pursuant to Task L involves exposure to a hazardous environment.   (DSOF ¶¶ 12-13).   Consistent with this requirement, detention officer recruits receive training on use of the specific make and model SCBA used in the jail facilities; recruits must also pass a fit test on that equipment during the Academy.  (DSOF ¶ 14).

### A.   OSHA Standards Regulate the Use of SCBAs in the Workplace:

The Occupational Safety and Health Administration ("OSHA") has promulgated an extensive set of regulations, encapsulated in 29 C.F.R. §1910.134, requiring employers to identify anticipated respiratory hazards employees may be exposed to in the workplace. (DSOF ¶15, 18-21, 23-24).   Where employees may be exposed to an environment immediately dangerous to life or health ("IDLH"), OSHA requires the employer provide appropriate respiratory equipment for employee use.  (DSOF ¶20-23).  In ascertaining whether an environment is IDLH, § 1910.134 counsels employers to "include a reasonable estimate of employee exposures to respiratory hazard(s)."   (DSOF ¶23; 29 C.F.R. § 1910.134(d)(1)(iii)).   Where, however, "[t]he employer cannot identify or reasonably estimate the employee exposure, the employer shall consider the atmosphere IDLH." (*Id*).

Once an employer determines its employees may be exposed to an IDLH atmosphere, OSHA requires the employer to provide a respirator to employees.  (DSOF ¶25).  There are only two types of respirator an employer may provide for use in an IDLH atmosphere – a full facepiece pressure demand SCBA, or a combination full facepiece pressure demand supplied-air respirator (SAR) with auxiliary self-contained air supply. While a SCBA is just that – contained as a single unit worn by the user – an SAR's air is

---

[2] As used herein, "full duty" detention officers refers to an officer who has not received any temporary administrative waiver from performance of his/her responsibilities.  (*See* Affidavit of Chief MaryEllen Sheppard, DSOF, Ex. ___, at ¶47).

3

1   provided from a source located a distance away from the user, and supplied via an air-line.

2   (DSOF ¶27, 30).

3        According to § 1910.134, employers bear the sole burden of selecting the

4   appropriate respirator that will be supplied for use in IDLH atmospheres.  (DSOF ¶21, 31-

5   32).  Selection is governed by consideration of workplace and user factors unique to the

6   particular work environment, which is why the burden for selecting the appropriate piece

7   of equipment rests solely with the employer.  (DSOF ¶¶20-21).

8        Where an employer provides a tight-fitting facepiece for use in an IDLH

9   environment, OSHA imposes strict regulations regarding the use of such equipment.  In a

10   subsection titled "facepiece seal protection," § 1910.134(g)(i)(A), provides:

11        The employer **shall not permit** respirators with tight-fitting facepieces to
         be worn by employees who have:

12        Facial hair that comes between the sealing surface of the facepiece and the

13        face or that interferes with the valve function; …

14   The prohibition on the use of tight-fitting facepieces with facial hair that would come

15   between the facepiece seal and the user's mask, or that would interfere with valve

16   function, is one promulgated not just by OSHA, but also by NIOSH, the Nuclear

17   Regulatory, ANSI and other standard-setting bodies.  (DSOF ¶35).

18        The "sealing surface" is defined as the location of the respirator that is intended to

19   make contact with the face and is intended to participate in making an acceptable seal.

20   (DSOF ¶34).  For a tight-fitting full facepiece respirator, the sealing surface must seal

21   with the various portions of the user's face with which it comes in contact including,

22   critically, the chin.  (DSOF ¶28).  Ensuring a good seal is crucial to the facepieces

23   effectiveness, since the "facepiece is the principal component of the apparatus that

24   protects the individual from the contaminate, protecting both their respiratory system and

25   their eyes from the contaminate."  (DSOF ¶32).  In order to test the sufficiency of the

26   facepieces seal, employees must be fit tested on the equipment annually.  (DSOF ¶36).

27        In Arizona, OSHA standards are enforced by the Arizona Department of

28   Occupational Safety and Health ("ADOSH").  (DSOF ¶16-17).  Employers can be cited

1  for between $7k - $70k for violating § 1910.134's requirement for provision, selection,

2  and use of respirators.  (DSOF ¶39).

### B.    MSCO Designates Emergencies in the Jails as Constituting IDLH Atmospheres:

4  MCSO provides tight-fitting facepiece SCBAs to its detention officers because it

5  believes officers may be exposed to IDLH atmospheres in responding to emergency

6  situations in the jails, including fires, chemical spills, accidental mixing of cleaning

7  chemicals, incidents involving smoke, and other hazards.  (DSOF ¶40-44; 49).  And

8  MCSO has actually experienced emergency incidents creating an IDLH atmosphere.

9  (DSOF at ¶¶45-47) (chlorine gas, riots, smoke-filled housing untis).  MCSO's

10  determination that detention officers may be exposed to an IDLH atmosphere in

11  responding to fires or in other emergency situations is supported by §1910.134's

12  requirement that where the employer cannot "identify or reasonably estimate the

13  employee exposure, the employer shall consider the atmosphere IDLH."  (29 C.F.R.

14  §1910.134(d)(1)(iii); DSOF ¶50).

15  MCSO has also determined that tight-fitting facepiece SCBAs are the best

16  equipment for use in the jail environment, where the primary anticipated use will be

17  emergency response and rescue.  (DSOF ¶¶52-54).  Tight-fitting facepieces are better

18  suited for use by detention officers, especially in anticipated rescue or interface with

19  inmates.  (DSOF ¶¶52-54).  Tight-fitting facepieces are smaller than most than loose

20  fitting facepieces (often referred to as "hoods"), which are more like bags, and therefore

21  allow the officer more mobility and agility in rescue.  (DSOF ¶54).  Tight-fitting

22  facepieces are also more difficult to dislodge and less likely to be tampered with by a

23  panicked or combative inmate during rescue.  (DSOF ¶253).

### C.    MCSO Policies Regarding Detention Officer Use of SCBAs:

25  Detention officers' use of SCBAs is largely governed by two MCSO policies –

26  DA-3 and CP-10 – and augmented by MCSO's general grooming standards, set forth in

27  GC-19.  DA-3 requires that "[a]ll detention officers must meet the minimum proficiency

28  requirements in the use of SCBAs."  (DSOF ¶56-57).  MCSO's respirator policy is

contained in CP-10, which mirrors, in large part, relevant OSHA regulations.  At the time Plaintiff was hired, CP-10 provided, "Office employees who have facial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function … will not use respirators with tight-fitting facepieces."  (DSOF ¶61).  This language was revised slightly in 2005 to read: "Office employees shall not have facial hair that comes between the sealing surface of the facepiece and the face for tight-fitting respirators, . . . , as specified in the Code of Regulations (CFR), OSHA, Standard number 1910.134."  (DSOF ¶65).

GC-19, MCSO's general grooming policy applies to *all* MCSO employees and is intended to ensure MCSO "present[s] a professional and business-like appearance to the public."  (DSOF ¶68-69, 76).  At the times relevant to Plaintiff's employment, GC-19 precluded detention personnel from having any facial hair other than a mustache.  (DSOF ¶70, 72-73).  Though the language of GC-19 was revised during Plaintiff's employment, substantively speaking, there was never a change in the requirement to be clean-shaven.  (DSOF ¶75).

Taken together and synthesized – DA-3, CP-10, and GC-19 – require detention officers to be clean-shaven (except for mustaches) when on duty.  There is no exception to DA-3's requirement that detention officers meet the minimum proficiency standards of wearing an SCBA – which includes not having any facial that will come between the sealing surface of the facepiece and the officer's face, or which would interfere with valve function.  And during Plaintiff's employment, MCSO never offered or granted a detention officer a permanent, wholesale exemption from DA-3's requirements.  Similarly, CP-10's requirement that detention officers be free of facial hair that will interfere with the facepiece seal or valve function of the SCBA applies uniformly, without exception.  MCSO also never provided any detention officer a permanent exemption or accommodation from CP-10's requirements during Plaintiff's employment.

**D.** **Plaintiff's Request for Religious Accommodation and Initial Response:**

6

On July 19, 2005, Plaintiff started work with MCSO in the Sheriff's Information Management Services ("SIMS") section, while he awaited the start of the next Detention Officer Academy.  (DSOF ¶ 90).  That same day, he verbally requested a religious accommodation from his supervisor. (DSOF ¶90-91).  He then filed his request in writing, on July 21, 2005, with Commander Tiffani Shaw, head of MCSO's Employee and Legal Compliance Division ("ELC"), advising that he was Muslim and asking to be exempted from "facial hair policy" so that he could practice his religion by wearing his beard.  (DSOF ¶¶90, 94).  Commander Shaw had already been notified by Plaintiff's SIMS supervisor that the request would be coming, and she therefore notified her boss, Deputy Chief MaryEllen Sheppard of the request.  (DSOF ¶91-92).  Commander Shaw also advised Captain James Mason, the head of MCSO's Fire and OSHA Safety Division ("Safety Division"), that a request for religious accommodation to wear facial hair had been made by a detention officer, and she asked that he begin researching the request as it related to the requirement that detention officers be able to use tight-fitting facepiece SCBAs.  (DSOF ¶ 92-93).  Plaintiff started at the Detention Academy on July 25, 2005.  (DSOF ¶97).  He was allowed to maintain his beard, while MCSO researched its ability to grant his requested accommodation.  (DSOF ¶96).

### (i)   Concerns from the Outset are Safety and Legal Compliance:

On July 20, 2005, Commander Shaw got an email from Lieutenant Bill Wiscombe, the second in command at the Safety Division, explaining that OSHA regulations applied to the use of respirators with tight-fitting facepieces, and the restrictions on wearing such equipment with facial hair. (DSOF ¶97-100). Lt. Wiscombe noted that there was no exception to §1910.134's facial hair restrictions, for religious reasons or otherwise, because interference of facial hair with the facepiece seal could "cause a person[']s death [if] not properly worn.  (DSOF ¶100.  Commander Shaw followed up on this information by requesting Captain Mason to address in further detail the safety issues implicated by Plaintiff's request, whether alternative equipment was available to accommodate Plaintiff, and he scope of applicable OSHA regulations.  (DSOF ¶ 102).

7

1    On July 26, 2005, Captain Mason provided Commander Shaw a comprehensive
2    memo.  (DSOF ¶ 103-104).  The memo addressed the existence of Job Function L, and
3    then pointed to policies related to detention officers' ability to use and safely wear SCBAs
4    with tight-fitting facepieces (including DA-3 and CP-10).  (DSOF ¶104-105).  Captain
5    Mason also noted that detention officers must be trained on the SCBA, and must pass a fit
6    test to become a detention officer.  (DSOF ¶ 106).  The relevant portions of §1910.134
7    were also provided.  (DSOF ¶ 108).  In regards to alternative equipment, Captain Mason
8    advised that the tight-fitting facepiece SCBA were the only type of equipment available
9    that met the specifications for use – e.g. would allow the use to enter a smoke-filled area
10   to physically remove inmates from danger, or evacuate inmates from emergency
11   situations.  (DSOF ¶109).  The preliminary conclusion was that Plaintiff's request could
12   not be granted without jeopardizing safety – his, that of inmates, and other officers – and
13   without violating the law. (DSOF, Ex. 25).

14       On July 28, 2005, Commander Shaw asked Chief of Custody Gerard Sheridan to
15   provide input as to whether MCSO had sufficient other detention officers perform
16   Plaintiff's duties in the event of emergency response or rescue, such that Plaintiff's
17   request could be granted.  (DSOF ¶111).  Chief Sheridan researched staffing levels and
18   determined, as of the date of Plaintiff's request, the jails were operating with about 66%
19   of the authorized level of detention officers.  (DSOF ¶ 112).  In other words, the jails had
20   just more than half the number of detention officers needed to adequately staff them at the
21   time Plaintiff requested his accommodation.   Accordingly, Chief Sheridan advised
22   staffing levels were such that "every detention officer position must be fully equipped and
23   prepared to perform all essential functions."  (DSOF ¶ 13).  Chief Sheridan believed that
24   allowing Plaintiff to finish training and begin work with an "inability to properly wear an
25   essential piece of safety equipment places inmates, his fellow officers, and himself at
26   grave risk."  (DSOF ¶ 118).

27   / / /

28       **(ii)    Consultation with ADOSH:**

1    MCSO then sought input from ADOSH regarding the ability to accommodate

2    Plaintiff, in light of stringent OSHA regulations.  (DSOF ¶ 119).  Among other things,

3    MCSO asked ADOSH if it could perform a fit test using a tight-fitting facepiece on an

4    employee with facial hair that comes between the sealing surface of the mask and the face

5    and what actions ADOSH would take if an employee were fit tested, passed, and then

6    "permitted the employee to work in an area that may require the employee to wear a tight-

7    fitting mask."  (DSOF ¶ 120-21).  On August 2, 2005, Jesus Maeda, the Industrial

8    Hygiene Compliance Supervisor responded to Captain Mason's questions by letter.

9    (DSOF ¶ 122).   He begins by advising that since 1996, OSHA regulations provide an

10   employer "**shall not**" permit respirators with tight-fitting facepieces to be worn by

11   employees who have; facial hair that comes between the sealing surface of the facepiece

12   and the face or that interferes with the valve function; …"  (DSOF at Ex.31)(emphasis in

13   original).  Mr. Maeda then noted that "[b]eard growth at points where the seal with the

14   face and the respirator occurs is a condition that has been shown by numerous studies to

15   prevent a good face seal."  (DSOF ¶ 123).  He explained that even if an employee were fit

16   tested with facial hair and passed, that test would not necessarily be reliable with respect

17   to predicting a good fit on the day the respirator was worn, because facial hair grows, and

18   therefore varies, daily.  (DSOF ¶124).  Consequently, "an employer using a respirator to

19   protect an employee with a growth of beard where the seal is comprised by the beard is in

20   violation of 29 CFR §1910.134."  (DSOF ¶ 123).  The letter concluded by noting that

21   "OSHA does not have a religious exemption for respirator use that allows employees to

22   have a full beard."  (DSOF ¶ 125).

23          **(iii)    Plaintiff is advised his request cannot be granted August 4, 2005.**

24   Based on the foregoing research, MCSO made an initial determination that it could

25   not grant Plaintiff his requested accommodation.  Accordingly, Commander Shaw met

26   with Plaintiff three times between the end of July and beginning of August 2005, and

27   explained that MCSO did not believe it could grant an accommodation due to safety

28   issues, OSHA regulations, and the lack of suitable alternative equipment.  (DSOF ¶ 126-

130).   In these conversations, she expressly advised Plaintiff of the contents of Jesus Maeda's August 2, 2005 letter.  (DSOF ¶130).  In the course of these meetings, Plaintiff advised he had information that demonstrated his request could be granted (including information on two cases from other jurisdictions related to Muslim firefighters' request to wear beards and information on alternative respirators) and he presented that to Commander Shaw.   This information was forwarded to Captain Mason and Chief Sheppard for further evaluation.

On August 4, 2005, Commander Shaw issued a memo to Plaintiff and advised him that MCSO had determined, based largely on safety issues, his accommodation could not be granted.  He was told that if he wanted to continue in the Academy, he would have to shave.  Alternatively, if he chose not to continue the Academy, "a job reassignment to a vacant position for which you qualify would be considered."  (DSOF ¶133).  Sometime between August 4 and August 15, 2005, Plaintiff shaved his beard.  (DSOF ¶134).  He continued Academy and graduated successfully, whereupon he was assigned to the Food Factory. (DSOF ¶135).

**E.**    **Plaintiff's 2005-06 Grievances and MCSO's Responses:**

Plaintiff filed his first grievance on August 15, 2005, alleging his "freedom of religion" was violated.  (DSOF ¶ 136).  Chief Tim Overton, the head of training at that time, responded to Plaintiff's grievance and reiterated that OSHA regulations precluded MCSO from granting his requested accommodation.  (DSOF ¶137).  Dissatisfied with the Grievance Response, Plaintiff appealed it to Sheriff Arpaio.  (DSOF ¶138).  Because his grievance alleged religious discrimination, it was Chief Sheppard and ELC for handling.  (DSOF  ¶39).   While Chief Sheppard and ELC were processing the August 2005 grievance, Plaintiff provided additional information related to his request; this information was again forwarded to Captain Mason with a request that he evaluate whether it bore on Plaintiff's request.  (DSOF ¶ 142).

Chief Sheppard asked for additional time to respond to Plaintiff's August 2005 grievance, so as to consider the information he had provided, and conduct additional

research.  Plaintiff agreed, and from late August through December 2005, Chief Sheppard, Commander Shaw, Captain Mason, and others continued their effort to find a way to grant Plaintiff's request.  (DSOF ¶141-42).  These efforts included contacting ADOSH again to ascertain if an exemption to §1910.134's facial hair restrictions could be granted for the purposes of religious accommodation, researching case law from other jurisdictions, seeking input from other agencies, the Large Jail Network, and trying to identify whether outside resources, like the Phoenix Fire Department, would assist MCSO in responding to emergencies and evacuating inmates should the need arise.  (DSOF ¶140-152).  This research yielded little in the way of information suggesting MCSO could grant the requested information; to the contrary, MCSO was again advised by ADOSH that if it allowed an employee with a beard to war a tight-fitting facepiece, in violation of § 1910.134, and the individual was injured, it would constitute a willful violation, subject to a substantial fine.  (DSOF ¶150-52).

Chief Sheppard and Commander Shaw prepared the Grievance Response to Plaintiff, which Deputy Chief David Hendershott issued to Plaintiff on January 25, 2006.  (DSOF ¶ 153).  The Response advised that all of the research MCSO had done, including the additional work through December, buttressed the conclusion that Plaintiff's requested accommodation could not be granted.  (DSOF ¶154-57).  Plaintiff was again advised that if he wished to grow his beard, MCSO would work with him to find a position that would accommodate his wearing a beard.  (DSOF ¶157).  Plaintiff contacted Commander Shaw the next day to initiate the reassignment process.  (DSOF ¶158).  In response, Commander Shaw provided Plaintiff information about all open positions within MCSO, and also gave him the web address for the County website with job postings.  (DSOF ¶159-161).  Plaintiff did not move any further in reassignment at that time.

**F.    Plaintiff regrows his beard in December 2006.**

On or about December 23, 2006, Plaintiff came to work following a regular day off and was unshaved.  (DSOF ¶¶172, 174).  He was placed in a position of "no-contact" with inmates while MCSO processed Plaintiff's December 20, 2006 request for exemption

from the facial hair restrictions.  (DSOF ¶175).

In his December 20, 2006 request for accommodation, Plaintiff pointed to a civilian employee who wore a uniform, yet also was allowed to wear a beard in apparent violation of GC-19.  (DSOF ¶¶169-70).  He also alleged that he had been subjected to discrimination and sexual harassment by his coworkers.  (*Id.*).  These claims were investigated.  MCSO confirmed that there was a civilian employee – James Alexander – who was granted an exemption from GC-19, the only policy applicable to him as a civilian.  Alexander was granted an exception because it did not pose any safety risk to do so, i.e. because he was not required, by virtue of his position to be able to don an SCBA.  (DSOF ¶¶184-186)  Additionally, MCSO learned of one detention officer who had a mustache that was longer than allowed.  Upon learning of this individual, MCSO directed him to come into compliance with GC-19, and he did.  (DSOF ¶188).

An internal inquiry was conducted on Plaintiff's claims regarding religious discrimination and sexual harassment by his coworkers.  (DSOF ¶194-196).  This investigation concluded that Plaintiff was not subjected to religious discrimination by his coworkers, nor was he sexually harassed.  (DSOF ¶197-203)

On January 2, 2007, Chief Sheppard responded to Plaintiff's December 2006 request for accommodation, and reiterated the contents of Commander Shaw's August 2005 memo and Chief Deputy Hendershott's January 2006 Grievance Response, pointing to the reasons outlined therein as the basis for continuing to believe Plaintiff could not be allowed to wear a beard and remain a detention officer.  (DSOF ¶¶176-178).  Chief Sheppard concluded her letter to Plaintiff by yet again asking that he decide whether he wanted to serve as a detention officer, in which case he needed to be clean-shaven, or whether he wished to seek reassignment in MCSO to a position in which he could wear a beard.  (DSOF ¶179).  **For the first time**, Chief Sheppard advised Plaintiff that if he did not choose either option, he would be subject to discipline.  (*Id.*).

**D.    The Job Reassignment Process:**

12

On January 20, 2007, pursuant to his request, Commander Shaw issued a memo to Plaintiff providing him with information about the job reassignment process, again providing copies of MCSO Job Postings.  (DSOF ¶181).  To give Plaintiff time to consider his options, he was placed in SIMS and was granted a temporary exemption from the requirement that he be clean shaven.  (*Id.*).  He also continued to receive his detention officer rate of pay.  (*Id.*).  This interim administrative assignment was to last for thirty days, until February 18, 2007; instead, MCSO allowed the reassignment process to continue until October 9, 2007.  (DSOF ¶182).

The parties went back and forth on this issue for months, with Plaintiff asking to be permanently exempted from the no-beard requirement for detention officers, suggesting that MCSO assign him to a duty post that he believed would not require him to continue to meet the no-beard requirement (e.g. to Tents, because it is an outdoor environment, to Jail Intel, or to SIMS).  (DSOF ¶203).  Chief Sheppard addressed these issues in an April 7, 2007 memo to Plaintiff in which she advised that he could not be assigned to SIMS or Jail Intel, or elsewhere, and remain a detention officer, because being a full duty detention officer required the ability to respond to emergency situations, which concomitantly required the ability to don a SCBA with tight-fitting facepiece.  (DSOF ¶204).  Consequently, Chief Sheppard advised Plaintiff that though ELC had worked diligently to identify a position for which he was qualified that would offer commensurate pay to detention officer wages, they had been unable to do so.  (DSOF ¶207).  She advised him that he was qualified for two open civilian positions – the Office Specialized Assistant position, or the SIMS Clerk position.  (DSOF ¶¶208-9).  Chief Deputy Hendershott likewise addressed these issues, in a Grievance Response.

Finally, on October 1, 2007, Chief of Operations Scott Freeman issued Plaintiff a memo and advised that his temporary administrative assignment would be ending and that he would have to decide whether he wanted to return to full duty detention officer status, or select some other position within MCSO that allowed him to keep his beard.  (DSOF ¶217).  Plaintiff was again advised he could be reassigned to the SIMS Clerk or OAS

position.  (DSOF ¶).  He chose the OAS position, at the Inmate Canteen (one of several OAS assignments offered), and began in that capacity on October 9, 2007.  (DSOF ¶221).  The very next day, Plaintiff emailed Commander Shaw and advised the position was unacceptable because it involved contact with inmates and he demanded to be moved elsewhere.  (DSOF ¶¶221-222).  Plaintiff was then again extended the offer to move to the previously offered OAS assignment at Fleet Management, or to take the SIMS Clerk position.  (DSOF ¶223).  While the OAS – Fleet Management position offered a higher rate of pay, Plaintiff chose the SIMS Clerk position for scheduling reasons.  (*Id.*).

**E.     How MCSO Determined Rates of Pay for the Civilian Positions:**

Following multiple emails on the subject, Plaintiff asked Commander Shaw to provide him something in writing about how MCSO determined where Plaintiff would fall on the pay scale for the two civilian positions.  (DSOF ¶228).  Plaintiff believed he should be offered a higher rate of pay for both positions than he was, especially in light of his experience, both within MCSO and generally.  Commander Shaw consulted with Kelly Grennan, the then-supervisor of the Compensation and Benefits Section, to find out how Ms. Grennan and her staff determined an applicant or employee's "related experience" for purposes of placing someone on the pay scale.  Ms. Grennan advised that the issue was analyzed on a case-by-case basis, but that generally speaking, time spent as a detention officer often was not creditable towards civilian positions because "detention time is a different career path."  She further explained that in determining related experience, she would prepare an Experience Worksheet, and use the employee's job history as set forth in the job application to determine creditable experience.  Ms. Grennan prepared the OAS and SIMS Experience Worksheets for Plaintiff.

**II.     Defendants have violated his First Amendment Right to free exercise of his religion.**

Plaintiff alleges that MCSO's "policies precluding Plaintiff and other Muslims from wearing beards in observance of their faith violate his First Amendment rights." (Dkt. #1 at ¶ 52).  MCSO's policy precluding detention officers from having beards is a

1    neutral policy of general applicability, and therefore passes constitutional muster, even

2    where they have the incidental effect of burdening a particular religious practice. *Church*

3    *of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citation

4    omitted).

5           **A.**       **The MCSO policies at issue are neutral.**

6           The minimum requirement of neutrality is that the law or policy at issue not

7    discriminate on its face. *Lukumi*, 508 U.S. at 533. The three MCSO policies at issue –

8    DA-3, CP-10, and GC-19 – that cumulatively define the clean-shaven requirement for

9    detention officers are facially neutral because they do not refer to religious practice in any

10   way. They likewise operate neutrally. There is no evidence in this case that the policies

11   have been applied so as to single out conduct based on religion. Rather, the only evidence

12   regarding application of the policies in this case demonstrates that exemptions, for

13   whatever reason, have been categorically denied due, primarily to safety concerns. When

14   MCSO learned from representative of the Council on Islamic relations that there was

15   allegedly a detention officer who was in violation of facial hair requirements, they

16   investigated and identified the officer, who had a mustache (not beard) longer than

17   permitted under GC-19. (DSOF ¶188). This individual was directed to come into

18   compliance with the policy, or face discipline, and he complied.

19          This series of events demonstrates that MCSO uniformly applied its facial hair

20   restrictions to all detention officers, without regard to religion. Thus, the policies at issue

21   do not suppress, target, or otherwise single out religion for separate treatment and

22   therefore are neutral. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2003)

23   (holding law prohibiting discrimination by pharmacists against patients, while possibly

24   affecting pharmacists who object to Plan B birth control for religious reasons was neutral

25   and did not violate Free Exercise Clause, even though a group motivated by religious

26   reasons was more likely to engage in the proscribed conduct).

27   / / /

28          **B.**       **MCSO's policies are generally applicable.**

1    To evaluate the general applicability of MCSO's policies, the Court must look at

2    whether they selectively impose a burden on conduct motivated by religious belief.

3    *Lukumi*, 508 U.S. at 543.  If the policies permit the wearing of a beard for non-secular

4    reasons, but not religious ones, they are underinclusive and therefore violate the First

5    Amendment. *Id.* at 543.

6    DA-3, CP-10, and GC-19, cumulatively define the facial hair restrictions

7    applicable to detention officers.  DA-3, a detention-only policy, requires officers to meet

8    the "minimum requirements of use" for the SCBAs MCSO provides for their use.  This

9    equipment consists of a tight-fitting facepiece which, according to federal law, may not be

10   worn by an employee with facial hair that comes between the user's face and the mask's

11   sealing surface.  CP-10 makes this restriction crystal clear – both versions in place during

12   Plaintiff's employment prohibited MCSO personnel from wearing a tight-fitting facepiece

13   with facial hair that would breach the seal, or interfere with valve function.  Neither DA-3

14   nor CP-10 contains language allowing exemptions from their requirements.  And while

15   GC-19's language allows for exemptions, they are not available to detention officers

16   because of the applicability of DA-3 and CP-10.   During the course of Plaintiff's

17   employment, *no detention officer* was ever granted a permanent exemption the no-beard

18   policy.  The policies are universal – officers must comply with them to the same extent,

19   regardless of their motivation for seeking to do otherwise.  As such, the policies are of

20   general applicability.  *Stormans*, 586 F.3d at 1134 (noting that rules requiring pharmacists

21   to deliver medication in a timely manner did not violate First Amendment where

22   pharmacies that did not have religious objection to Plan B had to comply with rules to

23   same extent – no more or less – than those who did have religious objection).

24       **C.    The policies satisfy the rational basis test.**

25   Because Defendants' policies are neutral and of general applicability they need

26   only be supported by a rational basis, which requires they be rationally related to a

27   legitimate government interest.  *See Perry v.* Brown, 2012 WL 372713, **32 (9th Cir.

28   2012).  Defendants' policies are supported by several legitimate interests, including

16

1   ensuring that equipment needed to respond to emergencies is available, and is used safely

2   and legally in compliance with OSHA standards.  More generally, MCSO's no-beard

3   policy in GC-19 is intended to present a professional, businesslike appearance to the

4   public.  These interests, alone, constitute legitimate government interests served by the

5   policies.  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1280 (9th Cir. 2004) (party attacking

6   law or policy must "negate every conceivable basis which might support it).  The policies

7   at issue further these articulated rationales by ensuring that detention officers will not

8   having facial hair that compromises the seal of any tight-fitting facepiece, as well as

9   promoting a uniform, professional appearance to the public, inmates, and jail visitors.

10  Because MCSO's no-beard policy for detention officers satisfies the rational basis test,

11  Plaintiff's First Amendment claim fails as a matter of law.

12  **III.    PLAINTIFF'S FOURTEENTH AMENDMENT CLAIM FAILS AS A MATTER OF LAW.**

13          Plaintiff claims he had a reasonable expectation in continued public employment as

14  a detention officer with MCSO and that Defendants violated his right to due process by

15  "forcing Plaintiff to relinquish" his position as a detention officer.[3]  In order to succeed on

16  this claim, Plaintiff must demonstrate that he acquired a property interest in continued

17  employment, was therefore entitled to due process prior to demotion, and that Defendants

18  denied him due process.  *Bd. of Regents v. Roth*, 408 U.S. 564, 577.  The issue is one that

19  turns on employment status, and that issue is determined according to state law. *Bd. of

20  Regents*, 408 U.S. at 577; *see also Guy v. Mohave Co.*, 701 F.3d 73, 76 (9th Cir. 1982).

21          By statute, Plaintiff served at the pleasure of the appointing authority – here,

22  Sheriff Arpaio.  *See* A.R.S. § 38-295(A).  In Arizona, "a public officer who holds office at

23  the pleasure of an appointing authority is an employee at will."  *Guy*, 701 F.3d at 76

24  (quoting, in part, *Ernst v. Ariz. Bd. of Regents*, 119 Ariz. 129, 579 P.2d 1099 (1978)

25

26          [3] Plaintiff also claims that Defendants' policies, which formed part of the basis for
    denying Plaintiff's request for religious accommodation, constitute a Fourteenth

27  Amendment violation, but he does not explain *how*.  [Dkt. 1 at ¶ 60].  To the extent
    Plaintiff is realleging claims that form the basis of his First Amendment claim, Defendants

28  have addressed those already.

1  (internal quotation marks omitted).  At will employees are not entitled to any form of due

2  process, as they enjoy no cognizable property rights.

3      Plaintiff may believe that Maricopa County's Merit Commission Rules apply here

4  and therefore entitled him to some form of due process in addition to what was offered in

5  the way of grievances and responses thereto.  The Rules do not apply here, because

6  Plaintiff's demotion was *not* involuntary.  Even assuming Plaintiff is correct, however, he

7  waived his right to a Merit Commission hearing by not timely appealing his demotion as

8  required.  To initiate an appeal, Plaintiff was required to file an appeal with the clerk of

9  the Merit Commission or the County Human Resources Director.  *See* A.R.S. §11-356.

10  He did not do so and therefore, to the extent he had any right to due process as conferred

11  by the Merit Commission system, he waived it by failing to timely appeal his demotion.

12  **III.    DEFENDANTS HAVE NO INDIVIDUAL LIABLITY.**

13      Plaintiff has named each Defendant in both their official and individual capacity.

14  Defendants can only be held individually liable for their own wrongful conduct.  *Hansen*

15  *v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989); *see also McGrath v. Scott*, 250 F.Supp.2d

16  1218, 1222 (D.Ariz. 2003).  More specifically, to be held individually liable under § 1983,

17  Plaintiff must prove Defendants, and each of them, acted affirmatively, participated in

18  another's affirmative acts, or omitted performance of an act that that Defendant was

19  legally required to do and, as a result, *caused* a constitutional deprivation.  *Leer v.*

20  *Murphy*, 844 F.2d 628, 633 (9th Cir. 1998).  In regards to the First Amendment claim,

21  Plaintiff must show that Defendants acted with discriminatory purpose, undertaking a

22  cause of action *because of*, not, as the case was here, in spite of, expected adverse effects

23  on Plaintiff's religion.  *Ashcroft v. Iqbal*, 556 U.S. 662, 673-74.  Because there has been

24  no constitutional violation here, no Defendant should bear any liability whatsoever –

25  individual or otherwise.

26  **IV.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.**

27      Even if Plaintiff can show any Defendant had the requisite personal involvement

28  that caused a constitutional deprivation, Defendants are nevertheless entitled to qualified

18

1    immunity.  Qualified immunity involves a two-pronged analysis – (1) was the claimed

2    right of Plaintiff clearly established, and (2) would a reasonable officer in Defendants'

3    position believed their conduct to be lawful under the circumstances."  Under the second

4    prong, qualified immunity applies if one reasonable law enforcement officer in the world

5    of reasonable officers could disagree on whether Defendants' conduct was permissible.

6    *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (where "officers of reasonable competence

7    could disagree, immunity should be recognized").   Qualified immunity is a lenient

8    standard, allowing for mistaken judgment, and protecting "all but the plainly incompetent

9    or those who knowingly violate the law."   *Harlow v. Fitzgerald*, 457 U.S. 800, 819

10   (1982).

11        The inquiry regarding whether one reasonable officer could believe Defendants'

12   conduct in this case to be reasonable is an objective one for the Court.  *Berry v. Baca*, 379

13   F.3d 764, 767 (9th Cir. 2004).  The record in this case demonstrates that Defendants are

14   entitled to qualified immunity.  A reasonable law enforcement officer could believe that

15   MCSO's no-beard policy for detention officers was necessary according to the OSHA

16   standards and further could have believed, as did Defendants, that unilaterally enforcing

17   that policy, though it burdened Plaintiff's religious practice, was lawful.  A reasonable law

18   enforcement officer could also believe that Plaintiff's transfer/demotion here was

19   voluntarily made, as a means of accommodating his religious practice of wearing a beard,

20   and that because Defendants did not impose the demotion (as discipline or otherwise),

21   there was no right to a Merit Commission appeal.   Moreover, a reasonable law

22   enforcement officer could believe that because Plaintiff did not appeal his

23   transfer/demotion as required by statute, he had waived that right, and that, accordingly,

24   Defendants had no further obligation (to the extent they had one to begin with) to try to

25   provided Plaintiff due process.  Thus, Defendants are entitled to qualified immunity as a

26   matter of law on all of Plaintiff's claims.

27   / / /

28   **IV.     PLAINTIFF'S  § 1983 CLAIMS AGAINST THE COUNTY ALSO FAIL AS A MATTER OF**

**LAW.**

To succeed on his § 1983 claim against the County, Plaintiff must show an official policy or custom was the driving force behind the alleged constitutional violations; there is no vicarious liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-95 (1978).   Liability attaches only where the County *itself* has committed the alleged constitutional violation through an unconstitutional policy or custom.  *Id.* at 694; *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Plaintiff's claims against the County fail, in the first instance, because he has not demonstrated any constitutional violations.  *See Quintanilla v. City of* Downey, 84 F.3d 353, 355-56 (9th Cir. 1996) (absent a constitutional violation, there is no *Monell* entity liability).  As discussed above, the MCSO policies challenged are neutral and of general applicability, and therefore pass constitutional must because they are in furtherance of legitimate government interests.  Further, he has failed to show he was entitled to due process related to his transfer from a detention officer position to a civilian one, and therefore has no claim pursuant to the Fourteenth Amendment.  And, even if such a claim exists, Plaintiff waived it by failing to meet the administrative prerequisite of appealing the transfer/demotion to trigger a hearing.

Moreover, Plaintiff has failed to prove, let alone allege, the existence of a County policy or custom that is the driving force behind any violation here.   Admittedly, Defendants enforced the no-beard restrictions against Plaintiff in the same way they had against all other detention officers.  But the policies at issue do not exist for the purpose of discriminating against Plaintiff; they do not "affirmatively command" that a deprivation occur.  Nor does their enforcement constitute a policy of denying Muslims the right to exercise their religious beliefs.  In short, there is no evidence here rising to the level of proving that the County had a policy or custom of "conscious or intentional interference" with the Free Exercise Clause and Plaintiff's claims against the County therefore fail. *See, e.g., Lovelace v. Lee*, 472 F.3d 174, 201 (4th Cir. 2006).  Because MCSO's policy precluding detention officers from wearing beards does not violate the First Amendment,

1  and given that Plaintiff cannot establish a violation of his Fourteenth Amendment rights,

2  the County is entitled to summary judgment on Plaintiff's § 1983 claims.

3  **IV.   DEFENDANTS DID NOT DISCRIMINATE BECAUSE OF HIS RELIGION.[4]**

4       To establish a *prima facie* Title VII religious discrimination claim, Plaintiff must

5  show (1) that he had a sincerely held religious belief that his religion compelled him to

6  wear a beard; (2) that he told Defendants of his belief; and (3) that he suffered an adverse

7  employment action as a result.  *Berry v. Dep't of Soc. Srvs.*, 447 F.3d 642, 655 (9th Cir.

8  2006).  Upon such a showing, the burden shifts to Defendants to show they either initiated

9  good faith efforts to reasonably accommodate Plaintiff's religion, or that they were unable

10  to do so without undue burden.  *Id.* (citations omitted).

11       In this case, Defendants did more than initiate good faith efforts to accommodate.

12  As the record amply demonstrates, Defendants exhaustively researched Plaintiff's request

13  by researching, amongst other things, the law, alternative equipment, cases from other

14  jurisdictions, the practices of other entities, and the availability of auxiliary rescue

15  resources.   Defendants repeatedly consulted with the ADOSH and, though told the

16  relevant OSHA standard did not allow for religious accommodation, Defendants

17  nevertheless continued to seek guidance from ADOSH and work towards other means of

18  accommodating Plaintiff.   More importantly, however, Defendants could not provide

19  Plaintiff his requested accommodation without undue burden.

20       **A.   DEFENDANTS COULD NOT GRANT PLAINTIFF'S REQUESTED RELIGIOUS ACCOMMODATION WITHOUT UNDUE HARDSHIP.**

21       Defendants are entitled to summary judgment on Plaintiff's Title VII religious

22  discrimination claims upon showing the requested accommodations would impose an

23  undue hardship on MCSO's business.  *Yott v. North American Rockwell Corp.*, 602 F.2d

24  904, 906 (9th Cir. 1979).  An employer can demonstrate undue hardship by proof that the

25  

26       [4] Plaintiff's discrimination claims are barred as untimely.  The ACRD issued him a Right to Sue Letter on October 11, 2007, at his request.  He had until January 9, 2007 to

27  file a Complaint based on his original Charge of Discrimination.  This lawsuit was filed on _____ and therefore Plaintiff's Title VII discrimination claims are time-barred.  *See* 42

28  U.S.C. § 2000e(5)(f)(1).

accommodation imposes more than a *de minimis* cost, or that the accommodation would impact other employees negatively. *Bhatia v. Chevron U.S.A., Inc.*, 734 F.3d 1382, 1384 (9th Cir. 1984).

This case is very similar in many respects to one already decided by the Ninth Circuit. In *Bhatia*, *supra*, the Ninth Circuit considered a Chevron policy that required its machinists who might be exposed to toxic gases to shave any facial hair that would prevent them from achieving a tight seal on respiratory equipment. Though not every machinist task required the use of a respirator, Chevron nevertheless required each machinist to be able to wear a respirator safely. *Bhatia*, 734 F.3d at 1383. Plaintiff, a Sikh, refused to shave and was suspended. *Id.* When Chevron could not find a position that paid equivalently, it offered the plaintiff three other lower paying positions, which the plaintiff declined. *Id.* Plaintiff sued Chevron for religious discrimination. In evaluating his claims, the Court noted that Chevron established that allowing the plaintiff to continue to work as a machinist and assigning him duties where he might be exposed to gas and need to use a respirator would expose Chevron to a potential fine from the state OSHA office. *Id.* at 1384. On the other hand, if it allowed him to continue as a machinist, and exempted him for assignment where exposure was possible, this would cause require Chevron to retool its unpredictable assignment system and would also require the plaintiff's coworkers to assume his share of hazardous work. *Id.* The Court found Title VII did not require Chevron to bear these burdens and affirmed summary judgment in Chevron's favor.

Many of these same facts exist here, though in some degree in a more compelling fashion. Less than a month after Plaintiff made his accommodation request, Defendants were advised by ADOSH that if they granted him the requested accommodation, they would be violating § 1910.134, maybe even willfully so. This exposed Defendants to a citation from ADOSH that may have been as high as $70,000.00. Additionally, given the extreme shortage of other personnel in existence at the time Plaintiff sought accommodation, the implementation of an accommodation that would have allowed him

22

to avoid the need to don a respirator in the event of emergency, would have had a myriad of negative consequences on Defendants.  Because MCSO is a paramilitary organization, it is critical that it be able to move detention officers around from facility to facility to ensure adequate coverage.  If Plaintiff were unable to participate in his share of any work involving entering an IDLH atmosphere, that slack would be borne by an already strained workforce.    According to *Bhatia*, these facts sufficiently establish an undue burden rendering summary judgment for Defendants appropriate.

There are other problems that Plaintiff's requested accommodation would have posed.  Detention officers are trained on and must pass a fit test yearly on the type of SCBA they will be asked to use in the facilities.  If Plaintiff were granted a religious accommodation, MCSO would then have to grant other legitimate requests for accommodation.  And if it facilitated the accommodation by providing an alternative respirator, this would mean additional training, upkeep, and fit testing.  More troubling, adding additional equipment would putatively hamper any response time in an emergency, and may have put Plaintiff's life at risk, as well as that of the inmates whose well-being he was charged with protecting, along with that of any fellow officer or jail visitor who needed to be evacuated or assisted in an emergency.  All of the foregoing sufficiently establish that Defendants could not grant Plaintiff an accommodation without undue hardship and that they are therefore entitled to summary judgment.

**V.**    **PLAINTIFF'S RETALIATION CLAIM FAILS AS UNTIMELY AND IS SUBSTANTIVELY WITHOUT MERIT.**

Any retaliation claim Plaintiff has based on revisions to MCSO is time-barred.  Even if the manner in which Defendants revised their policies was retaliatory – a claim which Defendants vociferously deny – Plaintiff's retaliation claim based on these revisons was not timely raised with the EEOC and therefore cannot be pursued here.  42 U.S.C. § 2000e-5(c).   Plaintiff first claimed retaliation in his January 29, 2007 Charge of Discrimination.  Therefore, anything that occurred before April 4, 2006 is barred.  The policy changes Plaintiff points to occurred in 2005 and are therefore barred.

1    **A.    Plaintiff's retaliation claim fails substantively.**

2    To establish a *prima facie* retaliation claim, Plaintiff must show (1) participation in

3    protected activity under Title VII, (2) adverse employment decision, and (3) causal

4    connection between the protected activity and the adverse action.   *Manatt v. Bank of*

5    *America*, 339 F.3d 792, 800 (9th Cir. 2003). Upon establishment of a *prima facie* claim,

6    the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for

7    the adverse employment action.   Once Defendants do so, Plaintiff bears the ultimate

8    burden of demonstrating the articulated reason is merely a pretext for discriminatory

9    motive.

10    The heart of Plaintiff's retaliation claim involves his transfer to a civilian position

11    and the resultant loss of pay.[5]  The transfer, or demotion, did not occur until Plaintiff had

12    been employed by MCSO for more than two years.   Plaintiff first sought religious

13    accommodation in July 2005.   His request was first denied in August 2005.   His

14    "demotion" occurred in October 2007.  Clearly the demotion was far removed from his

15    initial requests for religious accommodation and therefore not causally related.  Indeed,

16    the only new protected activity Plaintiff engaged in in any temporal proximity to his move

17    to the civilian position was the filing of his retaliation Charge with the EEOC, which

18    occurred in January 2007.  It cannot be said, on the record, that his demotion was in any

19    way related to the filing of the second Charge.

20    Rather, Defendants had a legitimate, non-retaliatory reason for transferring

21    Plaintiff to a civilian position – namely his inability to perform all the job tasks required

22    as a detention officer.  Defendants did not limit Plaintiff's job search improperly and

23    actually worked with him in all ways possible to find a suitable alternative position.  The

24    positions that Plaintiff was specifically offered – OAS and SIMS Clerk – were those for

25    which he was qualified.   Further, the hourly wage offered to him for each were

26    _____

27    [5] Plaintiff also claims the denial of his transfer requests constitutes retaliation, but
the denial of those requests did not constitute an adverse employment action since,
regardless of assignment, so long as Plaintiff was a detention officer, he was subject to the

28    no-beard policy.

1    determined using objective criteria related to his creditable related work experience.  All

2    of these facts, taken together, demonstrate that Plaintiff's transfer and the rates of pay he

3    was offered were legitimate, and non-retaliatory.  Consequently, Defendants are entitled

4    to summary judgment on this claim.

5    **VI.    <u>CONCLUSION:</u>**

6           Based on the foregoing, Defendants ask the Court to grant them summary

7    judgment on all Plaintiff's claims.

8           RESPECTFULLY SUBMITTED this _____ day of _____, 2011.

9                                          BERKE LAW FIRM, PLLC

10

11                                         By  /s/Erin E. Byrnes_____
                                              Erin E. Byrnes
12                                            1601 North 7th Street, Suite 360
                                              Phoenix, Arizona  85006
13                                            *Attorneys for Defendants*

14

15                          **<u>CERTIFICATE OF SERVICE</u>**

16   I hereby certify that on _____, I electronically transmitted the foregoing
     document to the Clerk's Office using the CM/ECF system for filing and transmittal of
17   Notice of Electronic filing to the following CM/ECF registrants:

18   Daniel L. Bonnett
     Mark A. Bracken
19   Martin & Bonnett, PLLC
     1850 N. Central Avenue, Suite 2010
20   Phoenix, Arizona  85004
     *Attorneys for Plaintiff*
21
     Daniel Pochoda
22   ACLU Foundation of Arizona
     3703 North 7th Street, Suite 235
23   Phoenix, Arizona  85014
     *Attorneys for Plaintiff*
24

25
     /s/Shirley Dykes_____
26

27

28

                                       25