Daniel Pochoda (SBA 021979)
James Duff Lyall (SBA 330045)*
ACLU FOUNDATION OF ARIZONA
3707 N. 7th Street, Suite 235
Phoenix, AZ 85014
Telephone: (602) 650-1854
dpochoda@acluaz.org
jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Susan Martin (SBA 014226)
Daniel Bonnett (SBA 014127)
Jennifer Kroll (SBA 019859)
Mark A. Bracken (SBA 026532)
MARTIN & BONNETT, P.L.L.C.
1850 N. Central Avenue, Suite 2010
Phoenix, Arizona 85004
Telephone:  (602) 240-6900
smartin@martinbonnett.com
dbonnett@martinbonnett.com
jkroll@martinbonnett.com
mbracken@martinbonnett.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Sinan Fazlovic,<br><br>            Plaintiff,<br><br>vs.<br><br>Maricopa County, a political subdivision;<br>Maricopa County Sheriff's Office, et al.,<br><br>            Defendants. | No. CIV-09-1151-PHX-DKD<br><br>PLAINTIFF'S RESPONSES AND OBJECTIONS TO DEFENDANTS' STATEMENT OF FACTS TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S ADDITIONAL STATEMENT OF FACTS<br><br>Hon. David K. Duncan |

**Plaintiff's Responses and Objections to Defendants' Statement of Facts**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule of Civil Procedure 56.1(b), Plaintiff submits his Response to Defendants' Separate Statement of Facts in Support of Motion for Summary Judgment, Dkt. 203 ("DSOF") and additional supplemental evidence attached as Exhibits to the March 23, 2012 Declaration of Daniel Pochoda ("3/23/12 Pochoda Decl."). As further evidence precluding Defendants' Motion, Plaintiff also incorporates below his Statement of Facts submitted in support of Plaintiff's Motion for Partial Summary Judgment, Dkt. 199 ("PSOF").

**General Objections**

Plaintiff objects that a majority of Defendants' "facts" are not "need[ed] to decide the motion" and simply "provid[e] background about the action or the parties." L.R.Civ. 56.1(a). As such, they should not be included in the separate statement of facts. *Id.*; *see also Anderson v. Liberty Lobby, Inc.*, 477 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted."). As a cautionary measure, Plaintiff lodges specific objections to the statements of fact below. In addition, Plaintiff submits that each document cited, quoted or otherwise relied upon in DSOF, to the extent that it is accurate, true, and correct speaks for itself. By not disputing a statement of fact, Plaintiff does not waive any objections to the admissibility or authenticity of that statement of fact or any document cited therein, and Plaintiff expressly reserves the right to make such objection. Plaintiff's responses are made only for the purpose of the Court's consideration of Defendants' Motion for Summary Judgment. Plaintiff's general objections are incorporated by reference into each response below, and the assertion of the same, similar,

or additional specific objections below does not waive any of the foregoing general objections.

**Specific Objections**

Defendants cite to evidence that was disclosed after the close of discovery. *See* DSOF 46-47, 72-75. The discovery deadline was November 7, 2011. Dkt. 157 at 1. Defendants served their Fourth Supplemental Disclosure Statement on December 9, 2011. Dkt. 188. Although Plaintiff recognizes the parties' responsibility to supplement or correct disclosures, pursuant to Federal Rule of Civil Procedure 26(e), Defendants improperly disclosed multiple new witnesses and additional documents that were not available for review during the course of discovery. *See* Defendants' Fourth Supplemental Disclosure Statement, attached as Ex. F to the 3/23/12 Pochada Decl. Plaintiff had no opportunity to depose any of these additional witnesses or depose witnesses regarding the newly disclosed documents. *See Merisant Co. v. McNeil Nutritionals, LLC,* 242 F.R.D. 303, 311 (E.D.Pa. 2007) ("a party cannot introduce a document as evidence while denying the opponent sufficient discovery with respect to the surrounding circumstances and substance of the document") (quotation omitted). Therefore, Plaintiff objects to Defendants' citation to certain documents and witness affidavits that were disclosed after the close of discovery because these disclosures were not substantially justified or harmless. *See* Fed.R.Civ.P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir.2001).

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 1 | Plaintiff Sinan Fazlovic, a Bosnian Muslim, applied to work as a detention officer for the Maricopa County Sheriff's Office ("MCSO") on or about May 25, 2005. (November 18, 2010 Deposition of Sinan Fazlovic, attached at Exhibit 1, at 104:9-15 −105:1-25; *see also* Complaint at ¶ 16). | Undisputed, except in so far as Defendants characterize Plaintiff as a "Bosnian Muslim." Sinan is an American citizen. PSOF 1-3. |
| 2 | The MCSO jail network consists of six total jail facilities, including theFourth Avenue Jail, the Estrella Jail, Durango Jail, Lower Buckeye Jail ("LBJ"), the Towers Jail, and Tent City. (Affidavit of Chief Deputy Gerard A. Sheridan, attached at Exhibit 2). | Undisputed. |
| 3 | Additionally, MCSO's jail network includes a facility known as the "Food Factory," which is directly adjacent to the LBJ facility, and in which the food trays for all facilities throughout MCSO's system is prepared and packed for delivery. (Sheridan Aff., Ex. 2, at ¶ 4). The Food Factory is part of a division known as Institutional Services, which also includes the MCSO jail laundry, also located adjacent to LBJ, and just across a narrow street from the Food Factory. (Id. at ¶ 5). | Undisputed |
| 4 | The overall inmate population (including pretrial detainees) housed in MCSO jails reached over 11,000 people daily several years ago, and currently hovers around 7,500 − 7,800. (October 19, 2011 Deposition of Chief Deputy Gerard A. Sheridan, attached at Exhibit 3, at 21:3-8). | Undisputed. |
| 5 | MCSO jails are staffed with detention officers twenty-four (24) hours a day, seven days a week. (August 10, 2010 | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|  | Deposition of Captain James Mason, attached at Exhibit 4, at 25:17-23). | |
| 6 | As a general rule, MCSO is also chronically understaffed with respect to detention officers. (Sheridan Depo., Ex. 3, at 22:16-20). In fact, between 1999 and 2011, MCSO generally ran at least 200 officers short of the number Maricopa County authorizes. (Sheridan Depo., Ex. 3, at 22:21-24). | Undisputed that the MCSO has employed less detention officers ("DOs") than are authorized by Maricopa County.  This does not mean that MCSO was "chronically understaffed" as stated in the facts.  "Authorized strength" means "the number of positions, authorized positions that the County actually funds."  See DSOF, Ex.3, at 22:21:21-24. |
| 7 | In 2005 and 2006, MCSO found it "very difficult to hire detention officers" because the economy was in better shape then, and other employers paid better. (Sheridan Depo., Ex. 3, at 23:9-13). Subsequently, even when the economy experienced a downturn, MCSO could not hire sufficient officers because the County implemented a hiring freeze. (Id. at 23:6-16). | Undisputed that Sheridan made these statements, but he did not provide the basis for his conclusions. |
| 8 | MCSO is a "paramilitary organization and [its] needs fluctuate on a frequent basis. [MCSO's] staffing is very fluid. [MCSO] needs to be able to have the ability to move officers from facility to facility, assignment to assignment as necessary, depending on the needs of the [Office] – whether it's a staffing level," or some other need. (Sheridan Depo., Ex. 3, at 110:1-8). According to the former Chief of Custody, Gerard ("Jerry") A. Sheridan, MCSO's "shifting needs" can only be met by having the "flexibility to be able to move people around." (Sheridan Depo., Ex. 3, at 110:24-25 – 111:1-7). | Undisputed that Sheridan made these statements.  Plaintiff, however, disputes that an accommodation for Plaintiff would interfere in any manner with the "paramilitary nature" of MCSO or would not permit him to be moved around. See PSOF 117-51.  Sheridan did not testify and there are no facts in the record showing that granting Fazlovic an accommodation would actually interfere with MCSO's ability to move DOs around.  PSOF 150-60.  For example, when Fazlovic was assigned to the security control post, there was no evidence that this assignment interfered with the MCSOs ability to move DOs around.  PSOF 124-25, 152. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 9 | The primary responsibility of a detention officer is the care, custody and control of the inmates and pretrial detainees housed in MCSO jail facilities. (September 9, 2011 Deposition of Deputy Chief Mary Ellen Sheppard, attached at Exhibit 5, at 171:24-25 – 172:1-7; *see also* Sheridan Aff., Ex. 3, at ¶ 6). | Undisputed. |
| 10 | At the time he applied to become a MCSO detention officer, Plaintiff understood his primary responsibility would be "welfare of the inmates – in jails or generally speaking of inmates." (Fazlovic Depo., Ex. 1, at 107:11-20). He further understood an MCSO detention officer's most important job function to be ensuring the "safety and security" of the inmates, "other [MCSO] employees and people in that environment," including other detention officers. (Fazlovic Depo., Ex. 1, at 107:21-25 –109:1-6). | Undisputed. |
| 11 | The "Essential Job Tasks" of MCSO detention officers are identified in several different places, including the Essential Job Tasks List and the position description for detention officers. (Fazlovic Depo., Ex. 1, at 110:17-25 – 111:1-20). The Essential Job Tasks List for the detention officer position was developed by jail facility commanders, and other administrators responsible for the jails, as the parties most familiar with a detention officer's job. (Sheppard Depo, Ex. 5, at 62:25 – 63:1-3). | Undisputed that Sheppard made these statements, but she did not provide the basis for the conclusions.  It is unclear who at MCSO defined the DOs' "essential job tasks."  PSOF 32. |
| 12 | MCSO detention officer Essential Job Task L requires detention officers to be capable of performing the following: | Disputed in part as incomplete. Undisputed that the tasks document states this, but Defendants fail to |

6

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | Respond quickly to emergency situations that may include physically restraining combative inmates, lifting & carrying inmates during a medical crisis or putting on an air pack for a fire emergency. This includes entering smoke-filled areas appropriately by stooping or crawling, selecting and opening fire extinguishers/hoses & physically removing inmates from danger which may include dragging unconscious victims. (Average 180lbs.) This also includes escorting inmates up & down stairs to evacuate areas while wearing emergency equipment.<br><br>(Fazlovic Depo., Ex. 1, at 110:17-25 –s 111:1-20; see also Signed MCSO Detention Officer Essential Job Task List, signed by Plaintiff, attached at Ex. 6, at 2). Per Essential Job Task L, detention officers must be capable of performing this function 100% of the time they are on duty. (Essential Job Task List, Ex. 6, at 2; *see also* Sheppard Depo. At 49:1-2; 173:11-22). | include that the document also states that: "in order to accommodate a disability or limitation, the essential job tasks may be performed in ways other than described on this page." See DSOF, Ex. 6, at 4; PSOF 27. Sheridan acknowledged that this would allow a person with a limitation to be accommodated and still remain a DO. PSOF 27-28. |
| 13 | And in order to be able to safely respond to certain types of emergencies, and evacuate inmates or otherwise secure their safety, detention officers may need to don certain protective equipment, which Essential Job Task L refers to as an air pack. MCSO uses a specific type of respiratory equipment more precisely identified as a self-contained breathing apparatus ("SCBA") with tight-fighting masks or facepieces.2 (Sheppard Depo., Ex. 5 at 49:2-3; 173:11-22; 174-176). | Disputed to the extent that this statement may infer that the device listed in the tasks document referred to a particular or "specific" type of respirator or to any SCBA.  *See* PSOF 27 (Defs. Ex. 8 – Essential Job Tasks, referring to "an air pack for a fire emergency"); *see also* DSOF 12. |

7

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 14 | During their training at the Detention Officer Academy, detention officer recruits are trained on the specific make and model of SCBAs that MCSO will provide them for use in the facilities to ensure they can use the equipment properly and can pass a "fit test," as required by federal regulation, on that equipment. (Mason Depo., Ex. 4, at 188:18-19). The presence of more than one particular make and model of equipment means officers must be trained on that equipment. (Id. at 188:21-24). | Undisputed. |
| 15 | The federal Occupational Safety and Health Administration ("OSHA") promulgates various safety and health regulations designed to ensure safe workplaces and the safety of employees in the workplace. (See July 1, 2010 Deposition of Darin T. Perkins, Director of Arizona's Division of Occupational Safety and Health, attached at Exhibit 7, at 35:4-8; http://www.osha.gov/doc/outreachtraining/htmlfiles/introsha.html). | Undisputed. |
| 16 | By their own terms, OSHA regulations are not applicable to state and local employees, but in the 1970's Arizona adopted what is known as a "state plan," and in so doing opted to make OSHA regulations applicable to government employees, including those of Maricopa County. (Perkins Depo., Ex. 7, at 35:15-25 – 36:1-7; 38:) | Undisputed. |
| 17 | The Arizona Department of Occupational Safety and Health, or "ADOSH," is the state agency authorized under Arizona's State Plan to "exercise sole jurisdiction over | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|  | occupational safety and health issues in Arizona," and therefore is the body that enforces OSHA regulations. (Perkins Depo., Ex. 7, at 36:2-4; 38:18-25 – 38:8-14). |  |
| 18 | With respect to occupational safety and health, the OSHA standards dictate the minimum standards an employer must meet. (Perkins Depo., Ex. 7, at 39:2-9). | Undisputed. |
| 19 | As they relate to this case, OSHA regulations govern an employer's provision, and its employees' use of, respiratory equipment in the workplace. (Perkins Depo., Ex. 7, at 40:13-21). More specifically, 29 C.F.R. § 1910.134 is aimed at regulating the use of respiratory equipment in the workplace to minimize exposure to respiratory hazards and was the controlling regulation at all times relevant to this case. (See 29 C.F.R. § 1910.134(a)(1); *see also* Perkins Depo., Ex. 7, at 27:1-20). | Undisputed as a general description of OSHA regulations, but disputed to the extent that this statement infers that the decision as to what type of SCBA to use by a particular employer is dictated by OSHA.  *See* 29 C.F.R. § 1910.134(d)(1)(i). |
| 20 | Section 1910.134 of Title 29 of the Code of Federal Regulations requires the employer to "evaluate respiratory hazard(s), identify relevant workplace and user factors, and base respirator selection on these factors." (29 C.F.R. § 1910.134(d); Perkins Depo, Ex. 7, at 27:21-24; 42:21 – 25; see also Deposition of Roy T. McKay, Ph.D., attached at Exhibit 8, at 54:21-25). | Undisputed. |
| 21 | Moreover, in selecting a respirator to provide to employees, the employer "shall select and provide an appropriate respirator based on the respiratory hazard(s) to which the worker is exposed and workplace and user factors that affect respirator performance and | Undisputed that the employer has the responsibility to select and provide a respirator appropriate for the workplace.  *See* 29 C.F.R. § 1910.134(d)(1)(i). Disputed, in so far as Plaintiff could not determine the validity of the statement because of an |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | reliability." (29 C.F.R. § 1910.134(d)(1)(i) (emphasis added); Perkins Depo., Ex. 7, at 46:9-12). In determining the appropriate respirator to provide employees, evaluation of workplace and user factors are "paramount" to providing the right respiratory equipment. (McKay Depo., Ex. 8, at 1-8). | erroneous cite to McKay's deposition. |
| 22 | OSHA regulations define an IDLH atmosphere as one "immediately dangerous to life or health." (29 C.F.R. § 1910.134(b)). | Undisputed. |
| 23 | In evaluating respiratory hazards in the workplace, OSHA requires employers to "include a reasonable estimate of employee exposures to respiratory hazard(s)." And, "[w]here the employer cannot identify or reasonably estimate the employee exposure, the employer shall consider the atmosphere to be IDLH." (29 C.F.R. § 1910.134(d)(1)(iii); *see also* Perkins Depo., Ex. 7, at 43:1-4, 20-35 – 44:1). | Undisputed. |
| 24 | Pursuant to the regulations, "All oxygen-deficient atmospheres shall be considered IDLH." (29 C.F.R. § 1910.134(d)(2)(iii)). | Undisputed. |
| 25 | Once an employer determines its employees may be exposed to an IDLH atmosphere, the employer must provide the appropriate respiratory equipment. (*See* 29 C.F.R. § 1910.134(d)(2)(i)). | Undisputed. |
| 26 | Section 1910.134 restricts the type of respirator that may be used by the employee in an IDLH atmosphere. (Perkins Depo., Ex. 7, at 43:11-13). In fact, OSHA only allows two types of respirators to be used by employees who may have to enter an IDLH | Undisputed, except in so far as this statement may be construed to read that OSHA does not allow the use of loose-fitting SCBA.  *See* PSOF 211. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | atmosphere. Employees may use a full facepiece pressure demand SCBA, certified by the National Institute of Occupational Safety and Health ("NIOSH") and capable of a minimum service life of thirty minutes, or a combination full facepiece pressure demand supplied-air respirator (SAR) with auxiliary self-contained air supply. (29 C.F.R. § 1910.134(d)(2); Perkins Depo., Ex. 7, at 45:1-6). | |
| 27 | The regulations define an SCBA as an atmosphere-supplying respirator that provides a breathing air source designed to be carried by the user. (29 C.F.R. §1910.134(b)). | Undisputed. |
| 28 | A tight-fitting, full facepiece respirator has a sealing surface that "includes the chin, comes up around the side of the face and then makes a seal along the forehead, and then comes back around the opposite side." (McKay Depo., Ex. 8, at 32:9-15). | Disputed, in so far as Plaintiff could not determine the validity of the statement because of an erroneous cite to McKay's deposition.  Moreover, the sealing surface of a full face piece respirator will vary according to each individual's face.  CFR § 1910.134(f)(3) (discussing facial scarring, dental changes, cosmetic surgery, changes in body type); *see also* June 11, 2010 and October 27, 2010 Federal Rule 26 Expert Reports of Brian P. Daly, attached as Ex. A to the 3/23/12 Pochoda Decl.  It is for this reason that OSHA regulations require each user to conduct regular fit-tests to ensure a proper seal between the mask and the face.   *See* DSOF 32, 34. |
| 29 | A full facepiece pressure demand SCBA works as follows: When the user exhales while using a pressure demand SCBA, the "pressure in the facepiece is positive with respect to the outside environment. [The user then pauses before he inhales.] As you breath in, | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | the pressure begins to drop again, but the regulator will open up and allow entry of air from the tank into the facepiece prior to – the intent is at least prior to the facepiece going negative." (McKay Depo., Ex. 8, at 42:1-9). | |
| 30 | An SAR is an "atmosphere-supplying respirator for which the source of breathing air is not designed to be carried by the user," meaning the air is supplied through a line to which the user is connected. (29 C.F.R. § 1910.134(b)). | Undisputed. |
| 31 | Only the employer can make the decision as to which of the two types of respirators authorized by the OSHA regulations for use in an IDLH atmosphere should be provided to employees. (Perkins Depo., Ex. 7, at 45:20-23). | Disputed to the extent it suggests that an employer must choose between the two types of respirators and may not provide both. When asked whether general OSHA regulations require an employer to provide more than one type of respirator, Plaintiff's expert Brian Daly responded, "Yes, that is my interpretation of that language." Deposition of Brian P. Daly ("Daly Dep."), attached as Ex. B to the 3/23/12 Pochoda Decl., at 217:20-25, 219:1-14. Daly continued to explain that "in many occasions, [he has] been on employers' premises in which more than one style of SCBA is available at discrete locations." Daly Dep., at 221: 5-7. |
| 32 | Ensuring an employee can form a good seal with the mask is paramount with regards to safety because the "facepiece is the principal component of the apparatus that protects the individual from the contaminate, protecting both their respiratory system and their eyes from the contaminate." (McKay depo, Ex. 8, at 43:1-5). | Undisputed. |
| 33 | OSHA strictly regulates the use of | Undisputed, except in so far as |

12

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | respirators with tight-fitting full facepieces. (See 29 C.F.R. § 1910.134(g)(1)). The relevant regulatory provisions provide:<br><br>The employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have:<br><br>Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function; or<br><br>Any condition that interferes with the face-to-facepiece seal or valve function.<br><br>(29 .F.R. § 1910.134(g)(1)(i)(A) – (B); Perkins Depo., Ex. 7, at 47:17-25 – 48:1-7). | Defendants allege OSHA "strictly" regulates the use of tight-fitting respirators.  Defendants merely cite to the regulation and do not cite (and there is nothing in the record showing) that OSHA "strictly" regulates use of tight-fitting respirators. |
| 34 | The "sealing surface" referred to in § 1910.134(g)(1)(i)(A) refers to the "location of the respirator that is intended [to] make[] contact with the face and is intended to participate in making an acceptable seal to the face." (McKay Depo., Ex. 8, at 29:2-5). | Undisputed. |
| 35 | Every legitimate standard-setting organization in the United States prohibits the use of tight-fitting respirators with facial hair at the sealing surface, including NIOSH, the Nuclear Regulatory Commission ("NRC"), the Department of Energy, the American Industrial Hygiene Association's Respiratory Committee, the Department of Defense, and the American National Standards Institute ("ANSI"). (McKay Depo., Ex. 8, at 2). | Disputed in so far as the citation to the record does not support this statement. Plaintiff further disputes this statement to the extent it implies that any facial hair is prohibited as opposed to such hair that in fact interferes with the seal. Facial hair that does not compromise the seal when wearing a tight-fitting respirator is permissible and does not violate the OSHA regulation.  PSOF 192.  Moreover, OSHA also prohibits the use of tight-fitting respirators when anything interferes with the sealing surface between the mask and the face, |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | including facial deformations or irregularities or use of eye-glasses. *See* CFR § 1910.134(g)(1)(ii) (discussing eye glasses) & (f)(3) (discussing facial scarring and other facial deformities); *see also* June 11, 2010 and October 27, 2010 Federal Rule 26 Expert Reports of Brian P. Daly, attached as Ex. A and to the 3/23/12 Pochoda Decl. |
| 36 | The restriction on use of tight-fitting facepieces with facial hair is intended, in large part, to ensure the wearer can achieve a good seal with his/her respirator. In order to ensure that the user has a good seal, employers are required to "fit test" their employees on the respiratory equipment they use in the workplace. (*See* 29 C.F.R. § 1910.134(b) (defining "fit test" as the use of a qualitative or quantitative protocol to evaluate the fit of a respirator on an individual user). | Disputed to the extent that it suggests that tight-fitting face pieces cannot be safely worn by a person with facial hair. *See* PSOF 192-93.   In 2005, ADOSH did not and does not now have a prohibition on any facial hair on an employee who wears a tight-fitting respirator.  PSOF 190. Plaintiff does not dispute that employers are required to "fit test" their employees on their respiratory equipment.  *See* PSOF 56, 89-90, 96, 193-94. |
| 37 | Section 1910.134's provisions require that in an IDLH atmosphere, at least one employee be located outside the atmosphere, and be equipped with a pressure demand, or other positive pressure SCBA, or a positive-pressure supplied air respirator with auxiliary SCBA. (29 C.F.R. § 1910.134(g)(3)(i) – (vi)(a)). The purpose of this requirement is to provide "some redundancy to be able to either extract or assist the person who may run into trouble in that IDLH atmosphere." (McKay Depo., Ex. 8, at 150 – 152:3). | Disputed to the extent this statement implies that the employee located just outside the IDHL atmosphere must wear an SCBA with a tight-fitting face piece. The equipment described is not a tight-fitting respirator, and the employee outside the IDLH atmosphere should not wear tight-fitting respirators. PSOF 121.  29 C.F.R. § 1910.134(g)(3)(i)-(vi), states, in full, that the employer shall ensure that:<br><br>(i) One employee or, when needed, more than one employee is located outside the IDLH atmosphere;<br><br>(ii) Visual, voice, or signal line |

14

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | | communication is maintained between the employee(s) in the IDLH atmosphere and the employee(s) located outside the IDLH atmosphere; |
| | | (iii) The employee(s) located outside the IDLH atmosphere are trained and equipped to provide effective emergency rescue; |
| | | (iv) The employer or designee is notified before the employee(s) located outside the IDLH atmosphere enter the IDLH atmosphere to provide emergency rescue; |
| | | (v) The employer or designee authorized to do so by the employer, once notified, provides necessary assistance appropriate to the situation; |
| | | (vi) Employee(s) located outside the IDLH atmospheres are equipped with: |
| | | (A) Pressure demand or other positive pressure SCBAs, or a pressure demand or other positive pressure supplied-air respirator with auxiliary SCBA; and either |
| | | (B) Appropriate retrieval |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | equipment for removing the employee(s) who enter(s) these hazardous atmospheres where retrieval equipment would contribute to the rescue of the employee(s) and would not increase the overall risk resulting from entry; or |
| | | (C) Equivalent means for rescue where retrieval equipment is not required under paragraph (g)(3)(vi)(B). |
| 38 | In Arizona, employers have no option but to follow the standards set forth in § 1910.134 as they relate to providing respiratory equipment to employees and for use of that equipment by employees. (Perkins Depo., Ex. 7, at 55:13-22). | Undisputed. |
| 39 | By law, ADOSH has the authority to enforce § 1910.134's requirements, including the requirements for choosing and providing the proper respiratory protection equipment, and relating to restricting use of tight-fitting facepieces with facial hair. (Perkins Depo., Ex. 7, at 49:10-18; see also McKay Depo., Ex. 8, at 166:6-13). ADOSH's enforcement authority allows it to cite any employer violating § 1910.134's standards; citations range from $7,000.00 for a non-intentional violation, to $70,000.00 for "willful disregard" of the requirements. (Perkins Depo., Ex. 7, at 49:19-25 – 50:1-4). | Disputed in so far as this statement may infer that ADOSH rather than the employer decides what respiratory equipment will be used in the workplace.  PSOF 74 & 185; DSOF 21, & 29 C.F.R. § 1910.134(d)(1)(i). Moreover, Defendants' citation to McKay's deposition at 166:6-13 does not support this statement because it discusses OSHA's authority and does not discuss specifically discuss ADOSH. |
| 40 | Long before Plaintiff's employment, MCSO determined that detention | Undisputed that this was stated but disputed to the extent it infers that any |

16

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | officers working in and/or responding to emergencies in the jails may be exposed to an IDLH atmosphere. For example, MCSO administration anticipates that detention officers might be exposed to, or have to respond to, emergency situations occasioned by fires, chemical spills and/or exposure, and other hazards, any of which might render the environment IDLH. (See Affidavit of Deputy Chief Mary Ellen Sheppard, attached at Exhibit 9, at 8; *see also* Perkins Depo., Ex. 7, at 44:3-13). | MCSO employee has ever had to use an SCBA because he/she encountered an IDLH environment, or that a decision by an employee to forego using an SCBA violates MCSO policies. PSOF 67 -70. Additionally, Plaintiff disputes this statement to the extent it suggests that these situations are necessarily IDLH atmospheres. "[E]ven fire or chemical spill situations in a jail are not necessarily IDLH environments." PSOF 180 (Sheridan Dep. 85:22-86:1; 88:22-89:17). |
| 41 | Fires can create IDLH atmospheres because they deplete oxygen and also generate carbon monoxide. (McKay Depo., Ex. 8, at 38:13-20). An employee's airborne exposure to carbon monoxide can cause "immediate death or unconsciousness or immediate harm to the individual." (Id. at 21-24). | Undisputed, except to the extent it suggests that these situations are necessarily IDLH atmospheres. "[E]ven fire or chemical spill situations in a jail are not necessarily IDLH environments." PSOF 180. |
| 42 | On average, detention officers respond to a fire in the housing units at least once every two years. (Sheridan Depo., Ex. 3, at 47:5-11). | Disputed. Plaintiff does not dispute that Sheridan testified as noted, but there is no factual basis to support this statement. Defendants failed to produce any records showing any detention officers have had to respond to a fire in housing units. Moreover, Sheridan further testified that he was not aware of any instances where a detention officer responding to a fire had to use an SCBA. Sheridan Dep. 47:12-48:11. Additionally, all reported fires were small and limited to one cell and did not require the use of an SCBA. PSOF 180. |
| 43 | Other situations that may constitute an IDLH atmosphere include chemical exposures, like chlorine gas or | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | ammonia at a high concentration. (McKay Depo., Ex. 8, at 38:25 – 39:1-5). An employee's exposure to chlorine gas or ammonia can cause pulmonary edema, which is potentially life-threatening. (*Id.* at 39:1-5). | |
| 44 | Additionally, where chemicals are present in the workplace, as is the case with MCSO, the employer must anticipate not only trying to protect the employees from the original product, but also from any accidental mixing of the various chemicals, which is a fairly common occurrence generally. (McKay Depo., Ex. 8, at 9-15). | Disputed.  Plaintiff cannot adequately respond because the citation to the record is erroneous and does not support this statement.  It is impossible to determine what basis McKay has for saying the "accidental mixing of the various chemicals . . . is a fairly common occurrence."  Plaintiff also disputes this statement to the extent that it suggests employers must take account of hypothetical dangers in determining whether a religious accommodation should be permitted.  See Plaintiff's Motion for Partial Summary Judgment ("MPSJ"), Dkt. 198, at 13, 24-28 & 14, 1-7.  "There were no actual examples or specific incidents that occurred in MCSO facilities that demonstrated the need for SCBAs in a fire or smoke emergency."  PSOF 67.  In addition, there is nothing in the essential job tasks for MCSO DOs that refers to use of chemicals.  See DSOF 12; PSOF 27. The MCSO's essential job tasks for DOs only references the use of "an air pack *for a fire emergency*."  See DSOF 12; PSOF 27 (Defs. Ex. 8) (emphasis added).   There is no evidence in the record and no evidence cited by Defendants showing "chemicals are in the workplace" at the MCSO or that accidental mixing of chemicals is a common occurrence. |
| 45 | MCSO's history of significant emergency events also supports | Disputed as there is no factual evidence in the record of an IDLH environment |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | designation of the jail workplace as potentially IDLH. (Sheppard Aff., Ex. 9, at ¶¶ 5-7). For instance, in July 1999, inmates working at the Durango Kitchen mixed Lime-A-Way with bleach, and caused a cloud of chlorine gas to form. Staff and prisoners required evacuation assistance; six inmates and three MCSO employees were sent to the hospital. (McKay Depo., Ex. 8, at 38-39). | created in any MCSO facility. The only "history" Defendants produced during discovery was an isolated report of an incident in the Durango Kitchen in 2009. The Durango kitchen incident relied on here, and by Defendants' expert Gary DeLand in his report, did not require use of an SCBA device and there is nothing in the record suggesting that the persons sent to the hospital suffered any serious harm. PSOF 69, 111-13; Deland Dep., 100:22–108:18, Exhibit G to the 3/23/12 Pochoda Decl. Moreover, Defendants acknowledge that there are no SCBAs located in any MCSO kitchen facility. PSOF 107. |
| 46 | Additionally, there was a riot at the Tents facility in 1996, during which inmates started fires, creating a dangerous environment. (Sheppard Aff., Ex. 9, at ¶ 6). | Disputed to the extent that there is no evidence that SCBAs were used or that this created an IDLH environment. Moreover, Plaintiff objects to any use of this statement in so far as it relies upon evidence disclosed by Defendants after the close of discovery.  *See* Specific Objection, *supra*. |
| 47 | Further, since 2007, there have been several incidents at LBJ where pods in which the inmates are housed have filled with smoke due to problems with the heating and cooling system. These incidents have required LBJ detention officers to evacuate inmates from the affected areas. (Sheppard Aff., Ex. 9, at ¶ 7). | Disputed to the extent that it is not supported by the citation to the record and in so far as Defendants may imply that any SCBAs were used during any of these alleged incidents or that this created an IDLH environment. Moreover, Defendants have not produced any incident reports showing that any of these alleged incidents actually occurred or the circumstances surrounding these incidents.  *See* Fed.R.Evid. 1002. Moreover, Plaintiff objects to any use of this statement in so far as it relies upon evidence that was disclosed by Defendants after the close of discovery.  *See* Specific Objection, *supra*. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 48 | In the case of MCSO detention officers, however, it is somewhat irrelevant how often they might actually use the tight-fitting respirator because in the jail setting, things can happen, and the intent of providing the respiratory equipment is to prepare for and equip officers for developing situations. (McKay Depo., Ex. 8, 65:25 – 66:1-6). Given the "wide variety of potential scenarios that can occur[,]" it is important for the employer – here MCSO – to "decide how it's best to logistically resolve the situation that they anticipate or expect may occur." (Id. at 66:11-19). | Disputed to the extent it implies that there is any evidence in the record indicating that tight-fitting SCBAs will be needed in a future MCSO situation. Moreover, Plaintiff disputes that it is "somewhat irrelevant how often [DOs] might *actually use* the tight-fitting respirator." This statement is an argumentative legal conclusion and is not a statement of fact.  *See* L.R.Civ. 56.1(a). As shown in Plaintiff's Motion for Partial Summary Judgment, whether SCBAs were ever used to respond to any alleged "significant emergency" at the MCSO is relevant to showing Defendants unjustifiably denied Plaintiff a religious accommodation because using an SCBA is not an essential job function of a DO.  MPSJ, Dkt. 198, at 5 (citing PSOF 67-76). |
| 49 | More generally, in identifying the jail environment as IDLH, MCSO took the following factors into consideration: the nature of the work detention officers perform, the specific job duties and responsibilities these officers have, the volatile and unpredictable nature of the inmate population served, they physical structure where the work is performed, and the nature of the emergencies that can arise within MCSO jail facilities. (Sheppard Depo., Ex. 5, at 153:5-22). | Disputed in so far as the evidence cited does not support this statement. Sheppard states that these factors "are relevant when considering whether or not it's an IDLH atmosphere," not that these factors were actually considered by the MCSO in determining that a jail environment would constitute an IDLH atmosphere.  DSOF, Ex. 5, at 153:5-22. Defendants do not cite any other evidence to demonstrate the accuracy of this statement.  Moreover, Plaintiff objects to any use of this statement because Sheppard's statement is based upon inadmissible hearsay.  *See* Fed.R.Evid. 801-803. |
| 50 | Furthermore, MCSO determined emergencies in the jails might expose detention officers to an IDLH atmosphere based on the inability to pinpoint risk of exposure – per OSHA | Disputed to the extent Defendants may imply there is any evidence in the record indicating that MCSO officers may be exposed to an IDLH atmosphere.  Although Plaintiff does |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|  | regulations, an employer in this situation shall deem the environment IDLH. (Sheppard Depo, Ex. 5, at 153:5-22, 154:1-6). | not dispute what is stated in the OSHA regulations, Plaintiff disputes Defendants overly broad interpretation of the OSHA regulations to identify all MCSO facilities as IDLH atmospheres. *See* PSOF 74-75, 80, 110, 180.  The relevant OSHA regulation states: "The employer shall identify and evaluate the respiratory hazard(s) in the workplace; this evaluation shall include *a reasonable estimate of employee exposures* to respiratory hazard(s) and an identification of the contaminant's chemical state and physical form. Where the employer cannot identify or *reasonably* estimate the employee exposure, the employer shall consider the atmosphere to be IDLH." 29 C.F.R. 1910.134(d)(1)(iii) (emphasis added). Plaintiff disputes that Defendants reasonably reviewed and determined that all MCSO facilities were IDLH environments.  PSOF 78-80, 110. |
| 51 | Based on its determination that the jail environment and an emergency therein might constitute an IDLH atmosphere, MCSO provides its detention officers with full tight-fitting facepiece, pressure demand, SCBAs. (McKay Depo., Ex. 8, at 40-42). | Disputed in so far as Plaintiff cannot adequately respond because the citation to the record is erroneous and does not support this statement.  Nevertheless, Plaintiff disputes this statement to the extent it implies that MCSO has sufficient SCBAs available for all officers on duty and that all of these are in operating condition.  There are not enough SCBAs in MCSO facilities for every on duty detention officer to wear an SCBA in an emergency situation. PSOF 104-105. Fire Inspection Reports for MCSO facilities indicated serious problems with the available SCBAs. PSOF 105-06. |
| 52 | The selection of this particular equipment was based in large part on | Disputed to the extent that Defendants cite to their expert, Gary DeLand, as a |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | workplace and user factors related to the type of environment in which the equipment would be used, along with the actual realities a detention officer would face as he donned the equipment. Specifically, detention officers would likely use SCBAs to respond to an emergency and evacuate or rescue inmates and so MCSO was mindful that an officer might be "wrestling prisoners out of a situation that [the officer] is trying to extract them from[,]" or might be "jostled by other prisoners who take this [the emergency situation] as an opportunity to try to escape." (September 10, 2010 Deposition of Gary W. DeLand, attached at Ex. 10, at 116:20-25 – 117:1-10). | fact witness concerning what allegedly went through the minds of MCSO personnel years before.  Plaintiff objects to any use of this statement because it is not based upon personal knowledge, is beyond the scope of the testimony of an expert witness, and is based upon inadmissible hearsay.  *See* Fed.R.Evid. 602, 701-703, 801-803. Moreover, there is nothing in the record to support this statement.  *See* PSOF 32 (noting it is unclear from the record who at MCSO defined the DOs' essential job tasks). |
| 53 | Where an employee – such as a detention officer working in an MCSO jail – "may have to respond to nearly anything and everything," selection is different than a person working in a factory setting. In the former situation, it is much more difficult to identify the anticipated exposure from something going wrong because of the unpredictability of the atmosphere. (McKay Depo., Ex. 8, at 59). The idea is to minimize the risk of exposure by selecting and providing the correct type of equipment. *(Id.)*. | Disputed to the extent the it implies that all MCSO DOs have to respond "to anything and everything" given the undisputed evidence that many officers are not required to leave their posts and respond to emergencies, others are specifically told to leave if a fire in their area and call the fire department, and no DO has ever had to use an SCBA. PSOF, 107-08, 110, 114, 120, 69.  This statement is also disputed to the extent that there is no evidence in the record upon which Defendants' expert, Dr. McKay, has based his opinion.  Plaintiff objects to any use of his statement in so far as it is not based upon personal knowledge, is beyond the scope of the testimony of an expert witness, and is based upon inadmissible hearsay.  *See* Fed.R.Evid. 602, 701-703, 801-803. |
| 54 | Given the relevant workplace and user factors relevant to a detention officer's | Disputed. Defendants' corrections expert, Gary Deland, admitted that he |

22

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | work in an MCSO jail facility, a smaller, tight-fitting unit makes the detention officer's job easier, especially when dealing with inmates, who may be combative, or trying to escape. (DeLand Depo., Ex. 10, at 116:20-25 – 117:1-10). | was not a technical expert in the use of these devices and had never used any type in an actual emergency situation. DSOF, Ex. 10 at 117:24-25,118:1-18 (DeLand stated that he had never seen a loose-fitting SCBA taken off of an officer by force, that he did not "have enough experience in that area with individual cases to be able to . . . give . . . a very comprehensive look at how often that happens" and that [SCBAs being removed by force] happens with the tight-fitting SCBAs as well.) |
| 55 | MCSO has three policies that relate to detention officers and the use of SCBAs with tight-fitting facepieces. These three policies – DA-3, CP-10, and GC-19 – cumulatively provide the facial hair requirements and restrictions applicable to detention officers. (Sheppard Aff., Ex. 9, at ¶ 9). | Undisputed. |
| 56 | The first of these policies, DA-3, is part of a set of policies applicable only to detention officers. (Mason Depo., Ex. 4, at 144:2-3, 11-15). DA-3 is the "Self- Contained Breathing Apparatus" policy and provides in relevant part that "[a]ll detention officers must meet the minimum proficiency requirements in the use of the SCBA." (June 10, 2005 version of MCSO Policy No. DA-3, attached at Exhibit 11; *see also* Sheppard Aff., Ex. 9, at ¶ 10). | Undisputed. |
| 57 | In other words, DA-3 is the policy that implements the job requirement that all detention officers be capable of donning an SCBA in the event of fire or other emergency. (Sheppard Aff., Ex. 9, at ¶ 11). | Disputed to the extent it infers that DOs ever have or will in the future don an SCBA for a fire or other emergency. *See* PSOF 83-84, 91-92, 113-16, 120; Declaration of Sinan Fazlovic, Dkt. 200 ("Fazlovic Decl."), at ¶¶ 24-28. Plaintiff also objects to this statement in so far as it misstates and is not |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
|  |  | supported by the language of the policy. *See* Fed.R.Evid. 1002. |
| 58 | The second policy setting forth facial hair restrictions for detention officers is CP-10, which is MCSO's Respirator Policy. (Sheppard Aff., Ex. 9, at ¶ 9). This policy was developed pursuant to § 1910.134 of the OSHA regulations, and is intended to ensure the safe and efficient use of its tight-fitting facepiece SCBAs by detention officers. (Mason Depo., Ex. 4, at 136:15-25 – 137:1; 138:9-25 – 139:4-6). | Disputed to the extent it infers that an OSHA regulation prohibits all persons with facial hair from safely using a tight-fitting SCBA. PSOF 192. Plaintiff also disputes that CP-10 was allegedly "developed pursuant to 1910.134 of OSHA regulations" because, unlike CP-10, OSHA regulations do not require the use of tight-fitting SCBAs. In addition, the second sentence is not supported by the citation to Mason's deposition. Finally, Plaintiff objects to this statement in so far as it is unclear which version of CP-10 Defendants may be referring to. |
| 59 | When Plaintiff was hired in 2005, the original version of MCSO Policy CP-10 – Respirator Program with an effective date of July 5, 2004 was in place. (MCSO Policy No. CP-10, effective July 5, 2004, attached at Exhibit 12). | Undisputed. |
| 60 | The policy statement of the July 5, 2004 version of CP-10 provides:<br><br>"The Office has selected and provided respirators approved by the National Institute for Occupational Safety and Health (NIOSH) and the Occupational Safety and Health Administration (OSHA) which, when used as directed, provide protection for the employee. As different respirators are designed to protect against different pathogens, the Office shall further specific types of duties where certain types of respirators may be necessary. The use of an improper respirator may reduce or eliminate its effectiveness and result in | Undisputed. |

24

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | an employee becoming injured or incapacitated. For this reasons, employees shall not substitute other respirators." (07/05/04 version of CP-10, Ex. 12, at 1). | |
| 61 | With regards to facepiece seal protection, the July 2004 version of CP-10 provides: "Office employees who have facial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function or any condition that interferes with the face-to-facepiece seal or valve function will not use respirators with tight-fitting facepieces." (07/05/04 version of CP-10, Ex. 12, at 3). | Undisputed.  It is important to note, however, that this policy does not require detention officers to be "clean shaven" and merely prevents use of "tight-fitting facepieces," if facial hair or any condition "interferes with the face-to-facepiece seal or valve function." *See also* 29 C.F.R. § 1910.134(g)(1)(i).  MCSO policy GC-19 requires MCSO employees to be "clean shaven" to "present a professional and business-like appearance to the public. . ." *See* DSOF, Ex. 15. |
| 62 | In 2005, CP-10 was revised by the MCSO Fire and Occupational Safety Division ("Safety Division"), which in 2005 was headed by Captain James Mason at that time. (Mason Depo., Ex. 4, at 136:15-25 – 137:1; 138:9-25 – 139:4-6). A new version of CP-10 became effective on December 2, 2005. (See MCSO Policy No. CP-10, effective December 2, 2005, attached at Exhibit 13). | Disputed in so far as the statement that the MCSO Fire and Occupational Safety Division revised CP-10 is not supported by the citation to the record. Mason testified that he assisted with drafting the policy in effect in 2004, but there is no indication who was responsible for the December 2, 2005 revision to CP-10. |
| 63 | The Safety Division was responsible for revising CP-10, since it had drafted the original and had the necessary expertise. (Mason Depo., Ex. 4, at 139:15-17). | Disputed in so far as it is not supported by the citation to the record, which states:  "Q: Were you given any specific instructions about how to revise CP-10? A: No, sir." DSOF, Ex. 4, at 139:15-17. |
| 64 | The policy statement in the December 2, 2005 version of CP-10 provides: "The Office has selected and provided | Undisputed, except in so far as the policy statement is misquoted.  The first line should read "The Office shall use |

25

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
|  | respirators approved by the National Institute for Occupational Safety and Health (NIOSH) and the Occupational Safety and Health Administration (OSHA) which, when used as directed, provide protection for the employee. As different respirators are designed to protect against different pathogens, the Office shall further specific duty positions where certain types of respirators may be necessary. Employees shall not substitute the make, model, or style of respirator identified for a duty position without the prior approval of the Occupational Safety Division. The use of an improper respirator may reduce or eliminate the respirators [sic] effectiveness and result in an employee becoming injured or incapacitated. Supervisors shall be responsible for enforcing the program in their respective components." (12/02/05 version of CP-10, attached at Ex. 13, at 1). | and provided [sic] respirators . . ." and the fifth line should read "against different pathogens the Office shall specify duty positions. . ." *See* DSOF, Ex. 13. |
| 65 | The December 2005 version of CP-10 added a direct citation to the OSHA regulations into the provisions related to facepiece seal protection, so that this section now read: "Office employees shall not have facial hair that comes between the sealing surface of the facepiece and the face for tight-fitting facepieces, or that interferes with the valve function or any condition that interferes with the face to facepiece seal or valve function, as specified in the Code of Federal Regulations (CFR), OSHA, Standard number 1910.134. (12/02/05 version of CP-10, attached at Ex. 13, at 3). | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 66 | In revising CP-10, the Safety Division revised also revised slightly the language that already existed in the policy which prohibited employees from substituting respirators. (Mason Depo., Ex. 4, at 140:8-15). This language was clarified to make clear the prohibition was aimed at ensuring MCSO employees used only that make and model of equipment they had fit-tested on for their given duty position. (Mason Depo., Ex. 4, at 140:16-20). This clarification was in keeping with the existing OSHA standards. (*Id.*). | Disputed in so far as it suggests that CP-10 was only "revised slightly" or that the passage cited contains the only changes to CP-10. |
| 67 | The Safety Division's inclusion of language prohibiting substitution of equipment without prior approval was in no way related to Plaintiff's request to wear a beard as a detention officer, or any other similar accommodation request. (Mason Depo., Ex. 4, at 140:21-24; 141:5-11). | Disputed.  Plaintiff does not dispute that Mason testified as noted.  Plaintiff, however, objects and objects to any use of this statement because it is a legal conclusion and not a statement of fact. *See* L.R.Civ. 56.1(a); *see also Huynh v. J.P. Morgan Chase & Co.*, 2008 WL 2789532, *5 (D. Ariz. July 17, 2008) ("to the extent the [statements of fact] contains conclusory or otherwise in admissible 'facts' under the summary judgment standard, the court will not consider any of those claimed 'facts'"). Although Mason may testify to facts relevant to showing Defendant's motives, Mason cannot testify conclusively as to the motivation for the change in language.  *See U.S. Postal Service Bd. of Governors v. Aiken*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Moreover, Plaintiff made complaints regarding the MCSO's policies requiring him to shave his beard beginning July 28, 2005 and approximately five months later on |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | December 02, 2005, Defendants revised the language of the CP-10 policy.  *See* PSOF 47-49 & MCSO Policy No. CP-10, DSOF, Ex. 13. A reasonable jury may infer that Defendants were motivated by discrimination and/or retaliation. |
| 68 | Finally, MCSO had a generally applicable grooming policy in effect at all times during Plaintiff's employment, which more globally addressed facial hair standards. This policy, GC-19, is a general policy (as denoted by the "G"), and is applicable to all MCSO employees, including sworn officers, detention officers, and civilian employees. (Affidavit of Anni Foster, Former MCSO Policy Development Supervisor, attached at Exhibit 14, at 8). | Undisputed, except in so far as Defendants refer to the policy as "generally applicable."  Whether the policy was in fact "generally applicable" is a question of law, not of fact.  *See* L.R.Civ. 56.1(a); *see, e.g., Huynh*, 2008 WL 2789532 at *5. |
| 69 | One of the purposes underlying GC-19 is to ensure MCSO employees "present a professional and business-like appearance to the public…" (MCSO Policy No. GC-19, effective April 30, 1993, attached at Ex. 15, at 1; see also Fazlovic Depo., Ex. 1, at 255:9-25 – 256:1-2). | Undisputed that this is the language in the policy. |
| 70 | With respect to facial hair grooming standards, the 1993 version of GC-19in effect when Plaintiff was hired provided that all "[m]ale sworn and detention personnel shall be clean shaven while on duty." (04/30/93 version of GC-19, Ex. 15, at 2). | Undisputed. |
| 71 | In 2005, the MCSO Policy Development Section, which included Tom Dauphin and Anni Foster, revised GC-19 slightly and the updated version became effective on September 23, | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|     | 2005. (July 15, 2010 Deposition of Commander Tiffani P. Shaw, attached at Exhibit 16, at 36:6-15). | |
| 72 | The Policy Section revises all MCSO policies pursuant to a regular revision schedule and revised GC-19 in 2005 as part of a process to standardize MCSO policies so that each would include distinct sections for "purpose," "policy," "definitions," and "procedure." (Foster Aff., Ex. 14, at ¶ 6-7; *see also* MCSO Policy No. GC-19, effective September 23, 2005, attached at Exhibit 17; Fazlovic Depo., Ex. 1, at 256:12-25). | Disputed in so far as Defendants rely upon the Affidavit of Anni Lori Foster. Plaintiff objects to any use of the Affidavit of Ms. Foster because she was not disclosed as a potential witness until after the close of discovery. *See* Specific Objection, *supra*. |
| 73 | The September 23, 2005 version of GC-19 further sought to clarify facial hair requirements for all MCSO employees. (Foster Aff., Ex. 14, at  8). Whereas facial hair requirements had previously been lumped together in a section detailing other requirements applicable to sideburns and mustaches, the September 2005 version of GC-19 contained a "Facial Hair" section, providing: <br><br> "For safety reasons and uniformity, deputies, detention officers, and others representing the Office in uniform shall not have facial hair, except mustaches .Civilian employees not in uniform may have facial hair if it does not create a safety issue." <br><br> (09/23/05 version of GC-19, Ex. 17, at 2). | Disputed in so far as Defendants rely upon the Affidavit of Anni Lori Foster. Plaintiff objects to any use of the Affidavit of Ms. Foster because she was not disclosed as a potential witness until after the close of discovery. *See* Specific Objection, *supra*. In addition, the statement that "the September 23, 2005 version of GC-19 further sought to clarify facial hair requirements for all MCSO employees" is unsupported by the citation. |
| 74 | None of the Policy Section's work on GC-19 in 2005 was related to Plaintiff, his request for accommodation, or his employment. (Foster Aff., Ex. 14, at ¶ 15). | Disputed in so far as Defendants rely upon the Affidavit of Anni Lori Foster. Plaintiff objects to any use of the Affidavit of Ms. Foster because she was not disclosed as a potential witness until |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | after the close of discovery. *See* Specific Objection, *supra*. Moreover, there is no basis provided for the conclusion that the revisions were not related to Plaintiff. *See* Fed.R.Evid. 602; *see, e.g., Huynh*, 2008 WL 2789532 at *5. |
| 75 | And, substantively speaking, there was no difference between the facial hair requirements applicable to detention officers contained in the 2004 or 2005 version of GC-19. Both preclude detention officers from having facial hair. (Foster Aff., Ex. 14, at ¶ 12-13). | Disputed in so far as Defendants rely upon the Affidavit of Anni Lori Foster. Plaintiff objects to any use of the Affidavit of Ms. Foster because she was not disclosed as a potential witness until after the close of discovery. *See* Specific Objection, *supra*. In addition, Plaintiff disputes that there are no "substantive differences between the different versions of GC-19. The 1993 version, which was in effect in 2004, allowed some facial hair, including mustaches and trimmed sideburns. DSOF, Ex. 15 at 2. The 2005 version states that those in uniform "shall not have facial hair, except mustaches." *Id.* at 5 (MCSO 00396). |
| 76 | GC-19 addresses much more than just facial hair standards. It also prescribes the dress code for all MCSO employees, and sets standards for attire, hairstyles, makeup, jewelry, and even tattoos. (See 04/30/93 version of GC-19, Ex. 15, at 1-2 and 09/23/05 version of GC-19, Ex. 17, at 1-2). | Undisputed. |
| 77 | The 1993 version of this policy contained the following language: "Non- uniformed officers, by virtue of assignment to an undercover role, may be exempted from provisions of this Policy. Other designated personnel may be exempted from the provisions of this Policy for reasons of assignment, health or other appropriate reason, as | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | authorized in writing by the appropriate bureau commander." (04/30/93 version of GC-19, Ex. 15, at 3). | |
| 78 | The 2005 version of GC-19 altered this languages [sic] some, to read as follows: "Personnel not in uniform, by virtue of assignment to an undercover role, may be exempted from this policy. Exceptions to this policy for uniformed personnel shall only be approved by the Chief Deputy." (09/23/05 version of GC-19, Ex. 17, at 3). | Undisputed except in so far as it misquotes policy. |
| 79 | DA-3 does not contain a provision allowing a detention officer an exemption or waiver of the requirement that he be able to wear meet the minimum proficiency requirements in the use of the SCBA. (*See* DA-3, Ex. 11; *see also* Sheppard Aff., Ex. 9, at ¶ 12). | Undisputed, except to extent that it infers that the provisions of any MCSO policy are not subject to exception if required in order to provide constitutional or statutory rights. *See* PSOF 27-28, 42-46; *see also* MPSJ at 8-10. |
| 80 | Similarly, CP-10 does not provide any exemption or waiver to the restriction that MCSO personnel required to use SCBAs with tight-fitting facepieces not have facial hair that comes between the face and the facepiece's sealing surface, or which would interfere with the mask's valve function. (07/05/04 version of CP-10, Ex. 12 and 12/02/05 version of CP-10, Ex. 13; *see also* Sheppard Aff., Ex. 9, at ¶ 13). | Undisputed, except to extent that this statement infers that the provisions of any MCSO policy are not subject to exception if required in order to provide constitutional or statutory rights. *See* PSOF 27-28, 42-46; *see also* MPSJ at 8-10. Moreover, the 2005 version of CP-10 states that this policy applies to "deputies, detention officers, and others representing the Office in uniform…" |
| 81 | Plaintiff learned of the detention officer position with MCSO from his friend, Muhamed Dugonjic, who is also Muslim, and who was working for MCSO as a detention officer prior to Plaintiff submitting his application. (Fazlovic depo., Ex. 1, at 53:25 – 54:1-5, 20-22; 55:1-6). | Disputed in part. Mr. Fazlovic testified that he learned of the detention officer position from "mainly two sources." The first was his friend, Muhamed Dugonjic, and the second was "Sheriff Joe Arpaio himself." Fazlovic Dep. 54-60; PSOF 7-8. |
| 82 | As noted above, Plaintiff applied to | Undisputed, except in so far as the |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | become an MCSO detention officer on May 25, 2005, and was hired on July 19, 2005. (Fazlovic Depo., Ex. 1, at 104:9-15 – 105:1-25). Plaintiff was assigned to work in the Sheriff's Information Management System ("SIMS") office between July 19 and 21, 2005, while he awaited the start of the next Detention Officer Academy. (Id. at 135:6-12). | citations to the record do not support this fact. |
| 83 | At the time he was hired by MCSO, Plaintiff had a full-length beard that extended below his chin. (Complaint at ¶17; Fazlovic Depo. at 95:12-25 – 96:1-8; 97:12- 16; 99:14-17; see also Plaintiff's New Hire Photo, attached at Exhibit 18). Plaintiff's beard, as it existed at the time he was hired and as kept at the beginning of his training, would have come between the sealing surface of MCSO's tight-fitting facepiece and Plaintiff's face. (Sheridan Aff., Ex. 2, at ¶ ¶ 12-15; see also McKay Depo., Ex. 8, at 51-52). | Disputed.  The witnesses apparently based their opinions primarily on an undated photograph.  McKay stated that he saw a photograph, but did not recall whether it had a date on it or on what date it was taken.  DSOF, Ex. 8  at 52:8-17.  Defendants never allowed Mr. Fazlovic an opportunity to trim his beard or to conduct a fit-test with his beard, despite multiple requests to do so.  PSOF 194-95.  Thus, there is absolutely no evidence that his beard "would have come between the sealing surface of MCSO's tight-fitting facepiece and Plaintiff's face" as Defendants allege. *See* PSOF 190-93, 200-02.  Defendant Sheridan's self-serving, post-hoc statements in his February 16, 2012 affidavit are based upon his limited observations on July 28, 2005 and are not corroborated by any other evidence.  Defendant Sheridan has no basis for his conclusion that his beard "would have interfered with the seal of the MCSO SCBA…" Mr. Fazlovic was never fit-tested with his beard.  Fazlovic Decl., Dkt. 200, ¶¶ 30-41.  Thus, Plaintiff objects to any use of this statement and in particular paragraph 15 of Sheridan's February 16, 2012 affidavit because there is no |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | foundation to support this "belief" and it is not based upon personal knowledge. *See* Fed.R.Evid. 602; *See Huynh*, 2008 WL 2789532 at * 5. |
| 84 | Plaintiff was aware, even before applying to MCSO, that "normally … people applying for that job [detention officer] … are clean-shaven." (Fazlovic Depo., Ex. 1, at 70:24-25 – 71:1-4, 12-16). | Disputed as incomplete.  Mr. Fazlovic testified:  "I believe that what they [MCSO training facility employees] were trying to say is that most of the people or the people [who] are applying for that job, that they are clean-shaven. Before I explained to them that the meaning of facial hair and that I didn't keep my facial hair just for showoff but that was a part of my sincere religious belief… my faith."  Fazlovic Dep., attached as Ex. A to the Feb. 17, 2012 Declaration of Daniel Pochoda, Dkt. 201, at 71:2-9; *see generally id.* at 64-71. |
| 85 | On May 26, 2005, Plaintiff was provided a copy of the Essential Job Tasks for detention officers. He initialed each page of the Essential Job Tasks List, and signed the last page, acknowledging receipt. (Fazlovic Depo., Ex. 1, at 110:17-25 – 111:1-20; *see also* Signed Essential Job Tasks List, Ex. 19). | Undisputed.  *See* PSOF 27. |
| 86 | Plaintiff was also aware at the time he applied to become a detention officer that he would be required to respond quickly to emergency situations, which might include the need to physically restrain combative inmates, and/or lift or carry inmates to safety, tasks which might necessitate the use of an airpack. (Fazlovic Depo., Ex. 1, at 109:14-23; 112:3-15). And, as of May 25, 2005, Plaintiff understood that an "air pack" was "like a gas mask basically." (*Id.* at | Disputed to the extent that Plaintiff was aware of anything regarding the "air pack" beyond having to use a device "like a gas mask."  PSOF 29.  In addition, above Sinan's signature, the document he signed, which set forth essential job tasks, stated that the tasks "may be performed in ways other than described on this page." PSOF 27. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | 112:24-25 – 113:1-2). Thus, as of the date he applied to work as an MCSO detention officer, Plaintiff knew he would need to be qualified to don an airpack in the event of emergency. (*Id.* at 113:3-6). | |
| 87 | Plaintiff was also aware, at the time he applied, that detention officers are required to be able to enter smoke-filled areas, including by stooping or crawling, to physically remove inmates from danger, including dragging unconscious victims. (Fazlovic Depo. at 109:24-25 – 110:1-9; 112:16-23). | Undisputed.  Plaintiff was able, if necessary, to accomplish this task.  *See* PSOF 33; Fazlovic Decl., Dkt. 200, ¶¶ 75-76. |
| 88 | On July 18, 2005, while completing new hire paperwork, Plaintiff signed a document agreeing to abide by all MCSO policies and procedures. (Fazlovic Depo. At 116:14-21; see Signed MCSO Detention Applicant Acknowledgement Form, attached at Ex. 20). This same document, issued to all detention officers, puts them on notice that their potential employment as a detention officer requires them to be "willing and able to accept an assignment at any location within Maricopa County on any shift as determined by" MCSO. (Sheridan Aff., Ex. 2 at ¶ 8). Plaintiff was also issued his Basic Training Academy Manual on July 18, 2005, which likewise states that recruits must "adhere to MCSO policies and the rules and regulations of the Academy." (Fazlovic Depo., Ex. 1, at 119:1-21). | Disputed to the extent it implies that Sinan did not believe that he would be exempted from the facial hair policy to comply with his religious beliefs. Sinan was assured by several MCSO employees that maintaining facial hair would be permitted if based on his religious beliefs.  PSOF 23. Moreover, Plaintiff further disputes this statement in so far as the citation to the record does not include the Academy Manual and does not support the statement that recruits must "adhere to MCSO policies and the rules and regulations of the Academy."  *See* Fed.R.Evid. 1002. |
| 89 | Plaintiff was also was issued, and signed for, a copy of the MCSO Critical Policy Book on July 18, 2005, which contained a copy of MCSO's respirator policy, CP- 10. (Fazlovic | Disputed to the extent it implies that Sinan was not told by MCSO personnel that he would be allowed to maintain his beard for religious reasons. PSOF 23.  Moreover, Plaintiff further disputes |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | Depo. at 117:8-22; 121:19-25 – 122:1-10). Plaintiff understood MCSO's Critical Policies to be the "main policies," "the crucial policies of the department." (Fazlovic Depo. at 118:12-15). Plaintiff testified that "every employee should have been aware of and be familiar with" MCSO's Critical Policies. (Id.). | this statement in so far as the citation to Fazlovic's deposition does not support the statement that Plaintiff "signed for" the MCSO Critical Policy Book.  *See* Fed.R.Evid. 1002. |
| 90  | On July 19, 2005, his first day of employment, Plaintiff verbally requested a religious accommodation from Lieutenant Michael Wilkins, his SIMS supervisor. Specifically, Plaintiff asked to be allowed to wear a beard. (Fazlovic Depo., Ex. 1, at 149:20-25 – 150:1-13). Plaintiff was told to put his request in writing, so that it could be considered by the appropriate persons within MCSO. (Shaw Depo., Ex. 16, at 43:13-25 – 44:1-7; 45:16-25 – 46:1-2). | Disputed to the extent it implies that Sinan Fazlovic failed to report that he had been informed that he would be allowed to maintain a beard for religious reasons. PSOF 42-45. |
| 91  | Lieutenant Wilkins also verbally advised Commander Tiffani Shaw, who, at all times relevant to this case, was the Commander of the Employee and Legal Compliance ("ELC") Division of MCSO, about Plaintiff's request on this same date. (Shaw Depo., Ex. 16, at 43:13-22). In follow-up, Commander Shaw had a conversation with Plaintiff then, and reiterated the need for him to put his request in writing. (Shaw Depo., Ex. 16, at 45:16-25 – 46:1-2). | Undisputed that Shaw said this but no basis exists to assess if it is true. Disputed in so far as Defendants may infer that Mr. Fazlovic was told that he could not maintain a beard prior to on or about July 28, 2005.  Fazlovic Decl., Dkt. 200, ¶¶ 12-14. |
| 92  | While she awaited Plaintiff's written request for an exemption to the grooming standards for detention officers, Commander Shaw notified her boss, Deputy Chief MaryEllen Sheppard of the conversation with Plaintiff. Commander Shaw also | Undisputed that Shaw said this but no basis exists to assess if it is true. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | notified Captain James Mason, the Fire and OSHA Safety Division Commander, and Assistant County Attorney Clarisse McCormick. (Shaw Depo., Ex. 16, at 48). | |
| 93 | Commander Shaw asked Captain Mason to begin doing some research into what MCSO might be able to do with respect to Plaintiff's request for reasonable accommodation, given the requirement that all MCSO detention officers be able to don a tight-fitting SCBA. (Shaw Depo., Ex. 16, at 49:6-18). | Undisputed that Shaw said this but no basis exists to assess if it is true. Plaintiff disputes, however, any inference that the requirement was imposed on MCSO or that it could not be modified by MCSO. PSOF 180-82, 185. |
| 94 | On July 21, 2005, Plaintiff filed his first written request for religious accommodation with Commander Shaw seeking to be exempted from MCSO's "facial hair policy." (Fazlovic Depo., Ex. 1, at 140:16-22; 143:7-16; *see also* Memorandum of Plaintiff to Tiffany [sic] Shaw, dated July 21, 2005, attached at Exhibit 21). | Undisputed. |
| 95 | Plaintiff's July 21, 2005 Memo claims that he was told by an MCSO "representative" that a beard might be allowed by the office for religious or medical reasons, yet he testified in deposition that he submitted his request because he knew that someone higher up in MCSO needed to make a final determination on his request for accommodation. (Fazlovic Depo., Ex. 1, at 145:3-20). | Disputed to the extent that it infers that Sinan Fazlovic was not told by MCSO employees that he could maintain a beard for religious reasons. PSOF 23. |
| 96 | Upon receipt of Plaintiff's first memorandum seeking an exemption from the detention officer facial hair requirements, MCSO allowed Plaintiff to begin attendance at the Detention Officer Academy with his beard while | Undisputed that Sinan attended the Academy with his beard. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|     | the Office researched its ability to grant Plaintiff's requested accommodation. (Fazlovic Depo. at 151:22-5 – 152:1-3). Plaintiff understood Commander Shaw to have told him that MCSO would be investigating the request and that he would be advised of the outcome of that research. (Fazlovic Depo. at 151:1-7, 13, 18-21). | |
| 97 | Plaintiff began the Detention Officer Academy on July 25, 2005. (Fazlovic Depo. at 125:2, 13-16, 23-25 – 126:1-4). | Undisputed. |
| 98 | As noted, even before receiving Plaintiff's July 21, 2005 written request for accommodation, MCSO's research into its ability to grant the request was underway. On July 20, 2005, in response to Commander Shaw's request for research from the Safety Division, Lieutenant William Wiscombe in the Safety Division sent her an email to Commander Shaw in which he outlined the relevant section of OSHA regulations that prevented detention officers with beards from wearing the MCSO SCBAs with tightfitting masks. (Shaw Depo., Ex. 16 at 54:2-14; Affidavit of Commander Tiffani P. Shaw attached at Exhibit 22, at ¶ 4; July 20, 2005 Email from William Wiscombe to Tiffani Shaw attached at Exhibit 23). | Disputed to the extent that it infers that there is an OSHA regulation that prevented detention officers with beards from wearing SCBAs with tight-fitting masks. OSHA regulations prevent using tight-fitting SCBAs when there is anything that comes between the sealing surface of the face-piece and the face. PSOF 187-88. In addition, there are loose-fitting SCBAs that can be safely worn with a beard. PSOF 182, 209, 211-12. |
| 99 | In his email, Lieutenant Wiscombe reminded Commander Shaw that OSHA § 1910.134's language was mirrored in CP-10, and noted that MCSO's uniform policy also prohibits uniformed officers from wearing beards for personal appearance reason.(07/20/05 Wiscombe Email, | Undisputed, except in so far as Defendants fail to note that Lt. Wiscombe also noted that the OSHA regulation "does not preclude a person having a mustache as long as it does not interfere with the seal of the mask." *See* DSOF, Ex. 23. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | Exh. 23).                     |                      |
| 100 | Lieutenant Wiscombe also reported the regulation did not "make exceptions for 'religious beliefs' since the interference of the hair could cause a persons [sic] death in [sic] not properly worn." (07/20/05 Wiscombe Email, Exh. 23). | Undisputed that Lt. Winscombe made this statement in the email. However, the email also quotes CFR § 1910.134(g)(1), which states: "The employer shall not permit respirators with tight-fitting facepieces to be worn by employees who have: [f]acial hair that comes between the sealing surface of the facepiece and the face or that interferes with valve function; or [a]ny condition that interferes with the face-to-face seal or valve function." It further states: "If an employee wears corrective glasses or goggles or other personal protective equipment, the employer shall ensure that such equipment is worn in a manner that does not interfere with the seal of the facepiece to the face of the user." There is also a handwritten note, stating: "MCSO does have 6 hood type but are at Mesa/Avondale jails…" DSOF, Ex. 23; *see also* Shaw Dep. 55-56.  Plaintiff disputes that the provisions of any MCSO policy are not subject to exception if required in order to provide constitutional or statutory rights.  *See* PSOF 27-28, 42-46; *see also* MPSJ at 8-10. |
| 101 | At least as early as the date of Lieutenant Wiscombe's email, July 20, 2005, MCSO also was considering what type of respirator might be available, or made available, to Plaintiff to accommodate his religious practice of wearing a beard and not shaving. (Shaw Depo., Ex. 16, at 55-56). | Disputed to the extent Defendants are inferring that they considered alternate equipment that would accommodate Plaintiff's request.  PSOF 205, 208, 212.  Although Plaintiff provided D with information regarding alternate equipment, Defendants never provided Plaintiff with any loose-fitting SCBAs or discussed this option with him. PSOF 212, 215; Fazlovic Decl., Dkt. 200, ¶¶ 29-33.  In fact, Defendants |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|--------------------------------|----------------------|
|     |                                | expressly refused to consider providing him with a loose-fitting respirator although Shaw noted that the MCSO had six of these "hood type" respirators at other facilities.  PSOF 209, 217; Fazlovic Decl., ¶ 31.  Defendant does not cite anything in the record that supports their conclusion that MCSO was "considering what type of respirator might be available, or made available, to Plaintiff to accommodate his religious practice of wearing a beard."  Shaw only testified what her handwritten note stated and there had been some discussion about the particular type of respirators that might be available to Mr. Fazlovic.  DSOF, Ex. 16, Shaw Dep. at 55-58. |
| 102 | In an email dated July 21, 2005, Commander Shaw asked the Safety Division to do additional research on the issue of Plaintiff's religious accommodation request. (Shaw Depo., Ex. 16, at 58). Therein, she requested further documentation on the issues involved, including safety, whether alternative equipment existed, the scope of the applicable OSHA regulations, and whether the prohibition on beards was categorical or whether certain types of beards could safely be worn with MCSO's tight-fitting SCBA equipment. (July 21, 2005 Email from Commander Shaw to Captain Mason, attached at Exhibit 24). | Undisputed, except in so far as it misstates the actual language of the email, which states:<br><br>I am respectfully requesting that you draft a document that will be able to be referred to as needed. Specifically, I need the document to identify the issues involved (safety), whether we can accommodate a request for facial hair, and if not, why not. If it is an issue of equipment, provide supporting documentation from manufacturers that addresses that nothing is available to accommodate any type of beard and/or if any alternative equipment is available, what specifically and the cost involved. If it is |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | an OSHA law, provide the supporting documentation for this.  If certain types of beards would interfere with the equipment, what kind of beard it would be.  Basically, I need to know can we accommodate facial hair for Detention Officers and if not why not with supporting documentation. |
| | | DSOF, Ex. 24. |
| 103 | Captain Mason prepared a comprehensive memorandum in response to Commander Shaw's request. (Memorandum from Captain Mason to Commander Shaw dated July 26, 2005, attached at Ex. 25; *see also* Mason Depo., Ex. 4, at 42:12-24). | Undisputed, except in so far as Defendants refer to the memorandum as "comprehensive." |
| 104 | Captain Mason's Memorandum covers a variety of topics, including the detention officer Essential Job Tasks, training requirements for detention officers, MCSO's policies and practices, information about the respirators used by detention officers, ADOSH and OSHA standards, and various accommodation issues. (July 26, 2005 Mason Memo, Ex. 25, at 1-10). | Undisputed, except in so far as Defendants allege Mason's Memorandum covers "various accommodation issues."  *See* PSOF 171-73.  Mason's memorandum does not recommend any possible accommodations.  *See* DSOF, Ex. 25 at MCSO 00068.  It merely wrongly concludes without any discussion of alternate equipment or loose-fitting SCBAs that there "is no equipment currently on the market that would accommodate the aforementioned specifications."  *Id.*; PSOF 172-73.  The memorandum does not discuss any other possible accommodations, such as a transfer or assignment to a position that would never require use of an SCBA or a facility where there were no SCBAs.  *See, e.g.,* PSOF 105, 107, 117, 122-24. |

40

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| 105 | Captain Mason's memorandum discussed four specific MCSO policies that had bearing on Plaintiff's request:<br><br>  ▪ GG-1 – which requires detention officers to attend and complete the training academy;<br><br>  ▪ GG-2 – which requires detention officers to attend proficiency training in, among other things, use of air pacs, on a scheduled basis, and in addition to the mandatory minimum 8 hours in-service per year on other topics;<br><br>  ▪ DA-3 – which requires all detention officers to meet the minimum requirements for use of SCBAs; and<br><br>  ▪ CP-10 – which provides MCSO's respirator program policy, outlines the fit testing requirements for MCSO's tight-fitting respirators, including the SCBA used by detention officers and the N95, and parrots the facial hair restrictions contained in 29 C.F.R. § 191.134.<br><br>(July 26, 2005 Mason Memo, Ex. 25, at 2-4). | Undisputed. |
| 106 | Additionally, Captain Mason discussed several MCSO practices having a bearing on Plaintiff's request, including:<br><br>  ▪ Detention officers have a pre-employment medical exam during which they must be medically cleared for a fit test on the SCBA;<br><br>  ▪ During Detention Officer | Undisputed, except in so far as it suggests that these practices have "a bearing on Plaintiff's [religious accommodation] request." *See* PSOF 171-73.   None of the aforementioned practices discussed in Mason's Memo considered Mr. Fazlovic's sincerely held religious beliefs. *See* DSOF, Ex. 25 at MCSO00064-65. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | Academy, all detention officers are trained on, and must successfully pass use of and fit testing on the SCBA and N-95; <br><br>■ During employment, all detention officers, regardless of duty assignment, are required to be medically cleared to be fit tested, and actually undergo fit testing annually, on the SCBA and N-95. <br><br>(July 26, 2005 Mason Memo, Ex. 25, at 4-5; *see also* October 13, 2011 Deposition of Captain Penny Babb, attached at Exhibit 26, at 46:5-11). | |
| 107 | Captain Mason's memo also explains that MCSO uses two types of air pac, or SCBA, within the jails – the Ultra Lite II and the Air Hawk, both of which are manufactured by Mine Safety Appliances ("MSA"). (July 26, 2005 Mason Memo, Ex.25, at 5). | Undisputed. |
| 108 | The memo goes on to outline the relevant OSHA regulations, including identification of an IDLH atmosphere and those regulations applicable to an employer's selection of an appropriate respirator for use in IDLH atmospheres. (July 26, 2005 Mason Memo, Ex. 25, at 6). Captain Mason then thoroughly outlines the relevant OSHA requirements on use of SCBAs with tight-fitting facepieces by employees with facial hairs. (*Id*. at 6-7). | Undisputed, except in so far as it suggests that the Memo "thoroughly outlines the relevant OSHA requirements." Although Plaintiff does not dispute that the Memo outlines some of the OSHA regulations, Plaintiff disputes that the Memo considers all relevant regulations and interpretations of these regulations. PSOF 172. |
| 109 | In discussing possible accommodations for Plaintiff, Captain Mason indicated that the tight-fitting facepiece respirators that MCSO used were the only type on the market that would accommodate the specifications for use | Disputed. Plaintiff disputes that Mason's memorandum discusses possible accommodations for Plaintiff. PSOF 172-73. Mason merely concludes, without explanation, that there is not equipment to accommodate |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | – i.e. allowing the user to enter a smoke-filled area to physically remove inmates from danger, or evacuate inmates from emergency situations. (07/26/05 Mason Memo, Ex. 25, at 8). | facial hair. *See* DSOF, Ex. 25 at MCSO 00068. |
| 110 | He concluded by saying that there was not an equivalent piece of equipment to the tight-fighting facepiece SCBA with regards to a detention officer's anticipated use in jail settings to rescue and/or evacuate inmates. (07/26/05 Mason Memo, Ex. 25, at 9). | Undisputed that Mason made this conclusion.  Plaintiff, however, disputes Mason's conclusion because there was alternative equipment available and other possible accommodations that are not discussed in Mason's Memo.  PSOF 139, 144, 182-83, 185, 209, 211, 218, 221. |
| 111 | Given the information contained in Captain Mason's memo, on July 28, 2005, Commander Shaw sent an email to Chief of Custody Gerard ("Jerry") Sheridan and advised him 111.          Undisputed that Shaw made these statements in her email. Plaintiff, however, disputes Defendants' conclusions because there was alternative equipment available and other possible accommodations that are not discussed in Mason's Memo.  PSOF 139, 144, 182-83, 185, 209, 211, 218, 221that MCSO had received a request for religious accommodation from a detention officer wishing to keep a beard. She explained the results of Captain Mason's research to date, and indicated the next step was to determine if there were "sufficient other Detention Officers to perform Essential Job Task L which would allow for the requested accommodation." (July 28, 2005 Email from Tiffani Shaw to Jerry Sheridan, attached at Exhibit 27; *see also* Shaw Depo., Ex. 16, at 62:16-21; 64-66). | Undisputed that Shaw made these statements in her email.   Plaintiff, however, disputes Defendants' conclusions because there was alternative equipment available and other possible accommodations that are not discussed in Mason's Memo.  PSOF 139, 144, 182-83, 185, 209, 211, 218, 221. |
| 112 | Chief Sheridan researched Commander | Disputed in so far as Defendants assert |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | Shaw's request, the Detention Bureaus were understaffed, leaving the jails with approximately 66% of authorized levels of detention officer staff. (Sheridan Aff., Ex. 2, at ¶¶ 10-11, 16; *see also* July 28, 2005 Memorandum from Chief Sheridan to Chief Hendershott, attached at Exhibit 28). | that Chief Sheridan "researched Commander Shaw's request." Defendants' citations to the record do not support this statement. Otherwise, Plaintiff does not dispute that these statements are made in Sheridan's Memorandum. Plaintiff, however, disputes Sheridan's conclusions because there was alternative equipment available and other possible accommodations that are not discussed or considered. PSOF 139, 144, 182-83, 185, 209, 211, 218, 221. |
| 113 | Chief Sheridan told Commander Shaw that staffing levels were such that "every detention officer position must be fully equipped and prepared to perform all the essential functions." (Shaw Depo., Ex. 16, at 162:15-25 – 164:18). | Undisputed that Shaw testified as noted. Plaintiff, however, disputes that every detention officer position was in fact fully equipped and prepared to perform all the essential functions. PSOF 102-06. There were not enough SCBAs for all on-duty detention officers and there were several detention officer posts that did not have any SCBA or were not required to respond to emergencies. PSOF 105-07, 110. |
| 114 | Chief Sheridan then sent a memorandum to Chief Deputy David Hendershott regarding his concerns related to providing a wholesale exemption to the duty to respond to emergencies, given severe staffing shortages within MCSO (Sheridan Aff., Ex. 2, at ¶ 17). Chief Sheridan advised Deputy Chief Hendershott that the request conflicted with OSHA regulations applicable to use of SCBAs with tight-fitting facepieces. *(Id.).* | Undisputed that Sheridan made the noted statements in his Memorandum. Plaintiff, however, disputes Sheridan's conclusions because there was alternative equipment available and other possible accommodations that are not discussed or considered. PSOF 139, 144, 182-83, 185, 209, 211, 218, 221. Plaintiff also disputes that Plaintiff's request for an accommodation conflicts with OSHA regulations. PSOF 182-83, 185, 190-93. |
| 115 | He also discussed the "inherent responsibility of all detention officers | Undisputed that Sheridan made the noted statements in his Memorandum, |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | to provide for the safety and well [-] being of inmates and fellow officers." (*Id.*). He explained that in order to ensure detention officers can meet this responsibility, MCSO facilities are equipped with SCBAs with tight-fitting facepieces. (*Id.*). | except that there were no references made to SCBAs – only air packs. Plaintiff, however, disputes Sheridan's conclusions. PSOF 139, 144, 182-83, 185, 209, 211, 218, 221.   Not all MCSO facilities were in fact equipped with tight-fitting SCBAs and those that had SCBAs did not have enough for all detention officers on duty.  PSOF 104-05, 107. |
| 116 | Chief Sheridan further explained that OSHA prohibits the use of those facepieces by employees with facial hair that interferes with the airtight seal of the mask, and that the beard Plaintiff had as of that date would "in fact interfere with the seal of the masks." (*Id.*). | Undisputed that Sheridan made the noted statements in his Memorandum. Plaintiff, however, disputes Sheridan's statement that the "beard worn by Recruit Sinan Fazlovic will in fact interfere with the seal of the masks." There is no foundation or basis for this statement and it is inadmissible hearsay. *See* Fed.R.Evid. 602, 801-03.  Sheridan never observed Mr. Fazlovic wearing an SCBA and Mr. Fazlovic was never permitted an opportunity to take a fit-test with his beard to demonstrate whether his beard actually interfered with the seal of the mask.  PSOF at 194-95; Fazlovic Decl., Dkt. 200, ¶¶ 30-41. |
| 117 | Chief Sheridan goes on to state that the Detention Bureaus were understaffed, leaving the jails with approximately 66% of authorized levels of detention officer staff. (*Id.*). Critically, the understaffing "places the burden of care custody and control of all inmates on every available officer and leaves no room for someone that cannot perform the essential functions of a detention officer." (*Id.*). | This statement is duplicative of DSOF 112 and Plaintiff incorporates his response to DSOF 112 in response to this statement.  Plaintiff does not dispute that these statements were made in Sheridan's memorandum but disputes the conclusions made.  PSOF 104-07, 139, 144, 182-83, 185, 209, 211, 218, 221. Defendants do not cite and there is no evidence in the record that Mr. Fazlovic could not perform the essential functions of a detention officer with a beard.  PSOF 193-95; Fazlovic Decl., Dkt. 200, ¶¶ 74-76. |

45

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| 118 | For those reasons, Chief Sheridan indicated he did not recommend that Plaintiff be allowed to continue training to become a detention officer, because his "inability to properly wear an essential piece of safety equipment places inmates, his fellow officers and himself at grave risk." *(Id.)*. | Undisputed that Sheridan came to the noted conclusion.  Plaintiff, however, disputes Sheridan's conclusions.  PSOF 190-93.  Plaintiff objects to this statement in so far as it is not based upon personal knowledge, may be based upon inadmissible hearsay, and is conclusory.  Fed.R.Evid. 602; 801-03; *See Huynh*, 2008 WL 2789532 at * 5.  Sheridan never observed Mr. Fazlovic wearing an SCBA.  There is no evidence to support the conclusion that Mr. Fazlovic was unable to properly wear an essential piece of safety equipment because he was never granted an opportunity to take a fit test. *See* Fazlovic Decl., Dkt. 200, ¶¶ 30-41. |
| 119 | On July 29, 2005, MCSO also sought assistance from ADOSH in considering Plaintiff's request for accommodation.  In an email, Captain Mason asked for information regarding the application and limits of 29 C.F.R. § 1910.134's restrictions on facial hair and use of tight-fitting facepiece SCBAs. (Mason Depo., Ex. 4, at 73:10-17; see also July 29, 2005 Email from James Mason to Darren Bar and Jesus Maeda, attached at Ex. 29). | Disputed.  The only request in ADOSH records from the Sheriff's Office was to confirm that if MCSO required a tight-fitting respirator, the employee could not have facial hair that interferes with the seal.  PSOF 196-98, 206. |
| 120 | Captain Mason sent his July 29, 2005 email at Mr. Barr's request, and addressed it both to Mr. Barr and his supervisor, Jesus Maeda, the Compliance Section Supervisor; Mr. Barr told Captain Mason that he would review the questions with his supervisor, Jesus Maeda. (Mason Depo., Ex. 4, at 74:10-22). Given his position as the head of Safety, Captain Mason knew and had interacted with both Mr. Barr and Mr. Maeda before | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | sending his request or seeking their assistance with Plaintiff's accommodation request. (Id. at 73-74). | |
| 121 | In his email, Captain Mason posed the following questions to ADOSH:<br><br>▪ What was the effective date of that portion of § 1910.134 which prohibits employers from allowing an employee to wear a tight-fitting mask with facial hair that either comes between the sealing surface of the face and mask or interferes with the valve function?<br><br>▪ Are employers allowed to fit test a tight-fitting facepiece on an employee with facial hair that comes between the sealing surface of the face and the facepiece?<br><br>▪ What actions would ADOSH take if:<br><br>▪ An employer allows such an employee to be fit tested?<br><br>▪ The employee passed?<br><br>▪ The employer then "permitted the employee to work in an area that may require the employee to wear a tight-fitting mask[?]" | Undisputed. It is important to note, however, how the questions were framed. Captain Mason asked ADOSH whether MCSO could violate OSHA regulations (i.e. "Are employers allowed to fit test a tight-fitting facepiece on an employee with facial hair that comes between the sealing surface of the face and the facepiece?"). MCSO never asked ADOSH whether tight-fitting SCBA could be used with any facial hair or whether there were any other SCBAs that could be used with a beard.  See PSOF 190-202, 206. |
| 122 | On August 2, 2005, ADOSH, through Jesus Maeda the Compliance Supervisor, responded to Captain Mason's email by letter. The letter explained that § 1910.134's restrictions on facial hair and the use of tight-fitting masks had been in place since 1996, and noted that the requirement applied to the use of both negative and positive pressure respirators. (August 2, 2005 Letter from Jesus Maeda, Industrial Hygiene Supervisor, Compliance | Undisputed that Jesus Maeda sent a letter to MCSO on August 2, 2005. Plaintiff, however, disputes Defendants' characterization of what is stated in the letter.  The letter speaks for itself.  See Fed.R.Evid. 1002. |

47

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | Section, to MCSO Ex. 30; Mason Depo., Ex. 4). | |
| 123 | ADOSH's letter went on to explain that beard growth at points where the mask's seal comes into contact with the face "has been shown by numerous studies to prevent a good face seal." (08/02/05 ADOSH Letter, Ex. 30). "Thus, an employer using a respirator to protect an employee with a growth of beard where the seal is compromised by the beard growth is in violation of 29 C.F.R. 1910.134." *(Id.)*. | Disputed in so far as Defendants mischaracterize what is stated in the letter. Defendants take statements out of context and omit other relevant statements in the letter.  *See* DSOF, Ex. 30. The letter speaks for itself.  *See* Fed.R.Evid. 1002. |
| 124 | Mr. Maeda advised that while the OSHA standard would allow beards with respirators that do not rely on a tight facepiece seal, such as loose fitting helmets or hoods, with tight-fitting facepieces, the relevant regulatory language "does not make any exceptions when fit testing shows that a good fit has been achieved for persons with beards." (08/02/05 ADOSH Letter, Ex. 30).(emphasis in original). He continued, explaining that a fit test in such a situation would not be reliable, since facial hair growth occurs daily and therefore "fit testing performed on a previous day may not be valid for the day the respirator is worn." *(Id.)*. | Disputed in so far as Defendants mischaracterize what is stated in the letter.  Defendants take the statements regarding other available respirators (i.e. loose-fitting helmets and hoods) out of context in an attempt to improperly minimize the fact that ADOSH notified MCSO that there is other equipment available that allows beards with the use of respirators. DSOF, Ex. 30; *see also* PSOF 205-06. The letter speaks for itself.  *See* Fed.R.Evid. 1002. |
| 125 | As such, ADOSH advised MCSO that "OSHA does not have a religious exemption for respirator use that allows employees to have a full beard." *(Id.)*. | Disputed in so far as Defendants mischaracterize what is stated in the letter. Defendants take statements out of context and omit other relevant statements in the letter.  The letter speaks for itself.  DSOF, Ex. 30.  In addition, ADOSH's Director further explained OSHA's regulations. PSOF 190-202. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 126 | Commander Shaw met with Plaintiff in person three times before ever issuing anything to him in writing regarding his July 2005 request for accommodation. (Shaw Depo., Ex. 16, at 71-72). | Disputed in so far as Defendants assert that Commander Shaw met with Mr. Fazlovic "in person" three times before issuing him anything in writing regarding his request.  Shaw only met with Mr. Fazlovic on two occasions. First, on or about July 28, 2005 and then again on or about July 29, 2005. DSOF, Ex. 16, Shaw Dep. at 71-72; *see also* Fazlovic Decl., Dkt. 200, ¶¶ 13-14. |
| 127 | She first met with Plaintiff on July 28, 2005, and explained that MCSO did not believe it could accommodate his request due to safety concerns and a lack of alternative equipment. (See August 4, 2005 Memorandum from Commander Shaw to Plaintiff, attached at Exhibit 31, at 1; Shaw Depo., Ex. 16, at 142-143). Plaintiff advised Commander Shaw that he had information that would demonstrate MCSO could grant the requested accommodation. (08/04/05 Shaw Memo to Plaintiff, at 1). | Undisputed. |
| 128 | At a second meeting on July 29, 2005, which was set specifically to allow Plaintiff to provide the information he referenced in the prior day's meeting, Plaintiff gave Commander Shaw some case law related to the issue of Muslims, beards, and requests for religious accommodation. (Shaw Depo., Ex. 16, at 72:13-25 – 73:1-11; 08/04/05 Shaw Memo to Plaintiff, Ex. 31, at 1-2). One of the cases involved Washington, D.C. and another Philadelphia. (Shaw Depo., Ex. 16, at 72:13-25 – 73:1-11). Plaintiff also provided Commander Shaw with | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
|  | "some articles from the OSHA website and some pictures with different air pacs." (Fazlovic Depo., Ex. 1, at 154:212-25 – 155:3-11). Plaintiff gathered some of these materials directly from OSHA's website. (Fazlovic Depo., Ex. 1, at 155:13-18). |  |
| 129 | On August 4, 2005, Commander Shaw again personally met with Plaintiff. (08/04/05 Shaw Memo to Plaintiff, Ex. 31). Prior to meeting with him, she prepared a set of notes to provide talking points for the meeting. (Shaw Depo., Ex. 16, at 141:22-25; 142:23-25 – 143:1-5 and 10-15; 144:5-12; *see also* August 4, 2005 Handwritten Notes of Tiffani Shaw, attached at Exhibit 32). | Undisputed. |
| 130 | In accordance with her notes, Commander Shaw shared the following information with Plaintiff during their in-person August 4, 1005 meeting: <ul><li>□ MCSO had engaged in considerable research about his request, including contacting ADOSH directly for input.</li><li>ADOSH advised that their regulations do not allow for an exception to facial hair requirements for employees who would wear a tight-fitting facepiece SCBA;</li><li>That the research conducted by MCSO's Safety Division led to conclusion that there was no equipment available that would accommodate Plaintiff's desire to have a beard, while still allowing him to "enter a smoke filled environment to perform evacuation and/or rescue</li></ul> | Undisputed that Commander Shaw made these notes.  Plaintiff disputes, however, that MCSO engaged in "considerable research," that ADOSH advised that their regulations do not allow for an exception to facial hair requirements, that Plaintiff needed to shave his beard to be a detention officer, and that MCSO was willing to reassign Plaintiff to another position. PSOF 190-93, 206-08, 145. |

50

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | procedures which would ensure the safety of [Plaintiff], [his] coworkers and the inmates."<br><br>▪ Plaintiff needed to shave his beard, if he wanted to continue on the path to becoming a detention officer.<br><br>▪ Alternatively, MCSO was willing to "reassign [Plaintiff] to a vacant position" for which he was qualified.<br><br>(Shaw depo. at 144:19-22; see also 08/04/05 Shaw Notes, Ex. 33). | |
| 131 | At Plaintiff's request, Commander Shaw followed up on this meeting with a written memorandum, also dated August 4, 2005. (Shaw Depo., Ex. 16, at 142-143; Fazlovic Depo., Ex. 1, at 149:4-4-11, 16-17). Therein, Commander Shaw noted that MCSO had contacted ADOSH in response to some of the materials Plaintiff provided on July 29, 2005 to determine whether an exemption to 29 C.F.R. § 1910.134's facial hair restrictions could be given. (08/04/05 Shaw Memo to Plaintiff, Ex. 31 at 2). She advised Plaintiff that ADOSH responded and advised that there was no religious exception to the regulation, and that OSHA did not provide a religious exemption "for respirator use that allows employees to have a full beard." *(Id.)*. | Undisputed that Plaintiff requested a written memorandum and that the following statements were made in the memorandum. |
| 132 | Commander Shaw's memo reiterated that MCSO had "determined that **for safety reasons**, Detention Officers must be clean shaven and there are no reasonable accommodations which would allow a Detention Officer to | Undisputed that Defendant Shaw's memorandum stated as noted. *But see* PSOF 190-93, 200-02, 209, 211. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | wear a beard and safely fulfill the essential functions of the position." (08/04/05 Shaw Memo to Plaintiff, Ex. 31 at 2) (emphasis added). | |
| 133 | Consequently, Commander Shaw told Plaintiff that if he "chose not to remain a Detention Officer, a job reassignment to a vacant position for which you qualify would be considered." (08/04/05 Shaw Memo to Plaintiff, Ex. 31, at 2). In an effort to facilitate his consideration of his options, Plaintiff was provided with copies of "all Office job postings" that were open for recruitment at that time, or which were expected to open for recruitment. (*Id.*). Plaintiff was also advised that if he wished to consider reassignment, he would be "temporarily assigned to an administrative assignment, at no loss of pay, …" (*Id.*). | Undisputed that Defendant Shaw's memorandum stated as noted.  *But see* PSOF 218-19, 144-45.  Plaintiff objects to this statement in so far as there are no documents attached to the memorandum supporting the conclusion that he was provided copies of "all Office job postings."  *See* Fed.R.Evid. 1002.  Although Mr. Fazlovic was told that there were openings, it is undisputed that when he applied or requested reassignment to other MCSO positions his requests were rejected.  *See* PSOF 218-19, 144-45; *see also* DSOF 163-68. |
| 134 | Sometime after August 4, 2005, but before August 15, 2005, Plaintiff elected to shave his beard and continued with his training at the Detention Officer Academy. (Complaint at ¶ 28; August 15, 2005 Plaintiff's Grievance to Chief Overton, attached at Exhibit 33). | Undisputed that Mr. Fazlovic shaved his beard sometime between August 4, 2005 and August 15, 2005.  Mr. Fazlovic, however, was forced to shave his beard because he was faced with the ultimatum to shave his beard or lose the DO job he sought and was hired for. PSOF 49; Fazlovic Decl., Dkt. 200, ¶¶ 20-23. |
| 135 | Following his graduation from the Detention Officer Academy, Plaintiff was assigned to work in MCSO's Food Factory. (Fazlovic Depo., Ex. 1, at 191:25 – 192:1-9). Again, the Food Factory is located next to the Lower Buckeye Jail ("LBJ") and is the place where MCSO prepares all food and food trays for inmates, including juvenile detainees, throughout Maricopa County. (*Id.* at 192:8-11). | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| 136 | On August 15, 2005, Plaintiff filed his first grievance with Deputy Chief Timothy Overton, who was the head of the Training Division at that time. (08/15/05 Plaintiff Grievance to Overton, Ex. 33, at 1; *see also* July 20, 2010 Deposition of Chief Timothy D. Overton, attached at Exhibit 34, at 25-27). Therein, Plaintiff alleged he was being denied his constitutional right to "freedom of religion" because he had been forced to shave his beard. (08/15/05 Plaintiff Grievance to Overton, Ex. 33). | Undisputed. |
| 137 | Chief Overton responded the same day, and advised that he had reviewed the grievance along with relevant OSHA regulations, and noted that § 1910.134 mandated that "the employer SHALL NOT permit respirators with tight-fitting facepieces to be worn by employees who have; facial hair that comes between the sealing surfaces of the facepiece and the face or that interferes with valve function …" (08/15/05 Plaintiff Grievance to Overton, Ex. 33, at 2) (emphasis in original). Chief Overton noted that enforcement of that regulation was "for the safety of the user, other [d]etention [o]fficers and the inmates." (*Id.*). | Undisputed. |
| 138 | On August 24, 2005, Plaintiff appealed Chief Overton's response on the August 15, 2005 grievance to Sheriff Arpaio. (Plaintiff's MCSO Grievance to Sheriff Arpaio dated August 24, 2005, attached at Ex. 35, at 1; Sheppard Aff., Ex. 9, at ¶ 15). Therein, Plaintiff details his three meetings with Commander Shaw, beginning with their initial meeting on July 28, 2005, | Disputed in so far as Defendants mischaracterize Mr. Fazlovic's statements in his grievance.  Mr. Fazlovic referred Sheriff Arpaio to a case in Washington, D.C., in which a District Court judge ruled that the Fire department must accommodate the religious needs of employees whenever possible and allow the Muslim firefighters to take a fit-test and |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
|  | during which Plaintiff indicates he was told that he "could not keep [his] beard due to the safety concerns." (*Id.*) Plaintiff asked Sheriff Arpaio to review a case out of Washington, D.C. in which three Muslim firefighters sued their department and prevailed. (*Id.*). | continue to work as firefighters if they pass.  DSOF, Ex. 35.   The Grievance speaks for itself.  *See* Fed.R.Evid. 1002. |
| 139 | Because it raised allegations of religious discrimination, Plaintiff's August 24, 2005 grievance appeal was forwarded to Chief Sheppard, as the head of MCSO's ELC Division, for processing. (Sheppard Aff., Ex. 9, at ¶ 15). MCSO asked Plaintiff for additional time to consider his August 24, 2005 grievance, primarily to allow the Office to research the court case he had referenced in his appeal, and to research the types of equipment the entities cited in the case used so as to obtain clarification on any information gathered from ADOSH. (Id. at ¶¶ 16-18). | Undisputed that Sheppard's Affidavit states as noted. |
| 140 | On September 6, 2005, Chief Sheppard, Captain Mason, and Commander Shaw met to discuss the court decisions in two cases Plaintiff had presented to MCSO. (Sheppard Depo., Ex. 5, at 82-83, 104-105; *see also* Mason Depo., Ex. 4, at 75-76). | Undisputed. |
| 141 | Captain Mason was asked to perform additional research in follow-up to the meeting and, on September 8, 2005, he circulated a memorandum by email that detailed information related to the D.C. and Philadelphia Muslim firefighter cases that were discussed at the September 6, 2005 meeting. (Mason Depo, Ex. 4, at 75-76). This research involved investigating the type of equipment used by the D.C. and | Disputed in so far as it mischaracterizes what is stated in the email.  Plaintiff objects to this statement in so far as it is not supported by the best evidence – the September 1, 2005 email – which shows what Mason was asked to do prior to the meeting.  *See* Fed.R.Evid. 1002. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | Philadelphia entities. |  |
| 142 | Sometime in mid-September 2005, Plaintiff provided MCSO with an article from the Council on American Islamic Relations' ("CAIR") website which discussed issues related to accommodation of the Muslim religious practice of having a beard in connection with an employer's use of tight-fitting facepiece SCBAs. Commander Shaw forwarded the information to Captain Mason, and asked that he review it and ascertain if there were any respiratory protection alternatives to accommodate facial hair, that would nevertheless meet the needs of the detention officer position. Captain Mason was also asked to evaluate whether loose-fitting hoods or helmets would work for detention officers. (Shaw Depo., Ex. 16, at 145-148; MCSO 02558UR). | Undisputed that Plaintiff provided MCSO with an article from the Council on American Islamic Relations (CAIR). Plaintiff disputes the remainder of this statement because it is not supported by Defendants' citation to the record. Shaw testified that she did not know if she had forwarded the information to Captain Mason.  DSOF, Ex. 16, Shaw Dep. 147:11-13. |
| 143 | Then, on September 15, 2005, Captain Mason reissued his memorandum on information related to the D.C. and Philadelphia firefighters case research he had performed, and in so doing, included various additional information, including standards from NIOSH, and the NRC. | Disputed in so far as Defendants provide no citation to the record that supports this statement. |
| 144 | On September 27, 2005, Chief Sheppard, Chief Sheridan, County counsel Clarisse McCormick, Captain Mason, Lieutenant Bill Wiscombe (from Safety,) Captain Penny Babb, and Chief Jesse Locksa (both from Training) met again to discuss issues raised by Plaintiff's request for accommodation. (Sheppard Depo., Ex. 5, at 106; Shaw Depo., Ex. 16, at 148-152). This meeting was in follow-up to | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | the September 6, 2005 meeting and was held, in part, to discuss the research Captain Mason was directed to perform following the initial September 6th meeting. (Mason Depo., Ex. 4, at 81:9-25 – 82:1-4). | |
| 145 | One of the issues discussed again at the September 27, 2005 meeting were the OSHA regulations that applied to an employer's use of a tight-fitting facepiece SCBA and an employee's facial hair when using that type of equipment, as those regulations applied to Plaintiff's request. (Shaw Depo., Ex. 16, at 150-151). | Disputed in so far as Defendants mischaracterize Shaw's testimony. Shaw only testified that there was some discussion at the September 27, 2005 meeting about OSHA regulations. DSOF, Ex. 16, Shaw Dep. 150:22-151:2. |
| 146 | Following the September 27, 2005 meeting, additional research was performed. For instance, Chief Sheppard researched whether the Phoenix Fire Department and/or the Phoenix Police Department would assist MCSO detention officers in the event of emergency involving risk of bodily harm and/or violent conflict to responding personnel. (Sheppard Aff., Ex. 9, at ¶¶ 20-22). | Undisputed that Chief Sheppard's affidavit states as noted. |
| 147 | Chief Sheppard concluded, based on her research, that the Phoenix Fire Department would not respond to a fire or other emergency in a jail where inmates were not under control. (Sheppard Aff., Ex. 9, at ¶¶ 20-22). Similarly, pursuant to relevant policies, Phoenix Fire personnel would not be available to assist MCSO detention officers in the evacuation or rescue of inmates in an unstable environment. (*Id.* at ¶¶ 20-22; see also Sheridan Aff., Ex. 2, at ¶ 22). | Undisputed. |
| 148 | Chief Sheppard also personally | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | contacted the National Institute of Corrections. (Sheppard Depo., Ex. 5, at 135:2-9). She asked for input and assistance in researching the requested accommodation and equipment issues. (*Id.* at 135:23-25). | |
| 149 | MCSO also sought assistance, and gathered input from, the Large Jail Network ("LJN"), which is a group of jail administrators organized by the National Institute of Corrections. (Sheppard Depo., Ex. 5, at 85:1-14, 87:16-25 – 88:1-2). | Undisputed. |
| 150 | Further, On November 14, 2005, Commander Shaw sent an email to Jesus Maeda of ADOSH asking him to answer the following questions:<br><br>▪ Whether there was any equipment available that MCSO could use in the confines of a jail facility that would accommodate Plaintiff, while also allowing him to meet the requirements of his job;<br><br>▪ Whether ADOSH anticipated any changes to 29 CFR § 1910.134; and<br><br>▪ "Given that we are determining if a reasonable accommodation is available, what are the consequences of non-compliance with 29 CFR §1910.134?"<br><br>(Shaw Depo., Ex. 16, at 80:13, 21-23). | Disputed in so far as the citation to the record does not support this statement. Plaintiff objects to any use of this statement because it is not supported by the original email, which is the best evidence of what may have been communicated to ADOSH. *See* Fed.R.Evid. 1002. |
| 151 | On December 7, 2005, Captain Mason followed-up with Mr. Maeda by phone and was advised:<br><br>▪ That Mr. Maeda was not aware of any equipment that would | Disputed in so far as the citation to the record does not support this statement. Plaintiff objects to any use of this statement because it is not supported by the original email communications, |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | allow an employee to perform the requirements of Essential Job Task L with a beard that comes between the sealing surface of the respirator and the face or that interferes with the valve function.<br><br>▪ That there were no anticipated changes to § 1910.134.<br><br>▪ That if MCSO "permitted a violation of 29 CFR 1910.134 in regard to beards and an employee got injured, Mr. Maeda would consider it to be a willful violation."<br><br>(Shaw Depo., Ex. ___, at 80:11-25 – 82:12; *see also* December 7, 2005 Email String between Commander Shaw, Jesus Maeda, and Captain Mason, attached at Exhibit ____, at 1-2. | which is the best evidence of what may have been communicated to and from ADOSH.  *See* Fed.R.Evid. 1002. |
| 152 | On December 8, 2005, Captain Mason emailed Chief Sheppard and advised that ADOSH could levy fines against MCSO for OSHA noncompliance and further stated that such fines could be imposed on a daily basis for any continuing violation not rectified after a correction date. (December 8, 2005 Email String from Captain Mason to Chief Sheppard, attached at Exhibit 37). | Undisputed that Mason's December 8, 2005 email states as noted. |
| 153 | On January 25, 2006, after conducting significant additional research on Plaintiff's request, re-consulting with ADOSH, and seeking input from other jail resources, MCSO responded to Plaintiff's August 24, 2005 grievance. (*See* Sheppard Aff., Ex. 9, at ¶¶ 19-23; January 25, 2006 Memorandum from | Undisputed except in so far as Defendants characterize their actions as "significant."  *See* PSOF 171; Fazlovic Decl., Dkt. 202, ¶¶ 29-45, 62-65. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | Chief Deputy David Hendershott to Plaintiff, attached at Exhibit 38). Pursuant to regular MCSO human resources and personnel practice, the memorandum responding to Plaintiff's August 2005 grievance appeal was prepared by Chief Sheppard and Commander Shaw, and was signed off on by Chief Deputy David Hendershott. (Sheppard Aff., Ex. 9, at ¶¶ 24-25). | |
| 154 | Chief Hendershott's January 25, 2006 Grievance Response to Plaintiff detailed MCSO's research of Plaintiff's requested religious accommodation, and the information that led to its determination that it could not grant him his requested religious accommodation. First, Chief Hendershott addressed the relevant background on the issue – namely discussing the Essential Job Tasks of detention officers, including task L, and the concomitant requirement regarding the use of SCBAs with tight-fitting facepieces, as established by OSHA and enforced by ADOSH. (01/25/06 Hendershott Memo to Plaintiff, Ex. 38, at 1). Specifically, the memo indicates that per OSHA and ADOSH regulations, "when wearing a SCBA, the officer must be clean shaven so that the facial hair does not come between the sealing surface of the facepiece and the face, or interfere with the valve function. (*Id*. at 1). | Undisputed that Hendershott's January 25, 2006 Memorandum states as noted. Plaintiff, however, disputes the conclusions reached in the Memorandum. *See* PSOF 188, 190-93. There is nothing in the OSHA regulations requiring an officer to be "clean shaven." PSOF 191. |
| 155 | Chief Hendershott went on to advise that MCSO had performed extensive research, and determined the following:<br><br>▪ That Job Task L is a "core job function for all detention officers;" | Undisputed that Hendershott's Memorandum states as noted. Plaintiff, however, disputes Defendants characterization of their research as "extensive." *See* PSOF 171; Fazlovic Decl., Dkt. 202, ¶¶ 29-45, 62-65. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | ▪ That staffing levels within the Detention Bureaus had been historically low, leaving the jails understaffed, which, in turn, placed "the burden of care, custody, and control of all inmates on every available officer." This fact "le[ft] no room for someone that cannot perform the essential functions of a detention officer on a permanent basis." | |
|     | ▪ That other states and entities addressing similar religious accommodation issues were not all subject to OSHA's regulations on respiratory equipment and use with facial hair. By contrast, MCSO was responsible for following federal OSHA standards on the use of SCBAs. | |
|     | ▪ That the alternative equipment Plaintiff had proposed he be allowed to use, and which he had provided information on, was not appropriate for use in jail environments. Specifically, MCSO had determined that the hooded respirators that Plaintiff suggested be used to accommodate his desire to wear a beard, were not designed to "withstand extended exposure to smoke and heat from a fire." | |
|     | ▪ That MCSO had researched Phoenix Fire Department policies, as that issue related to determining "whether detention officers would, in fact, be | |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | responsible for controlling or evacuating inmates in the event of a fire or other emergency actions where inmate actions could result in an unstable situation." And, MCSO determined that the Fire Department's policies prevented Phoenix Fire personnel from assuming any responsibility for inmates in the event of fire or other emergency resulting in an unstable situation. | |
|     | ▪ That the August 2005 advice and guidance of ADOSH regarding 29 C.F.R. § 1910.134 was of "paramount significance," and that ADOSH told MCSO that OSHA regulations do not allow an employer to permit respirators with tight-fitting facepieces to be worn by employees with facial hair that will interfere with the sealing surface of the mask with the face, or its valve function. | |
|     | ▪ That, according to ADOSH, § 1910.134 makes no exception to allow use of tight-fitting facial hairs with beard, *even where a good fit test has been achieved by an employee with a beard*. Per ADOSH, facial hair growth is highly variable, and therefore passage of a fit test one day was not a guarantee of safe use the next. | |
|     | ▪ That MCSO had contacted ADOSH more than once to seek guidance on addressing | |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | Plaintiff's request, and that during consultation with ADOSH in November 2005, ADOSH confirmed it did not know of any equipment MCSO could use to accommodate Plaintiff, that there were no expected changes to the regulation which would allow religious accommodation, and that if the office allowed an employee to wear a tight-fitting SCBA with a beard, it would be engaging in a willful violation of OSHA standards. | |
| | ▪ That if MCSO violated OSHA standards, it could be cited not less than$5,000.00 and not more than $70,000.00. | |
| | ▪ That MCSO personnel met with an investigator from the Council on American-Islamic Relations related to your requested accommodation. During that meeting, CAIR advised MCSO of two individuals who were not in compliance with MCSO's facial hair restrictions and requirements. | |
| | ▪ That, in response, MCSO determined that one of the individuals was not a detention officer and therefore occupied a position that allowed beard growth. The other individual was a determined his mustache beyond allowable limits. This individual was promptly ordered into compliance. | |
| | (01/25/06 Hendershott Memo to | |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | Plaintiff, Ex. 38, at 2-5; *see also* Sheppard Aff., Ex. 9, at ¶¶ 26). | |
| 156 | Based on MCSO's research related to Plaintiff's requested accommodation and the results thereof, Chief Hendershott indicated that MCSO had determined all officers needed to be able to perform Essential Function L, particularly in light of staffing levels. Alternative equipment was not available that would provide adequate protection in light of workplace factors present in MCSO jails. Thus, because MCSO detention officers must be able to use SCBAs with tight-fitting facepieces, and OSHA precludes the use of such equipment with beards that interfere with the seal or the facepiece seal, Plaintiff could not be allowed to have a full beard and work as a detention officer. (01/25/06 Hendershott Memo to Plaintiff, Ex. 38, at 5). | Undisputed that Hendershott's January 25, 2006 Memorandum states as noted. Plaintiff, however, disputes the conclusions reached in the Memorandum. *See, e.g.,* PSOF 188, 190-93. |
| 157 | The January 25, 2006 Grievance Response concluded by advising Plaintiff that MCSO "values its employees and makes every effort to reasonably accommodate religious beliefs. Should you decide that you cannot meet the facial hair requirements for a detention officer, you may request that we begin the process to determine the availability of another position within MCSO, for which you are qualified, that will permit you to maintain a beard." (01/25/06 Hendershott Memo to Plaintiff, Ex. 38, at 5). | Disputed in so far as Defendants may infer that Defendants actually sought to find an alternative position to accommodate Mr. Fazlovic. The memorandum only states that this would later be possible. DSOF, Ex. 38 at 5. Plaintiff disputes and Defendants provide no evidence showing that Defendants sought to find another position to accommodate Mr. Fazlovic's religious beliefs. PSOF 145; Fazlovic Decl., Dkt. 200, ¶¶ 45-49, 51, 65-69. In fact, the undisputed evidence shows that Defendants rejected all of Mr. Fazlovic's requests for reassignment to another position. *See* DSOF 163-168. |
| 158 | Plaintiff received Chief Deputy | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | Hendershott's memo on January 30, 2006. (01/25/06 Hendershott Memo to Plaintiff, Ex. 38, at 5). The next day, Plaintiff contacted Commander Shaw to initiate the job reassignment process. (Shaw Aff., Ex. 23, at ¶ 15). | |
| 159 | On February 1, 2006, Commander Shaw followed up on Plaintiff's request to begin the reassignment process with a memorandum. (Shaw Aff., Ex. 22, ¶¶ 15-16; *see also* February 1, 2006 Memorandum from Tiffani Shaw to Plaintiff Re: Job Reassignment, attached at Exhibit 39). Commander Shaw advised Plaintiff that she had attached MCSO Job Postings to her memo, to assist Plaintiff in exploring other positions available to him in the Office. (02/01/06 Shaw Memo to Plaintiff, Ex. 39). She also reminded Plaintiff that he should check the County's recruitment website, and provided him with the web address for doing so. (*Id.*). Commander Shaw attached fifty-two pages of Job Postings to her memo. (*Id.*). | Undisputed. However, it is important to note that there is no evidence that Defendants ever considered Mr. Fazlovic for any of these positions, and Defendants rejected all of Mr. Fazlovic's requests for reassignment to other positions. *See* PSOF 145; Fazlovic Decl., Dkt. 200, ¶¶ 45-49, 51, 65-69; DSOF 163-168. |
| 160 | Commander Shaw further advised Plaintiff that if he were interested in any of the specific positions for which she had provided information, he was to contact her so she could begin arranging any necessary assessments with County Human Resources, or initiate transfer paperwork. (02/01/06 Shaw Memo to Plaintiff, Ex. 40). Plaintiff was advised that the reassignment process would last for a maximum of thirty (30) days. (*Id.*). | Undisputed. |
| 161 | By email dated February 8, 2006, Plaintiff confirmed receipt of the packet of information to facilitate his | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | exploration of other positions within MCSO and indicated he would be in contact with Commander Shaw to discuss potential reassignment. (Shaw Aff., Ex. 23, at ¶ 17). | |
| 162 | In spite of the suggestion that he wanted to pursue a possible reassignment, Plaintiff remained in his position as a detention officer. (Shaw Aff., Ex. 23, at ¶ 17). | Disputed in so far as it is not supported by the citation to the record.  In addition, Plaintiff made multiple requests for reassignment or transfer that were denied.  *See* PSOF 145; Fazlovic Decl., Dkt. 200, ¶¶ 45-49, 51, 65-69; DSOF 163. |
| 163 | On July 20, 2006, Plaintiff filed a Transfer Request Memorandum in which he sought transfer to the Transportation Division. (Affidavit of Kelly Grennan, attached at Exhibit 40, at ¶¶ 7-8; see also July 20, 2006 Transfer Request Memorandum from Plaintiff to Personnel Division, Division Commander, attached at Exhibit 41). | Undisputed. |
| 164 | At the time Plaintiff filed his Transfer Request Memo, he was not eligible for transfer. (Grennan Aff., Ex. 40, at ¶ 8). MCSO policy only allows employees who have successfully completed their probationary period to seek a transfer. (*Id.* at ¶ 8). The probationary period for detention officers is one year. (*Id.* at ¶ 8). | Undisputed that Defendants informed Plaintiff that he was not eligible for a transfer to the Transportation Division because he had not been employed for a year.  See PSOF 145.  Plaintiff disputes, however, that he was not eligible for a transfer.  PSOF 146-50; Fazlovic Decl., Dkt. 200, ¶ 48.  Defendants could have arranged a transfer to accommodate his religious beliefs.  PSOF 149-51, 158-67. |
| 165 | Plaintiff was advised by his supervisor that, by policy, he was not yet eligible for transfer, but that he could reapply in October 2006. (07/20/06 Transfer Request, Ex. 41). | Undisputed in so far as Mr. Fazlovic's supervisor told him that he was not eligible for a transfer.  Plaintiff, however, disputes that his supervisor informed him that he could reapply in |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | October 2006.  PSOF 145-147; Fazlovic Decl., Dkt. 200, ¶¶ 47-48. Defendants' citation to the record, which only includes an unidentified handwritten note on Fazlovic's transfer request, does not support this assertion. |
| 166 | Even if Plaintiff had been eligible for this transfer, however, he would not have been allowed to wear a beard because he would have still been a detention officers, and "all full-duty detention officers … regardless of the assignment they are working within the Sheriff's Office, must be able to respond to [an] emergency to ensure the care, custody and control of inmates." (Sheppard Depo., Ex. 5, at 163:5-17). | Disputed.  Plaintiff disputes that Plaintiff would have been ineligible for the transfer because Defendants' concern regarding use of an SCBA would be non-existent in the Transportation Department.  PSOF 104, 134, 142-47.  Plaintiff also disputes that all full-duty DOs must be able to respond to an emergency, regardless of assignment.  *Id*.; see also PSOF 133-35, 148. |
| 167 | On October 3, 2006, Plaintiff sought another transfer. (Grennan Aff., Ex. 40, at ¶ 9). As he had done in July, he addressed his transfer request to "Personnel Division, Division Commander," but this time requested a transfer to Jail Intel. (*See* October 3, 2006 Transfer Request Memorandum from Plaintiff to Personnel Division, Personnel Commander, attached at Exhibit 42; *see also* Grennan Aff., Ex. 40, at ¶¶ 9-10) | Undisputed. |
| 168 | Like a transfer to Transportation, a transfer to Jail Intel would not have provided Plaintiff the accommodation he sought, because, again, he would have still been a detention officer, and therefore would still be required to be able to respond to a jail emergency, including having the capability of wearing an SCBA with a tight-fitting facepiece. (Sheppard Depo., Ex. 5, at 1665:15-25). | Disputed.  Plaintiff disputes that Plaintiff would have been ineligible for the transfer to Jail Intel because Defendants' concern regarding use of an SCBA would be non-existent in Jail Intel.  PSOF 104, 133-34, 137.  Plaintiff also disputes that all full-duty DOs must be able to respond to an emergency, regardless of assignment. *Id*.; *see also* PSOF 133-35, 148. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 169 | On December 20, 2006, Plaintiff sent a memorandum to Commander Larry Hutcheson, the Commander of LBJ and Food Factory – the subject of the memo was "Bad work environment/religious request." (Sheppard Aff., Ex. 9, at ¶¶ 27-28; December 20, 2006 Plaintiff Memorandum to Commander Hutcheson, attached at Ex. 43). | Undisputed. |
| 170 | Therein, Plaintiff requested a transfer to a different place or different position within MCSO due to "unprofessional behavior" of his coworkers, which he defined as excessive use of profanity in the workplace. (12/20/06 Memo from Plaintiff to Commander Hutcheson, Ex. 43). He also again requested an exemption from the "'facial hair policy,'" and referenced a civilian employee that also worked at the Food Factory who was allowed to wear a beard, due to an exemption he received to MCSO's facial hair policies. (*Id.*). | Undisputed. |
| 171 | Plaintiff noted in his December 20, 2006 memo to Commander Hutcheson that he had previously addressed the profanity issue with his supervisor, Lieutenant Mike Hall, and that Lieutenant Hall had issued a memorandum addressing the issue, nothing had changed. (12/20/06 Memo from Plaintiff to Commander Hutcheson, Ex. 43). | Undisputed. |
| 172 | Then, on December 23, 2006, Plaintiff showed up for his shift at the Food Factory following regularly scheduled days off and was not shaved. (Shaw Depo., Ex. 16, at 168-170). | Disputed in so far as this statement is not supported by Defendants' citation to the record.  There is nothing in the cited portion of Shaw's deposition that mentions that Mr. Fazlovic was unshaven.  Mr. Fazlovic decided to regrow his beard after multiple attempts |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | to obtain a religious accommodation because he could no longer continue to live in shame and regret.  Fazlovic Decl., Dkt. 200, ¶¶ 24-35. |
| 173 | On this same day, Plaintiff submitted another memorandum, this time on the subject of "Facial Hair" to Sergeant Scott Wardlaw, which again addressed Plaintiff's request to be exempted from MCSO's facial hair requirements for detention officers. Plaintiff's memo referenced both GC-19, the grooming policy, and CP-10, the respirator policy. Plaintiff claimed that the older version of CP-10 did not prohibit facial hair and that GC-19's prior version similarly did not contain any restrictions that would have applied to him and precluded his wearing a beard. (Shaw Aff., Ex. 22, at ¶ 22). | Undisputed. However, Plaintiff objects to any use of this statement because it is not supported by the original memorandum, which is the best evidence of what Mr. Fazlovic stated. *See* Fed.R.Evid. 1002. |
| 174 | On December 27, 2006, Lieutenant Kimberley Thompson, the Commander of Institutional Services as of December 2006, called Commander Shaw and advised that Plaintiff had shown up to work on December 23, 2006 unshaved, and that since then he had refused to shave, and had ignored director orders from Lieutenant Hall to shave. (Shaw Aff., Ex. 22, at 18). | Disputed.  Plaintiff objects to any use of this statement in so far as it is based upon inadmissible hearsay.  *See* Fed.R.Evid. 801-03. There is no credible evidence in the record to support this statement. *See, e.g.,* Fazlovic Decl., Dkt. 200, ¶¶ 33-36. |
| 175 | He was placed in a no-contact position in the Security Tower. (Shaw Depo. at 168-170; *see also* Shaw Aff., Ex. 23, at ¶¶ 19-20). | Undisputed. |
| 176 | On January 2, 2007, Chief Sheppard issued a letter to Plaintiff in response to his December 20, 2006 memo to Commander Hutcheson. (Sheppard Aff., Ex. 9, at ¶¶ 29, 34; *see also* January 2, 2007 Letter from Chief | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | Sheppard to Plaintiff, attached at Exhibit 44). | |
| 177 | Therein, Chief Sheppard recounted the two prior detailed documents MCSO had provided to Plaintiff (the August 2005 Memo from Commander Shaw and the January 2006 Grievance Response from Deputy Chief Hendershott) related to his request for religious accommodation and MCSO's reasons for denying that accommodation. (01/02/07 Sheppard Letter to Plaintiff, Ex. 44, at 1-2; see also Sheppard Aff., Ex. 9, at ¶¶29). Specifically, Chief Sheppard's letter reiterates that MCSO determined all detention officers need to be able to perform the detention officer essential tasks, and that a shortage in staffing made that especially true. (01/02/07 Sheppard Letter to Plaintiff, Ex. 44, at 1; see also Sheppard Aff., Ex. 9, at ¶¶ 30). | Undisputed. |
| 178 | She further explained that the relevant law, along with concerns related to officer, inmate, and staff safety were involved in the decision to deny Plaintiff's request.(01/02/07 Sheppard Letter to Plaintiff, Ex. 44, at 1-2; see also Sheppard Aff., Ex. 9, at ¶¶29, 32). Chief Sheppard's letter also advised Plaintiff that MCSO again contacted ADOSH in November 2005, to ascertain if ADOSH was aware of any new information that would bear on Plaintiff's request, but that MCSO was told ADOSH's position had not changed. (01/02/07 Sheppard Letter to Plaintiff, Ex. 44, at 1-2; see also Sheppard Aff.,Ex. 9, at ¶ 32). | Undisputed that a letter was sent to Mr. Fazlovic from Tiffani Shaw on or about January 2, 2007.  Plaintiff objects to this statement in so far as it may be inconsistent with what is stated in the letter.  See Fed.R.Evid. 1002.  Plaintiff also notes that this letter, like other correspondence from Defendants in 2007, merely refers back to decisions and conclusions that were made in 2005 when Mr. Fazlovic first raised many of the same issues with Defendants.  See DSOF, Ex. 44.  Plaintiff, however, disputes the conclusions noted in the letter.  See, e.g., PSOF 139, 144, 182-83, 185, 209, 211, 218, 221. |
| 179 | Chief Sheppard concluded by | Disputed that this was the first time |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | reiterating that MCSO valued its employees –and Plaintiff – and suggesting to Plaintiff that he could remain a detention officer if he shaved, or that he could now avail himself of the assistance of the Office in finding a suitable non-detention officer position. (01/02/07 Sheppard Letter to Plaintiff, Ex. 44, at 1-2; *see also* Sheppard Aff., Ex. 9, at ¶¶ 31, 33). Plaintiff was also told, under for the first time, that if he did not either come into compliance with the facial hair requirements for his existing position, or participate in the process for finding another one, he would be subjected to disciplinary action for policy violations. (01/02/07 Sheppard Letter to Plaintiff, Ex. 44, at 1-2*; see also* Sheppard Aff., Ex. 9, at ¶¶ 33). | Plaintiff was told that if he did not come into compliance with the facial hair requirements he would be subjected to disciplinary action. Plaintiff was told multiple times prior to this that if he did not comply and shave his beard that he could not be a detention officer and was threatened with termination. *See, e.g.,* Fazlovic. Decl., Dkt. 200, ¶¶ 14, 20-22; DSOF, Ex. 31. |
| 180 | Then, on January 20, 2007, Commander Shaw issued a memorandum to Plaintiff in which she addressed Plaintiff's December 23, 2006 request for exemption from the facial hair restrictions and job reassignment issues. (Shaw Depo. at 91:21-25; 93:10-12). Commander Shaw noted that Plaintiff had contacted her on January 3, 2007, and advised that he had decided not to shave and remain a detention officer. (Shaw Aff., Ex. 22, at ¶¶ 23-24). | Undisputed. |
| 181 | Commander Shaw issued the January 20, 2007 memo to Plaintiff to reinitiate the job reassignment process. (Shaw Aff., Ex. 22, at ¶ 24). She provided Plaintiff with MCSO Job Postings. (*Id.* at ¶ 25). And, to further facilitate Plaintiff's ability to explore other positions, he was given a temporary exemption from the no-beard | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|  | requirements, and assigned to an interim administrative assignment in SIMS, with no loss of pay. (*Id*. at ¶ 24). |  |
| 182 | Plaintiff's interim administrative assignment was intended to last thirty (30) days, or until February 18, 2007. (Shaw Aff., Ex. 22, at 4). Instead, Plaintiff stayed in the interim administrative SIMS assignment until October 9, 2007, continuing to be paid at his detention officer rate of pay, and enjoying an ongoing exemption to the facial hair restrictions applicable to detention officers. (*See* October 3 – 17, 2007 Email String between Plaintiff, Commander Shaw, and Lieutenant Charles Kohlhase, attached at Exhibit 45, at 5; Shaw Depo., Ex. 16, at 145:11-19). | Undisputed. |
| 183 | Commander Shaw issued a second memorandum dated January 20, 2007 to Plaintiff in which she addressed Plaintiff's allegations regarding the civilian employee working in the Food Factory who was provided an exemption to applicable grooming standards and was allowed to wear a beard. (Shaw Aff., Ex. 22, at ¶¶ 26-27, 30*; see also* January 20, 2007 Memorandum from Tiffani Shaw to Plaintiff, attached at Exhibit 46). | Undisputed. |
| 184 | Therein, Commander Shaw explained that this other employee (Jame Alexander) was a civilian, not a detention officer, was therefore not responsible for responding to emergency situations that might require the physical restraint of combative inmates, lifting or carrying inmates in a medical crisis, or putting on an air pac for safety in emergencies. (Shaw Aff., | Undisputed that this is what Shaw stated in her January 20, 2007 Memorandum. |

71

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | Ex. 22, at ¶ 27-29; *see also* 01/20/07 Memo from Commander Shaw to Plaintiff, Ex. 46). | |
| 185 | As a result, the civilian employee at issue was not required to fit test on an SCBA, or be able to don a tight-fitting mask, and therefore the OSHA restrictions for use of such equipment did not apply. (Shaw Aff., Ex. 22, at ¶ 28; *see also* 01/20/07 Memo from Commander Shaw to Plaintiff, Ex. 46). This enabled MCSO to grant him an exemption from GC-19, the only policy applicable to him as a civilian. (Shaw Aff., Ex.22, at ¶¶ 11, 27-28; *see also* 01/20/07 Memo from Commander Shaw to Plaintiff, Ex. 46). | Undisputed except to the extent that it infers that Defendants could not provide Plaintiff with the same accommodation.  *See* PSOF 28, 46, 190-93, 200-04. |
| 186 | MCSO was already aware of, and had looked into, the allegation that this civilian employee – James Alexander – was allowed the same type of accommodation or exemption Plaintiff sought. (Shaw Aff., Ex. 22, at ¶¶ 10-11). Indeed, in November 2005, MCSO officials, including Commander Shaw and Chief Sheppard, met with representatives from the Council on American-Islamic Relations ("CAIR"), who wanted to address their concerns that MCSO was discriminating against Plaintiff. During the meeting, the CAIR representatives advised MCSO of two employees, one of whom was Alexander, who they alleged had been granted an accommodation or exemption from no beard policies, and suggested Plaintiff should be treated the same. (Shaw Aff., Ex. 22, at ¶¶ 10-11). | Undisputed.  Plaintiff notified Defendants that James Alexander was allowed the same type of accommodation that Plaintiff was seeking.  *See, e.g.,* Fazlovic Decl., Dkt. 200, Ex. 7.  Nevertheless, Defendants denied Plaintiff the same accommodations that were provided Mr. Alexander. |
| 187 | In fact, the issue was addressed in Chief Deputy Hendershott's January | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
|  | 25, 2006 Grievance Response to Plaintiff, thought Alexander's name is not used. (*See* 01/25/06 Grievance Response from Chief Deputy Hendershott to Plaintiff, Ex. 38). |  |
| 188 | MCSO also learned, in investigating the claims from CAIR, that there was a single detention officer who had a mustache longer than that which was permitted by the relevant MCSO policies. (Shaw Aff., Ex. 22, at ¶ 22). Upon identifying this individual, MCSO required him to shave some of the length of his mustache to come into compliance with the requirements of GC-19, which he did. (*Id.* at ¶ 12).e | Undisputed. |
| 189 | On February 2, 2007, Plaintiff sent a memorandum to Commander Shaw, seeking further information and clarification regarding the job assignment process she had outlined in the first of her two January 20, 2007 memos to him. (Shaw Aff., Ex. 22, at ¶¶31, 33; *see also* February 2, 2007 Memorandum from Plaintiff to Commander Shaw dated February 2, 2007, attached at Exhibit 47). | Undisputed. |
| 190 | Plaintiff advised Commander Shaw that he thought MCSO should authorize a permanent assignment for him to SIMS, in his capacity as a detention officer, and that he should continue to receive his detention officer rate of pay. (02/02/07 Memo from Plaintiff to Commander Shaw, Ex. 47, at 1). He also expressed his belief that there were many other areas and tasks which detention officers were assigned "where D.O.'s [sic] don't necessarily have to comply with GC-19, such as Jail Intel …." (*Id.*). | Undisputed. |

73

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| 191 | Plaintiff also again raised work environment issues related to his time in the, again indicating his belief that he had been discriminated against and sexually harassed, but pointing to much of the same conduct as proof of that discrimination and harassment that he had before, such as the use of profanity by coworkers. (02/02/07 Memo from Plaintiff to Commander Shaw, Ex. 47, at 1; Shaw Aff.,Ex. 22, at ¶ 32). | Undisputed. |
| 192 | Though Plaintiff reiterated his prior complaints about profanity, and noted that the bad, unprofessional work environment and sexual harassment, which he explained related to the profanity that occurred on a daily basis to include, "Fuck you, son of a bitch, mother fucker [sic] …," his memorandum seemed to potentially raise new issues. In particular, Plaintiff raised allegations regarding discrimination, related to his interactions with coworkers, whom he claimed were spreading false rumors about him regarding "bad performance," and involving a disagreement with a fellow detention officer involving the Bosnian war. (02/02/07 Memo from Plaintiff to Commander Shaw, Ex. 47, at 1). | Undisputed. |
| 193 | Plaintiff requested immediate transfer on December 20, 2006. (*Id.*). And, Plaintiff acknowledged receiving the response to his request for information on James Alexander, but indicated his disagreement with MCSO's position taken that the two employee's requests were different and therefore were treated differently; he again suggested that he was entitled to the same | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | exemption. (02/02/07 Memo from Plaintiff to Commander Shaw, Ex. 47, at 1-2). | |
| 194 | In processing Plaintiff's request for accommodation contained in his memo dated February 2, 2007, Commander Shaw recognized that some of Plaintiff's allegations about the workplace may have constituted new information. She therefore sent a memorandum to Chief Sheppard on March 6, 2007, in which she identified Plaintiff's allegations of religious discrimination and sexual harassment. (Shaw Aff., Ex. 22, at 36; *see also* Sheppard Aff., Ex. 9, at ¶¶ 41, 43). | Disputed only in so far as the first statement is not supported by anything in the record. |
| 195 | Upon receipt, Chief Sheppard consulted with Chief Deputy Hendershott, who directed her to open an initial inquiry into Plaintiff's allegations and to assign the matter to Lieutenant Fred McCann. (Sheppard Aff., Ex. 9, at ¶ 42, 44). | Undisputed. |
| 196 | As part of the investigation into Plaintiff's allegations, Commander Shaw was directed to assist in this investigation and interviewed many of the parties involved, including Lieutenant Jerry Rosas, Sergeant Steven Pistor, Sergeant George Corcodel, Sergeant Scott Wardlaw, Officer Michael Hensell, and Lieutenant Mike Hall. (Shaw Aff., Ex. 22, at ¶ 37-18; Sheppard Aff., Ex. 9, at ¶ 1). | Undisputed. |
| 197 | On or about April 23, 2008, Commander Shaw began drafting the investigative report memorandum to Chief Sheppard regarding findings on Plaintiff's religious discrimination and | Undisputed. |

75

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|     | sexual harassment claims, as contained in his February 2, 2007 memo. (Shaw Aff., Ex. 22, at ¶ 39; *see also* April 23, 2008 Draft Investigation Memorandum from Commander Shaw to Chief Sheppard, attached at Exhibit 48). | |
| 198 | With regards to Plaintiff's claims that excessive profanity was being used in the workplace in violation of policy, the investigation determined that Plaintiff's commanding officers, including Lieutenant Hall, had attempted to address this with staff. (04/23/08 Investigation Memo, Ex. 48, at 2-3). The investigation concluded that MCSO supervisory staff had appropriately addressed Plaintiff's complaints about profanity. (*Id*.at 3-4) | Undisputed that Shaw's draft Memorandum states as noted. Plaintiff objects to the use of this memorandum in so far as it is admittedly a draft and not a copy of the final memorandum that was provided to Plaintiff and is based upon inadmissible hearsay. *See* Fed.R.Evid. 801-03, 1002-04. |
| 199 | Regarding Plaintiff's claims that officers had falsely accused him of misconduct as a result of his religion, the investigation determined that these claims were investigated by personnel within Food Services, and found that the Log Book on site had been used improperly to report that Plaintiff was allegedly leaving inmates unattended while he prayed. (04/23/08 Investigation Memo, Ex. 48, at 8). The employees making the comments in the Log Book were disciplined. (*Id*.). | Undisputed, that this is stated in the draft Memorandum, except to the extent that Defendants mischaracterize the fact that Officers Pablo and Larsen were counseled to mean that they were disciplined. DSOF, Ex. 48 at p. 7. Plaintiff objects to the use of this memorandum in so far as it is admittedly a draft and not a copy of the final memorandum that was provided to Plaintiff and is based upon inadmissible hearsay. *See* Fed.R.Evid. 801-03, 1002-04. |
| 200 | The investigation determined that none of Plaintiffs coworkers had ever complained about Plaintiff taking time to pray, but rather the complaints were related to Plaintiff's failure to notify his coworkers when he was leaving a work area to pray. (04/23/08 Investigation Memo, Ex. 48, at 8). | Undisputed that this is stated in the draft Memorandum. Plaintiff objects to the use of this memorandum in so far as it is admittedly a draft and not a copy of the final memorandum that was provided to Plaintiff and is based upon inadmissible hearsay. *See* Fed.R.Evid. 801-03, 1002-04. Plaintiff disputes, however, that he failed to notify his |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | | coworkers when leaving the work areas to pray, and Defendants have cited no evidence in the record supporting this unfounded accusation.  Mr. Fazlovic consistently received Employee Performance Appraisals stating that he met or exceeded performance standards.  Fazlovic Decl., Dkt. 200, ¶ 76. |
| 201 | Additionally, no evidence was prevented indicated Plaintiff was subjected to a hostile work environment based on religion. (04/23/08 Investigation Memo, Ex. 48, at 8). Plaintiff's only evidence regarding this claim was his "gut feeling" that his coworkers were prejudiced against him and his religion. (*Id*. at 8). | Undisputed that this is stated in the draft Memorandum.  Plaintiff objects to the use of this memorandum in so far as it is admittedly a draft and not a copy of the final memorandum that was provided to Plaintiff and is based upon inadmissible hearsay.  *See* Fed.R.Evid. 801-03, 1002-04.  In addition, this conclusion is insufficient to find that "no evidence was prevented [sic] indicated [sic] Plaintiff was subjected to a hostile work environment based on religion." *See Huynh*, 2008 WL 2789532 at *5.  There were multiple findings of facts noted in this draft memorandum from which a reasonable fact finder could find evidence of discriminatory animus.  First, "Sgt. Pistor told [Fazlovic] that he needed to adjust his behavior as profanity was the culture of law enforcement."  DSOF, Ex. 48 at p. 3, ¶7.  Second, Mr. Fazlovic's coworkers falsely accused him of leaving inmates unsupervised, refusing to do his job, hating females, and saying American soldiers killed his family members in Bosnia.  *Id*. at p. 4, ¶ 2.  Third, Mr. Fazlovic's coworkers wrote inaccurate entries about him in the Logbooks and made false complaints to their supervisor.  *Id*. at p. 7, ¶ 9.  Third, Mr. Fazlovic reported |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | | that a coworker ignored his greetings and would walk away from him and that he believed his coworkers ignored him because of his religion, background and/or accent. *Id.* at p. 8, ¶ 1. The fact that Mr. Fazlovic reported that he had a "gut feeling" that these instances arose because of his religion does not preclude them as evidence of such. *See id.* at p. 8, ¶ 1 |
| 202 | Overall, the investigation concluded that while some of Plaintiff's claims were founded – i.e. that profanity had been used by his coworkers, and that someone had improperly used the Log Book to report that he allegedly left inmates unattended – none of this conduct was based on, or constituted, religious discrimination or animus against Plaintiff. (04/23/08 Investigation Memo, Ex. 48, at 10-11). Similarly, the investigation did not find that Plaintiff had been harassed or subjected to a hostile work environment because of his religion. (*Id.*). Furthermore, the investigation did not find any facts suggesting that Plaintiff was ever subjected to sexual harassment. (*Id.*). | Undisputed that this is stated in the draft Memorandum. Plaintiff objects to the use of this memorandum in so far as it is admittedly a draft and not a copy of the final memorandum that was provided to Plaintiff and is based upon inadmissible hearsay. *See* Fed.R.Evid. 801-03, 1002-04. As noted in response to DSOF 201 and incorporated herein, Plaintiff disputes the conclusions as stated in the draft memorandum. |
| 203 | Though Commander Shaw revised her draft Investigative Memorandum before it was finalized, her ultimate conclusions contained in the April 23, 2008 draft that Plaintiff was not discriminated against on the basis of religion, was not subject to a religiously hostile work environment, and was not sexually harassed remained the same. (Shaw Aff., Ex. 22, at ¶ 40). | Undisputed that Shaw revised her draft Investigative Memorandum. Plaintiff objects to this statement in so far as it is an incomplete sentence and it is unclear what is being said. Plaintiff also objects to this statement in so far as it is not supported by the actual final copy of the Investigative Memorandum, which is the best evidence of Defendants' final conclusions. *See* Fed.R.Evid. 1002-04. |
| 204 | On April 7, 2007, Chief Sheppard | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     | prepared a memorandum, with Commander Shaw's assistance, in response to Plaintiff's February 2, 2007 memorandum in which he continued to ask, amongst other things, to receive detention officer pay, yet be assigned to SIMS, or elsewhere, where he would not need to be able to wear an SCBA with tight-fitting mask. (April 7, 2007 Memorandum from Chief Sheppard to Plaintiff, attached at Exhibit 49; Shaw Depo., Ex. 16, at 101:9-16; *see also* Sheppard Depo., Ex. 5, at 163:5-7). | |
| 205 | In her April 2007 Memo, Chief Sheppard advised Plaintiff that he could not be assigned to SIMS or Jail Intel because, as a full duty detention officer, he would have to be able respond to any emergency situation, even in such an assignment, and would still be responsible for the care, custody and control of inmates. (Sheppard Depo., Ex. 5, at 165:15-25; *see also* 04/07/07 Memo from Chief Sheppard to Plaintiff, Ex. 49, at 1). She noted, too, that all full duty detention officers needed to be capable of performing in an emergency because MCSO "has been and remains chronically understaffed with detention officers, …" (04/07/07 Memo from Chief Sheppard to Plaintiff, Ex. 49, at 3) | Undisputed that Chief Sheppard's April 2007 Memorandum states as noted. Plaintiff disputes, however, that he could not have been assigned to SIMS or Jail Intel. PSOF 133-39, 147-151. |
| 206 | Chief Sheppard also addressed Plaintiff's claims that his request for accommodation should be treated the same as James Alexander's. She explained that Alexander's request for an exemption from GC-19 was different from Plaintiff's request because civilian employees are not required to respond to emergency | Undisputed that Chief Sheppard's April 2007 Memorandum states as noted. Plaintiff disputes, however, that he could not have been given an accommodation similar to James Alexander. *See, e.g.,* PSOF 158-61; Fazlovic Decl., Dkt. 200, Ex. 7. Plaintiff further disputes that OSHA regulations prevented him from |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | situations, nor are they required to be able to wear and SCBA. (*Id*.). She explained that Plaintiff's request went far beyond a "grooming issue to the much larger issue of safety and compliance with OSHA regulations." (*Id*.). | maintaining a beard. PSOF 182, 185, 187-88, 190-93. |
| 207 | Chief Sheppard also addressed material regarding hooded and air-line respirators that Plaintiff provided along with his February 2, 2007 memo, and which Lieutenant Bill Wiscombe of the Safety Division had evaluated, indicating that MCSO had determined those types of respirators were either improper for use in an IDLH atmosphere, or improper for use in a jail setting, given workplace factors. (04/07/07 Memo from Chief Sheppard to Plaintiff, Ex. 49). | Undisputed that Chief Sheppard's April 2007 Memorandum states as noted. Plaintiff disputes, however, that Defendants could not have provided him with alternative equipment. S*ee* PSOF180-82, 205-211.  In addition, Defendants could have given Mr. Fazlovic an opportunity to take a fit test using a tight-fitting respirator with his beard. *See, e.g.,* PSOF 158-61; Fazlovic Decl., Dkt. 200, ¶¶ 30-41. |
| 208 | Chief Sheppard concluded by advising Plaintiff that the ELC Division had worked hard to identify another position that would offer commensurate pay to Plaintiff's detention officer wage, but that her Division could not identify another position for which Plaintiff was qualified that offered the same hourly wage. (04/07/07 Memo from Chief Sheppard to Plaintiff, Ex. 49). She advised Plaintiff of four civilian positions for which he was qualified, and provided the rate of pay for each. (*Id*.). | Undisputed, except to the extent that Defendants allege they "worked hard to identify another position that would offer commensurate pay."  Defendants refused to consider Plaintiff for multiple positions that offered similar pay or to offer him a position with similar pay. *See* PSOF 218-225; Fazlovic Decl., Dkt. 200, ¶¶ 42, 46-69. |
| 209 | Plaintiff was told that he would have to either meet the requirements for staying in his position as a detention officer, or accept one of the civilian positions for which he was qualified. (04/07/07 Memo from Chief Sheppard to Plaintiff, Ex. 49). If he failed to do so, | Undisputed that Mr. Fazlovic was told that he would be terminated if he did not choose between two jobs with significantly lower pay or shave his beard. PSOF 220; Fazlovic Decl., Dkt. 200, ¶¶ 70-73. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|--------------------------------|----------------------|
| | he was told that the Office would commence involuntary removal procedures. (*Id.*). | |
| 210 | Chief Sheppard attached two MCSO job postings to her memorandum, identifying positions within MCSO for which Plaintiff was qualified – Office Assistant Specialized (in three different areas/divisions, including Inmate Canteen) and SIMS Clerk. (Shaw Depo., Ex.16; *see also* 04/07/07 Memo from Chief Sheppard to Plaintiff, Ex. 49). Plaintiff was told he had until April 11, 2007 to notify Commander Shaw of his decision. | Undisputed.  Both positions, however, offered a significantly reduced amount of pay.  PSOF 220; Fazlovic Decl., Dkt. 200, ¶¶ 70-73. |
| 211 | On April 9, 2007, Plaintiff filed a grievance with Chief Sheppard, and again claimed that he should be assigned to the Tents Jail, which was an open environment and therefore would allow MCSO to provide him the requested exemption from the detention officer facial hair restrictions. (See April 9, 2007 Grievance from Plaintiff to Chief Sheppard, attached at Exhibit 50, at 1; *see also* Sheppard Aff., Ex. 9, at ¶ 36). Alternatively, Plaintiff suggested he could use other equipment to accommodate his beard. (04/09/07 Grievance from Plaintiff to Chief Sheppard, Ex. 50, at 1). | Undisputed. |
| 212 | Chief Sheppard responded in a lengthy memorandum dated April 11, 2007. (Sheppard Aff., Ex. 9, at ¶ 36; see also April 11, 2007 Grievance Response from Chief Sheppard to Plaintiff, attached at Exhibit 51). Therein, Chief Sheppard explained to Plaintiff that MCSO could not provide his requested accommodation because: | Undisputed that Chief Sheppard's April 11, 2007 Memorandum states as noted. Plaintiff disputes, however, the conclusions stated in the Memorandum. *See, e.g.,* PSOF 139, 144, 182-83, 185, 209, 211, 218, 221. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | ▪ If he were going to be a full-duty detention officer, he would have to be able to respond to emergencies, and don an SCBA with a tight-fitting mask, regardless of his assignment. This requirement would apply to him even if assigned in SIMS, or at Tents. And wearing that equipment could not legally or safely be done with a beard, as outlined in policies DA-3 and CP-10, and bolstered by GC-19.<br><br>▪ The assignment of detention officers to SIMS was less than ideal, and was instituted as a temporary fix to a civilian employee shortage. She noted that eleven detention officers had been transferred out of SIMS, and this would continue as additional civilians were hired.<br><br>▪ The OSHA regulations precluded the use of SCBAs with tight-fitting facepieces with facial hair that interfered with the sealing surface, or the valve function.<br><br>▪ None of the alternative equipment analyzed for possible use as a means of accommodation, including the equipment Plaintiff had provided information on, was appropriate for its anticipated use in an IDLH atmosphere and/or in a jail setting.<br><br>▪ The civilian employee given an exemption was different and not | |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | subject to those MCSO policies involving employee use of SCBAs.<br><br>(04/11/07 Grievance Response, Ex. 51, at 1-4). | |
| 213 | Plaintiff was unsatisfied with this response and, on April 23, 2007, filed another grievance with Chief Deputy Hendershott. (Sheppard Aff., Ex. 9, at ¶ 37; *see also* April 23, 2007 Grievance from Plaintiff to Chief Deputy Hendershott, attached at Exhibit 52). Here, Plaintiff continued to seek exemption from detention officer facial hair restrictions, mentioned the civilian employee with a beard, and reiterated that he felt he had been harassed and discriminated against throughout his employment. (04/23/07 Grievance from Plaintiff to Chief Deputy Hendershott, Ex. 52). | Undisputed. |
| 214 | Chief Deputy Hendershott responded on April 26, 2007, and again explained MCSO's reasons for not granting Plaintiff his requested accommodation, pointing again to OSHA regulations as they related to a detention officer's duty to be able to respond to emergencies and wear an SCBA. He then noted that the "difference in responsibilities [between Plaintiff and the civilian employee allowed to wear a beard], not any discriminatory factor, [] allows th[e] Office to make an exception in his [the civilian's] case but not in yours." (April 26, 2007 Grievance Response from Deputy Chief Hendershott to Plaintiff, attached at Exhibit 53, at 1; *see also* Sheppard Aff., Ex. 9, at ¶39). | Undisputed that Hendershott's response stated as noted.  Plaintiff, however, disputes Hendershott's conclusions. *See* PSOF 146-50, 158-61, 182, 185, 187-88, 190-93.  Defendants could have granted Mr. Fazlovic an accommodation and OSHA regulations did prevent them from doing so.  *See*, e.g., PSOF 206, 209, 218-224. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| 215 | Chief Deputy Hendershott then confirmed that Plaintiff's allegations against his two coworkers and related to profanity in the workplace had been, or were being, investigated. (04/26/07 Grievance Response, Ex. 53, at 1). | Undisputed. |
| 216 | Plaintiff was advised that if he was not satisfied with Chief Deputy Hendershott's response and action, he could seek review from the County Human Resources Director. (See 04/23/07 Grievance Form, Ex. 52, at 1; *see also* Sheppard Aff., Ex. 9, at ¶ 40). | Disputed. Plaintiff was told that he could not write any more grievances regarding MCSO's decision.  DSOF, Ex. 45 at MCSO03033 (Shaw stating he may only file a grievance "if the matter is regarding something other than the issue involving wearing a beard and working as a detention officer as this issue has been fully addressed through the grievance process."); *see also* Fazlovic's October 14, 2007 Memorandum, MCSO03226, attached as Ex. E to the 3/23/12 Pochoda Decl. In addition, Plaintiff objects to use of this statement in so far as it is based upon unauthenticated typewritten notes added at some unidentified time to the bottom of Mr. Fazlovic's Grievance Form.  *See* Fed.R.Evid. 901.  In addition, in so far as Defendants are seeking to offer this grievance form as truth that Mr. Fazlovic was actually informed that he could appeal to the County Human Resources Director the statements are inadmissible hearsay. *See* Fed.R.Evid. 801-03. |
| 217 | Plaintiff never sought review of this, or any other Grievance Response from the County Human Resources Director or anyone else outside of MCSO. (Sheppard Aff.,Ex. 9, at ¶ 40). | Disputed.  Plaintiff filed two Discrimination Charges with the Equal Employment Opportunity Commission, which investigated his charges and found that the MCSO had discriminated against him on the basis of his religion and failed to provide him a reasonable accommodation. EEOC Charge No. 540-2006-04059 (EEOC00020, 00017- |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | 18); EEOC Charge No. 540-2008-00155 (EEOC00232, 00230-31), attached as Ex. I to the 3/23/12 Pochoda Decl. |
| 218 | Plaintiff remained in his temporary assignment at SIMS, and continued to receive detention officer pay through the spring and summer of 2007. Then, on October 1, 2007, Chief Scott Freeman, who was the Chief of Operations at the time, issued a memorandum to Plaintiff in which he advised that Plaintiff's temporary assignment was going to be ending, and that Plaintiff needed to make a decision about whether he wanted to remain a detention officer and comply with the requisite facial hair standards, or pursue other positions. (October 1, 2007 Memorandum from Chief Freeman to Plaintiff, attached at Exhibit 54; Fazlovic Depo., Ex. 1, at 271:13-24 – 3; *see also* August 16, 2010 Deposition of Chief Scott Freeman, attached at Exhibit 55, at 21:21-25 – 22:6-10). | Undisputed. |
| 219 | Chief Freeman advised Plaintiff of four possible scenarios – (a) that Plaintiff come into compliance with facial hair standards for detention officers and remain in that position; (b) to report to a position as an office assistant specialized; (c) report to work as a SIMS clerk; or (d) if he failed to choose one of those options, MCSO would proceed with disciplinary action. (Fazlovic Depo., Ex. 1, at 273:2-19). In other words, Chief Freeman's memo gave Plaintiff several options – not simply to either shave or be terminated. | Undisputed that the following options were given to Mr. Fazlovic. Plaintiff objects to use of this statement in so far as it is not supported by the best evidence – Freeman's October 1, 2007 Memorandum. *See* Fed.R.Evid. 1002. Plaintiff, however, disputes, that he was given "several" options. In reality, these options only allowed two outcomes: (1) shave his beard or (2) lose his job (and pay) as a detention officer. Fazlovic Decl., Doc. 200, ¶¶ 20, 71, 73. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | (Fazlovic Depo., Ex. 1, at 273:17-19). | |
| 220 | During his deposition, Chief Freeman testified that he did not personally draft the memorandum he issued to Plaintiff dated October 1, 2007. (Freeman Depo., Ex.55, at 22:6-16). Rather, either Chief Sheppard or Commander Shaw drafted this document for Chief Freeman's review and signature. (Freeman Depo., Ex. 55, at 22).Nor was Chief Freeman involved in any decisions regarding Plaintiff's accommodation request, his temporary assignment to SIMS in October 2007, or the options provided in the October 1, 2007 memo. (Freeman Depo., Ex. 55, at 28- 30, 51:10-13). | Undisputed that Chief Freeman testified as noted.  Plaintiff, however, disputes this statement in so far as Defendants may infer that the October 1, 2007 memorandum was not from Mr. Freeman and not signed by him.  Chief Freeman's name and signature are on his October 1, 2007 Memorandum. October 1, 2007 Memorandum, attached as Ex. C to the 3/23/12 Pochoda Decl.; see also DSOF, Ex. 63 (November 29, 2007 Memorandum re Religious Accommodation Process – Position Assignment from Chief Scott Freeman). |
| 221 | Plaintiff chose to take the Office Assistant Specialized ("OAS") Inmate Programs position and was assigned to work at the Inmate Canteen at LBJ. (10/01/07 Memo from Chief Freeman to Plaintiff, with signed response, Ex. 54, at 2). | Undisputed, except in so far as Defendants assert that he "chose to take the [OAS] position."  Plaintiff wanted to keep his job as a detention officer and was forced to accept the demotion from a detention officer to an office assistant.  Fazlovic Decl., Dkt. 200, ¶¶ 71-72; see also October 1, 2007 Memorandum, attached as Ex. C to the 3/23/12 Pochoda Decl. |
| 222 | Plaintiff began work as an OAS on October 9, 2007. (See 10/03-17/07 Email String, Ex. 45, at 5; Shaw Depo., Ex. 16, at 145:11-19). | Undisputed. |
| 223 | The next day, he emailed Commander Shaw and told her that he did not believe that his duties were as described in the position description, and he therefore demanded to be moved to another position. (10/03- 17/07 Email String, Ex. 45, at 5). | Undisputed, except in so far as Defendants assert that he "chose to take the [OAS] position."  Plaintiff wanted to keep his job as a detention officer and was forced to accept the demotion from a detention officer to an office assistant.  Fazlovic Decl., Dkt. 200, ¶¶ 71-72; see also October 1, 2007 Memorandum, attached as Ex. C to the |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | 3/23/12 Pochoda Decl. |
| 224 | Commander Shaw again gave Plaintiff a choice between moving to the OAS position with Fleet Management, or the SIMS Clerk position. (Shaw Depo., Ex. 16, at 200:15-25 – 201:1-2; *see also* 10/03-17/07 Email String, Ex. 45, at 3). Although it offered a slightly higher rate of pay, Plaintiff declined the OAS Fleet Management position because "it did not meet his needs for schooling." (*Id.* at 201:1-9). | Undisputed, in so far as the email speaks for itself.  Plaintiff disputes Defendants characterization of why he declined the office assistant position with Fleet Management and that this position offered a "slightly higher rate of pay."   Mr. Fazlovic declined the office assistant position because he was also a full time student and the shift conflicted with his school schedule. DSOF, Ex. 45 at MCSO03030.  In addition, according to the email string, Mr. Fazlovic believed he could receive a higher rate of pay in SIMS ($13.06) than as an office assistant with Fleet Management, and he was told by Lt. Charles Kohlhase that his pay will "remain at $13.06 while you work the temporary assignment in SIMS."  *Id.* |
| 225 | While Plaintiff decided which position he would move to, he was assigned to SIMS. (*See* 10/03-17/07 Email String, Ex. 45, at 1-2; Shaw Depo., Ex. 16, at 145:11- 19). | Undisputed. |
| 226 | On October 14, 2007, Plaintiff filed another Grievance with Chief Deputy Hendershott and essentially asked that the Chief Deputy reverse the action Chief Freeman took on October 1, 2007. (Shaw Affid., Ex. 22, at ¶¶ 34-35; *see also* October 14, 2007 Grievance from Plaintiff to Chief Deputy Hendershott, attached at Exhibit 56). Specifically, Plaintiff asked Chief Hendershott to allow him his previously requested religious accommodation. He also claimed that Commander Shaw was forcing him to perform jobs that were not part of his | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | current assignment as an OAS, and asserted he was being discriminated against on the basis of religion. (10/14/07 Grievance, Ex. 56, at 2). | |
| 227 | On October 22, 2007, Deputy Chief Hendershott provided his Grievance Response to Plaintiff and therein told him that his request for religious accommodation had been fully addressed and therefore prior responses and information would not be reiterated. (October 22, 2007 Grievance Response from Deputy Chief Hendershott to Plaintiff, attached at Exhibit 57). | Undisputed. |
| 228 | Plaintiff was further advised that Deputy Chief Hendershott found the claims against Commander Shaw to be without merit. (10/22/07 Grievance Response, Ex. 57). Plaintiff was again advised he could seek review of Deputy Chief Hendershott's Grievance Response from the County's Human Resources Director, but did not do so. (10/14/07 Grievance, Ex. 56, at 1; *see also* Sheppard Aff., Ex. 9, at 40). | Undisputed that Hendershott made the findings in his Grievance Response. DSOF, Ex. 57. Nothing in the response states that he can appeal to the County's Human Resource Director. *Id.* In fact, Plaintiff was told that he could not write any more grievances regarding MCSO's decision. DSOF, Ex. 45 at MCSO03033 (Shaw stating he may only file a grievance "if the matter is regarding something other than the issue involving wearing a beard and working as a detention officer as this issue has been fully addressed through the grievance process."); *see also* Fazlovic's October 14, 2007 Memorandum, MCSO03226, attached as Ex. E to the 3/23/12 Pochoda Decl. In addition, Plaintiff objects to this statement in so far as it is based upon unauthenticated typewritten notes added at some time to the bottom of Mr. Fazlovic's Grievance Form (DSOF, Ex. 56 at MCSO00327). *See* Fed.R.Evid. 901 |
| 229 | In the course of communicating with | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | Commander Shaw about transitioning to a civilian position and the rates of pay for those positions, Plaintiff asked for something in writing about how the hourly rates were determined. In response, Commander Shaw prepared a memorandum dated November 17, 2007, outlining the manner in which MCSO arrived at the rates of pay for Plaintiff for both the OAS and SIMS Clerk positions. (November 17, 2007 Memorandum from Commander Shaw to Plaintiff, attached at Exhibit 58; *see also* Shaw Depo., Ex. 16, at 103:17-25 – 104:1-6; 104:22-25 – 105:1-8). | |
| 230 | The information Commander Shaw provided in her November 2007 Memo relied, in part, on information she had gathered in June 2007 from Personnel and Employment Services. At that time, Commander Shaw sent an email to Kelly Grennan, who was at that time the supervisor of the Compensation and Benefits Section, which is a subdivision of Personnel and Employment Services, asking Ms. Grennan to advise how her section identified "related experience," for the purposes of determining hourly rate. (June 6, 2007 Email String between Shaw and Grennan, attached at Exhibit 59, at 2; *see also* September 27, 2011 Deposition of Kelly Grennan, attached at Exhibit 60, at 24:19-25 – 25:1-9). | Undisputed that Shaw inquired from Grennan in an email about "related experience," but Defendants do not cite to anything showing that Shaw's November 17, 2007 memorandum relied upon this information. |
| 231 | Commander Shaw clarified her request to indicate she was asking about a detention officer moving to a civilian position, not someone being demoted while in the same position. (06/06/07 Email String, Ex. 59, at 1). Ms. Grennan responded that because an | Disputed in so far as Defendants imply that Mr. Fazlovic was not demoted. Shaw emailed Grennan, asking about "processing demotions," and then restated her question in a second e-mail, asking, "How would this work if it is a detention officer being demoted to a |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|  | employee's "[d]etention time is in a different career path … chances are it would not count; but it would depend on the civilian position. We would look at their application and determine whether or not they have any time applicable to that civilian position." (*Id.*). | civilian position." DSOF, Ex. 59. In a later e-mail to Shaw, Grennan again discusses the "Detention Officer to Civilian Demotions." PSOF 224, October 25, 2007 Email from Kelly Grennan to Shaw, attached as Ex. S-3 to 2/17/12 Pochoda Decl., Dkt. 201. |
| 232 | Later, when Commander Shaw revisited these issues in her November 17, 2007 memo to Plaintiff, she asked Ms. Grennan to review the draft memo and provide input. (November 7, 2007 Email String Between Commander Shaw and Kelly Grennan, attached at Exhibit 61; Grennan Depo., Ex. 60, at 54:20-25 – 55:1-4). In fact, some of the information Ms. Grennan provided to Commander Shaw in emails between the two was incorporated into the memo to Plaintiff explaining how pay rates were determined. (Grennan Depo., Ex. 60, at 55-56). | Disputed in so far as it is not supported by the citation to the record. Plaintiff does not dispute that Grennan and Shaw had a conversation but there is nothing in the cited documents confirming that this information was then transferred to the November 17, 2007 memorandum. In addition, nothing in Grennan's Deposition at pages 55-56 establishes that the "information… was incorporated into the memo to Plaintiff explaining how pay rates were determined," as Defendants allege. |
| 233 | At the time when Commander Shaw first contacted Ms. Grennan, Maricopa County's Office of Management and Budget was in the process of finishing a market study for each position within the County, including those at MCSO. (Grennan Depo., Ex. 60, at 30-31). Ms. Grennan was directly involved in the market study process by evaluating the various MCSO positions and working with the County to identify a "placement in range." (*Id.* at 31-32). | Undisputed. |
| 234 | And, as of the time when MCSO was determining what rate of pay it would offer Plaintiff in the civilian positions he was considering, the placement in range strategies were still in the process of being implemented. (Grennan Depo., | Disputed in so far as the statement conflicts with the cited record. Grennan testified that "we were working on the market studies sometime at the end of 2006 going forward, so I don't know what specific |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | Ex. 60, at 33- 34). If a particular position had not yet been studied, then an individual being hired for, or moving into, that position would be placed at the beginning of the range, per standard practice. (*Id*. at 34:9-17). | time frame we completed those." DSOF, Ex. 60, Grennan Dep. at 33:20-23. Defendants considered Fazlovic's pay in November 2007 and there is nothing in the record to suggest that the market studies were still ongoing at this time. *See* DSOF, Ex. 61 |
| 235 | Ms. Grennan developed the experience worksheet used to determine the rate of pay offered to Plaintiff in the OAS and SIMS Clerk positions. (Grennan Depo., Ex. 60, at 35:16-20). This worksheet was used in tandem with Plaintiff's employment history, to ensure that full credit was given for relevant experience. (*Id*.). | Disputed in so far as it is not supported by the citation to the record. Plaintiff also disputes that he was given full credit for all of his experience and education. Defendants failed to consider Mr. Fazlovic's experience, skills, and education when determining his appropriate rate of pay. *See* PSOF 219-226; *see also* DSOF, Ex. 45 at MCSO03033 (Fazlovic stating: As I have mentioned earlier through emails and verbally I am [a] certified computer technician, multilingual, I have approximately 61 college credits in criminal justice, 2.5 years experience as a detention officer etc...") |
| 236 | So, when Ms. Grennan was asked to provide information regarding the rates of pay MCSO could offer Plaintiff in the two civilian posts, Ms. Grennan prepared the experience worksheets she had developed to aid with placement in range. (Grennan Depo., Ex. 60, at 71-73, 80-83). | Undisputed. |
| 237 | For the OAS position, Plaintiff was given credit for .46 years of relevant experience, and was placed in the range for the OAS position accordingly. (Grennan Aff., Ex. 40, at ¶ 12; see also OAS and SIMS Experience Worksheets for S. Fazlovic, attached at Exhibit 62). As a result of credit for other experience, Plaintiff was eligible to receive $13.06/hr. | Undisputed that Defendants decided to pay Mr. Fazlovic $13.06/hr for the office assistant (OAS) position. PSOF 225. Plaintiff does not dispute that Defendants only credited him for ".46 years of relevant experience," but disputes this is accurate. He had worked for the MCSO for nearly two and a half years when he was demoted to office assistant. Fazlovic Decl., Dkt. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | 200, Exs. 16 (compensation history) & 18 (application noting experience); DSOF, Ex. 45 at MCSO03033 (noting 2.5 years experience as a detention officer). |
| 238 | And for the SIMS Clerk position, Plaintiff was credited for 1.05 years of relevant experience. (OAS and SIMS Experience Worksheets, Ex. 62, at 4). Accordingly, Plaintiff was placed at the second "step" in the placement, where the wage was $12.32/hr. | Undisputed that Defendants decided to pay Mr. Fazlovic $12.32/hr for the SIMS position. PSOF 225. Plaintiff does not dispute that Defendants only credited him for "1.05 years of relevant experience," but disputes this is accurate. He had worked for the MCSO for nearly two and a half years when he was demoted to office assistant. Fazlovic Decl., Dkt. 200, Exs. 16 (compensation history) & 18 (application noting experience); DSOF, Ex. 45 at MCSO03033 (noting 2.5 years experience as a detention officer). |
| 239 | The rate of pay for the OAS and SIMS Clerk positions is lower than that offered to detention officers for various reasons, including that a "detention officer's essential functions are completely different than a SIMS clerk and inmate classification counselor and a crime lab [analyst], and so their rates of pay and those kinds of things are completely different than a detention officer." (Shaw Depo., Ex. 16, at 206:14-25). The differences in the job functions for each also is the reason work done as a detention officer is deemed a "different career path," and therefore not necessarily credited towards service in calculating a rate of pay for a new position. (*Id*.). | Undisputed that the rate of pay for the OAS and SIMS Clerk position are lower than that offered to detention officers. Defendants, however, could have paid Plaintiff the same rate of pay as detention officers while working in SIMS, because they had already done so on prior occasions, and other individuals working in SIMS received a higher rate of pay and were permitted to work in SIMS as medical accommodations. PSOF 36, 134-36, 139, 148-51. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| 240 | On November 29, 2007, Chief Freeman issued another memorandum to Plaintiff and advised he could either select to move to an OAS position with Fleet Management, or transfer to a full-time position as a SIMS clerk. (Freeman Depo., Ex. 55, at 39; *see also* November 29, 2007 Memorandum from Chief Freeman to Plaintiff, attached at Exhibit 63). | Undisputed. |
| 241 | Plaintiff selected the SIMS Clerk position, which paid $12.32 an hour, and started in that position on December 17, 2007. Though the OAS position Plaintiff was offered would have paid $13.06 an hour, he elected the SIMS position because the shift he was would be working accommodated his school schedule. (Shaw Depo., Ex. 16, at 105:21-25 – 106:1; *see also* December 5, 2007 Email String between Plaintiff and Commander Shaw, attached at Exhibit 64). | Disputed in so far as it is duplicative of DSOF 223 and mischaracterizes the events.  Plaintiff incorporates his response to DSOF 223 in response to this statement. |
| 242 | In July 2008, Plaintiff applied to become an Inmate Classification Specialist. Plaintiff was not selected for the position because, in part, he performed poorly in the interview, scoring only 7 out of a possible 20 points. According to the interviewers, his responses did not meet expectations nor did he meet interview standards, in part due to a lack of relevant commensurate experience. (Shaw Aff., Ex. 22, at ¶¶ 43-44). | Disputed.  Plaintiff objects to any use of this statement because it is based upon inadmissible hearsay and is not supported by the best evidence – documents showing his interview scores.  *See* Fed.R. Evid. 803, 1002. Plaintiff also objects that he lacked relevant experience.  *See Fazlovic Decl.*, Dkt. 200, Exs. 16 (compensation history) & 18 (application noting experience); DSOF, Ex. 45 at MCSO03033 (noting 2.5 years experience as a detention officer). |
| 243 | On July 27, 2008, Plaintiff resigned. (Shaw Aff., Ex. 22, at ¶ 45; *see also* July 27, 2008 Notice of Resignation, attached at Exhibit 65). | Disputed in so far as Defendants' characterize Mr. Fazlovic's constructive discharge as a resignation.  Mr. Fazlovic stated: "I would like to advise |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|--------------------------------|----------------------|
|  |  | all of you that my last day of employment with MCSO will be 08/10/2008. There are numerous reasons for my tough decision here are just few of them. 1st Discrimination including job demotion based on religious ground. 2nd With my current income I am no longer able to support and provide basic necessities for me and my family. ($12.32 per hr) 3rd Individuals without any experience were and are still making more money than me with 3 years of experience in law enforcement and Associate degree (over 80 credit hrs). Thank you." July 27, 2008 Letter, attached as Ex. 17 to Fazlovic Decl. (Bates No. MCSO 01520). |
| 244 | Before his resignation from MCSO, Plaintiff had already applied for and been selected for a position within Maricopa County with Juvenile Probation. (Fazlovic Depo., Ex. 1, at 304:17-25 – 305:10-12). | Undisputed.  *See also* Fazlovic Decl., Dkt. 200, ¶¶ 74-75. |
| 245 | In fact, Plaintiff had no lapse in employment with the County as a result of his resignation from MCSO. (Fazlovic Depo., Ex. 1, at 305:9-27). Instead, he used up his accrued leave time with MCSO, then simply "moved on with the new department." *(Id.)*. | Undisputed, except in so far as Defendants appear to characterize his new position with the Juvenile Probation Department as with the Defendants. |
| 246 | On February 6, 2007, Commander Shaw emailed Captain Mason and advised that she would be sending him a set of documents related to various respirator products that she received from Plaintiff, along with his February 2, 2012 memorandum. Shaw Depo., Ex. 16, at 98:21 – 99; *see also* Email | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | String between Commander Shaw, Captain Mason, and Lieutenant Wiscombe dated February 6, 2007 and Facsimile from Commander Shaw to Captain Mason Re: Respirator Products, collectively attached at Exhibit 66). Commander Shaw asked Captain Mason to review the materials to ascertain if they could be used by Plaintiff in the jail setting, as a means of accommodating his religious practice. (Shaw Depo. at 98:21 – 99; *see also* 02/06/07 Email String and Fax from Shaw to Mason, Ex. 66). | |
| 247 | Lieutenant Wiscombe responded to Commander Shaw's request that the Safety Division evaluate this alternative equipment, which included various hooded and loose-fitting facepieces to use with SCBAs. (02/06/07 Email String and Fax from Shaw to Mason, Ex. 66, at MCSO 02312). Lieutenant Wiscombe carefully explained why none of these alternatives would work in the jail environment because of the hazards detention officers could face, the need to be able to evacuate combative or unconscious inmates, and because of issues posed by the alternative equipment itself – such as a hood being noisier in use than a tight-fitting facepiece, and a reduction in peripheral vision. (*Id.*). | Undisputed. |
| 248 | On March 26, 2008, Commander Shaw again asked Captain Mason and his office to follow up with ADOSH and determine if there was any new respirator equipment that would allow a detention officer to wear a beard and still perform his essential job tasks and/or whether there were any | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|     | anticipated changes to 29 C.F.R. § 1910.134 which might allow such an occurrence. (Shaw Depo. at 106:3-7; *see also* March 26-27, 2008 Email String between Captain Mason and Commander Shaw, attached at Exhibit 67). | |
| 249 | Captain Mason responded to the request the next day, March 27, 2008, and advised that he had spoken with Jesus Maeda, who indicated ADOSH was not aware of any new equipment that would fit MCSO's needs, nor of any upcoming changes to § 1910.134. (03/26-27/08 Email String, Ex. 67). | Undisputed. |
| 250 | MCSO determined it could not safely allow Plaintiff to wear a hooded facepiece, for a variety of reasons. First, hooded facepieces are bigger items than are the tight-fitting facepieces – the hood is more like a bag, and therefore easier to get a hold of and pull. (McKay Depo., Ex. 8, at 102:24-25 – 103:1-3). | Disputed. Plaintiff objects to any use of this statement in so far as it relies upon the testimony of its expert, Dr. McKay, as a fact witness to what MCSO determined. *See* Fed.R.Evid. 602, 701-03.<br><br>Plaintiff does not dispute that MCSO determined that Plaintiff would not be allowed to wear a hooded facepiece. Plaintiff could have safely worn a hooded or loose-fitting SCBA if he had been permitted to do so by Defendants. PSOF 190-94; Daly Dep., at 218:10-13 (stating "OSHA requires that a variety of respirator types are provided to employees so that employees have the option to select the respirator that is most suitable for them."); Report of Pl's Expert, Brian P. Daly, at 4, ¶¶ 6.2, 6.5 ("Daly Report"), attached as Ex. A to the 3/23/12 Pochoda Decl. Plaintiff even offered to purchase a loose-fitting SCBA with his own money. Fazlovic Decl., Dkt. 200, ¶ 31; DSOF, Ex. 50 at 1 (stating "I have found many different respirators compatible for use with |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
| | | facial hair and [in] compliance with OSHA regulation.  I am willing to pay for that with my own mon[ey] [if] necessary just to keep my job.").  A tight-fitting facepiece can be pulled just as easily as a hooded facepiece.  Daly Report, at 4-5, ¶ 6.6. In fact, Daly states that a tight fitting respirator would be more easily dislodged than a hooded respirator.  Daly Dep., at 132:32-137:13. |
| 251 | Additionally, hoods of the sort Plaintiff asked MCSO to let him wear are more susceptible to tampering and puncture, both at the lens of the hood, and the hood generally. (McKay Depo., Ex. 8, at 111:12-23). The visual acuity in hooded respirators is also lower. (Id. at 94:17-25 – 96:1-13). | Disputed.  There is no difference in the visual acuity or susceptibility of tampering or puncture between loose-fitting and tight-fitting SCBA.  Daly Report, at 5, ¶ 6.6.  Moreover, Plaintiff objects to McKay's testimony on this in so far as it is not based upon any scientific, technical or other specialize knowledge.  *See* Fed.R.Evid. 702.  McKay admitted he has "not seen the study" comparing susceptibility to tampering and puncture, and basis his opinion on visual acuity only upon his own perceived "common sense."  DSOF, Ex. 8, at 111:12-112:3. |
| 252 | Further, tight-fitting facepieces allow detention officers to move freely and flexibly, which is critical in the jail setting. (DeLand Depo., Ex. 10, at 57:14-16). | Disputed.  Defendants do not cite any actual evidence showing that a loose-fitting SCBA limits the user's ability to move any more than a tight-fitting SCBA. Moreover, Plaintiff disputes that this flexibility to move freely is "critical in the jail setting."  For example, many detention officer positions are required to remain at their position in the event of an emergency.  PSOF 120, 131-33.  In addition, there is no evidence that a detention officer has ever had to use an SCBA when responding to an emergency, and even if a detention |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | officer had to respond to an emergency with an SCBA there are not enough SCBAs available for the detention officers to use. PSOF 67-69, 104-06. |
| 253 | The SURVIVAIR Puma, one of the many pieces of equipment MCSO evaluated in seeking to address Plaintiff's request for accommodation, is a hooded respirator with straps outside the hood. (McKay Depo., Ex. 8, at 98-100). These straps are used to fasten the rubber nose cup that is inside the hood to the wearer's face. Because the fastening straps are outside the hood, it is easier to tamper with the user, and easier to dislodge than a tight-fitting facepiece. (*Id.*). | Disputed.  Defendants do not cite to anything in the record that shows that the MCSO actually considered the Survivair Puma SCBA. Plaintiff disputes that the Survivair Puma is any more susceptible to tampering than a tight-fitting SCBA. Daly Report, at 5, ¶¶ 6.8, 6.9 (stating "the airline of a loose-fitting hood is no more or less prone to tampering by inmates than the airline that exists on a tight-fitting SCBA" and that "the loose-fitting hood is no more or less proe to tampering by inmates than the tight-fitting SCBA mask.")  Plaintiff objects to any use of this statement of fact in so far as it relies upon the testimony of its expert, Dr. McKay, as a fact witness as to what MCSO allegedly evaluated.  *See* Fed.R.Evid. 602, 702. |
| 254 | It is also significant that hooded respirators are classified and regulated as full facepiece respirators, meaning even users of this equipment must be fit tested because the equipment still must form a good seal, just not at the face. (McKay Depo., Ex. 8, at 80). | Undisputed except in so far as Defendants allege that this statement is "significant."  The evidence cited does not support this conclusion. |
| 255 | Had MCSO provided an alternative respirator or facepiece for use to its detention officers, it likely would hamper emergency response times because the presence of more than one type of equipment complicates the donning process and can cause unnecessary confusion among emergency responders. (McKay Depo., Ex. 8, at 67:1-24; 68:5-14; *see also* | Disputed.  This statement is an opinion, it is not a fact.  The opinions of Defendants' experts are not supported or based upon any facts.  *See* DSOF, Ex. 8, McKay Dep. at 67-68.  Plaintiff's expert, Brian Daly, expressly stated that "an employer's choice to offer to an employee more than one type of SCBA does not hamper response time."  Daly Dep., at 217:12- |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | DeLand Depo., Ex. 10, at 77:17-21). | 16.  As Defendants even acknowledge, they had multiple types of equipment.  DSOF 107 ("Captain Mason's memo also explains that MCSO uses two types of air pac"); DSOF, Ex. 23 (6 hooded respirators are available at the MCSO Mesa and Avondale locations); *see also* Shaw Dep., at 55-56; PSOF 209.  As noted in the statement, Defendants believe "it likely would hamper response times…"  There is no actual evidence that having different equipment did in fact hamper response times.  According to Daly, "[a]n individual may be trained to use two different types of respirators without any anticipated problem that would hamper response time.  Employees routinely receive training concerning multiple types of respirators and based on my personal experience, such a practice does not result in confusion or any other circumstance that would delay response time."  Daly Report, at 6, ¶ 6.10. |
| 256 | MCSO detention officers are trained on the specific makes and models of SCBAs they use in their facilities. The presence of more than one particular make and model of equipment means officers must be trained on that equipment. (Mason Depo., Ex. 4, at 188:19-24; *see also* DeLand Depo., Ex. 10, at 77:17-21). | Disputed that "MCSO detention officers are trained on the specific makes and models of SCBAs they use in their facilities" in so far as Defendants do not cite anything in the record to support this statement.   The MCSO does not have SCBAs in many facilities.  PSOF 104, 107.  In addition, detention officers only receive a brief training on SCBAs when they are in the academy.  PSOF 102.  There is no evidence that the equipment detention officers are trained on is the same make and model of SCBA available in the facility where they will work, if there are any SCBAs available.  Moreover, |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | Defendants acknowledge that they have multiple makes and models of SCBAs in their facilities. DSOF 107; DSOF, Ex. 23; PSOF 209; *see also* Shaw Dep., at 55-56. *See supra* 255 for specific quotations. |
| 257 | As a result, if "one type of respirator will do the job appropriately, from a training perspective, maintaining the equipment, keeping supplies, the ability to do the fit–testing and everything else, limiting the number [of types] makes it easier." (McKay Depo., Ex. 8, at 68:19-24). | Disputed to the extent that it implies that ease of administration (training, simpler fit testing, etc.) is a prime consideration in the type of respirator. "[T]he intent of the standards…are to provide protections for worker." Daly Dep., at 28:2-3.  Moreover, an employer should select more than one type of respirator for employees to choose from. Daly Dep., at 219-20.  It is important to note that Defendants' expert only testified that limiting the number "makes it easier" for training, not that multiple types would cause any burden. In fact, Defendants acknowledge that they have multiple makes and models of SCBAs in their facilities, and there is no evidence that having multiple types have caused any burden on training. DSOF 107; DSOF, Ex. 23; PSOF 209; *see also* Shaw Dep., at 55-56. *See supra* 255 for specific quotations. Defendants only provide a brief training on the use of SCBA during the Academy and thereafter detention officers never use or even see an SCBA, unless they see the facepiece portion for a fit test. PSOF 102; Fazlovic Decl., Dkt. 200, ¶ 26. |
| 258 | According to Chief Sheppard, Plaintiff's request to be assigned permanently to a single facility was unreasonable because ultimately it would mean that Plaintiff would be exempt from performing one of the | Disputed in so far as the evidence cited by Defendants does not support this statement. Chief Sheppard did not testify that Plaintiff's request was "unreasonable." *See* DSOF, Ex. 5, Sheppard Dep. at 168-69. Sheppard |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | essential job functions of the position. (Sheppard Depo., Ex. 5, at 168-69). Had MCSO permanently assigned Plaintiff to a single post – e.g. the security control room at a facility, Jail Intel, Tents, or SIMS – it would have "fundamentally change[d] the position." (Sheppard Depo., Ex. 5, at 171:16-23). | testified "the issue was ability to perform all of the essential functions, specifically the ability to respond to emergencies." *Id*. Defendants, however, do not cite any evidence showing that Mr. Fazlovic could not respond to emergencies or perform all of the essential functions. *See* PSOF 27, 30; *see also* PSOF 160-61, 201-204. |
| 259 | If Plaintiff had been allowed to maintain a beard, he would have been unable to safely and capably don an SCBA with a tight-fitting mask in the event of emergency would mean that he was incapable of performing all the tasks required in a safe and secure manner. (Deland Depo., Ex. 10, at 96:11-20). This would have required other detention officers to perform Plaintiff's duties in responding to emergencies, dealing with fires, evacuating or rescuing inmates, and the like. (Sheridan Aff., Ex. 2, at ¶¶ 20-22). | Disputed in so far as the evidence cited by Defendants does not support this statement. In addition, Plaintiff objects to any use of this statement of fact in so far as it relies upon the testimony of its expert, Gary Deland, as a fact witness as to whether Mr. Fazlovic could in fact safely and capably don an SCBA. *See* Fed.R.Evid. 702. Mr. Deland is a designated expert witness; there is no evidence that he ever observed Mr. Fazlovic or observed him donning an SCBA. *See* Fed.R.Evid. 602. Although Mr. Fazlovic requested multiple times to be fit tested with his beard, Defendants never gave him the opportunity to do so. PSOF 194-95; Fazlovic Decl., Dkt. 200, ¶¶ 30-41. |
| | | Defendants do not cite and there is no evidence that Mr. Fazlovic could not safely or capably don a tight-fitting SCBA in the event of an emergency. In addition, there is no evidence that any detention officers ever had to perform Mr. Fazlovic's duties in responding to emergencies, dealing with fires, or evacuating or rescuing inmates, etc. Sheridan's self-serving statements in his affidavit are based upon speculation and conjecture, rather than fact. *See* Fed.R.Evid. 602. |
| 260 | When he was hired and began work in | Undisputed. |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|  | July 2005, Plaintiff's rate of pay was $14.90 per hour. (Grennan Aff., Ex. 41, at 11; Plaintiff's Maricopa County Sheriff's Office Salary and Position Record Sheet, attached at Exhibit 68). |  |
| 261 | On July 31, 2006, Plaintiff received a merit raise and thereafter was paid $15.51 an hour. (Plaintiff's Salary and Position Record, Ex. 68). | Undisputed. |
| 262 | Plaintiff received another raise on December 4, 2006 and his rate of pay increased to $18.11. | Undisputed. |
| 263 | In 2006, Maricopa County was in the process of conducting its market study and adjusting salaries for positions throughout the County, including within MCSO, consistent with the results of that study. | Disputed in so far as Defendants do not cite any evidence in the record to support this statement. |
| 264 | Consistent with the market study, Plaintiff received another increase, to $18.74, on July 2, 2007. | Disputed. According to MCSO's records, Mr. Fazlovic received a "Merit Increase" on July 2, 2007 to $18.74 an hour.  DSOF, Ex. 68.  Defendants do not cite any evidence to support their statement. |
| 265 | Plaintiff filed his first Charge of Discrimination with the Arizona Civil Rights Division ("ACRD") and the Equal Employment Opportunity Commission ("EEOC") on September 7, 2006. (Fazlovic Depo., Ex. 1, at 292:11-14; see also Charge of Discrimination dated September 7, 2006, attached at Exhibit 69). In so doing, Plaintiff alleged he was discriminated against on the basis of religion and race. | Disputed.  Mr. Fazlovic filed his first Charge of Discrimination with the Equal Employment Opportunity Commission on September 7, 2006. EEOC 00020, attached as Ex. I to the 3/23/12 Pochoda Decl.  According to the work-sharing agreement between the EEOC and the Arizona Attorney General's Office, Civil Rights Division (ACRD), the Charge was considered filed with both agencies, but it was "investigated by the EEOC."  EEOC 00020, 00022; see also EEOC 00234, attached as Ex. I to the 3/23/12 Pochoda Decl.  Mr. Fazlovic alleged that the MCSO "failed to accommodate my |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
| | | religious request" and that he was required to shave his beard if he wanted to continue his job as a detention officer.   EEOC 00020, attached as Ex. I to the 3/23/12 Pochoda Decl.  He alleged that he was discriminated on the basis of his religion and race because, among other things, a Black MCSO employee was allowed to continue working at the MCSO and maintain a beard. *Id.* |
| 266 | Plaintiff testified that he believed he was discriminated on the basis of race because the civilian employee who was allowed to wear a beard while in uniform was African-American. (Fazlovic Depo., Ex. 1, at 292:22-25; 293:5-11). | Undisputed that Mr. Fazlovic testified that "an African-American gentleman [James Alexander] who had at that time – I don't know if he still has – a long facial hair," and "wore a "sheriff's uniform."  DSOF, Ex. 1, Fazlovic Dep. at 292:22-293:11.  Mr. Fazlovic has never alleged in this action that he was discriminated against on the basis of his race. Dkt. 1. |
| 267 | The ACRD issued Plaintiff a right to sue letter related to his initial Charge on January 29, 2007. (January 29, 2007 Right to Sue Letter to Plaintiff, attached at Exhibit 70) | Disputed in so far as Defendants infer that the Notice of Right to Sue from the ACRD relates to Plaintiff's charge under Title VII of the Civil Rights Act (Title VII).  Plaintiff's charge was investigated by the EEOC, not the ACRD.  EEOC 00020, 00022, attached as Ex. I to the 3/23/12 Pochoda Decl. The EEOC investigated Mr. Fazlovic's charges and found, on November 12, 2008, that "there is reasonable cause to believe that there is a violation of Title VII in that [MCSO] discriminated against [Fazlovic] and a class of similarly situated individuals because of their religion (Muslim) in that it denied them religious accommodation." EEOC 00017-18, 00009, 00230-31, attached as Ex I to the 3/23/12 Pochoda |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|---|---|---|
| | | Decl.  The EEOC then referred Mr. Fazlovic's charge to the U.S. Department of Justice, and notified Mr. Fazlovic that if "DOJ does not bring a lawsuit, they will notify you and issue a Notice of Right to Sue, which will entitle you to sue the respondent under Title VII."  EEOC 00012, attached as Ex. I to the 3/23/12 Pochoda Decl.; *see also* EEOC 00226.   The DOJ sent Mr. Fazlovic a "NOTICE OF RIGHT TO SUE WITHIN 90 DAYS" on March 26, 2009.  EEOC 00011 & SF000001, attached as Ex. I to the 3/23/12 Pochoda Decl. |
| 268 | Plaintiff filed a second Charge on October 11, 2007 in which he alleged Defendants had retaliated against him. (Fazlovic Depo., Ex. 1, at 294-296:1-8). Plaintiff also claims he was discriminated against on the basis of religion, but not facts were provided in the Charge. | Undisputed that Mr. Fazlovic filed a second Charge of Discrimination with the EEOC on October 11, 2007 alleging continued retaliation.  EEOC 00232, attached as Ex. I to the 3/23/12 Pochoda Decl.  Plaintiff disputes this statement in so far as it does not rely upon the best evidence – a copy of Mr. Fazlovic's October 11, 2007 Charge of Discrimination – and does not accurately represent the content of the Charge.  *See* Fed.R.Evid. 1002. |
| 269 | Plaintiff claims MCSO retaliated against him by assigning him to the Inmate Canteen, which is located inside the same building that houses the Food Factory, when he chose to take the Office Assistant Specialized position. (Fazlovic Depo., Ex. 1, at 294:20- 25 – 295:1-18). This was the sole action Plaintiff pointed to during his deposition as supporting his claim that Defendants retaliated against him. (Fazlovic Depo., Ex. 1, at 295:24-25 – 296:1-8). | Disputed as incomplete.  Plaintiff alleged in his Complaint that Defendants retaliated against him by: "refusing reasonable transfer requests, punishing Plaintiff for making and persisting in his requests to wear a beard and for pursuing his rights by changing MCSO policies after Plaintiff pointed out that they were inconsistent with Defendants' denial of his requests for religious accommodations and first indicating that his request would be granted; by refusing to allow Plaintiff to |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|---------------------|
|  |  | take a 'fit test' to prove that he could wear the assigned SCBA in emergency situations or, alternatively, demonstrating that other SCBA were available and approved for use by Detention Officers; by requiring the Plaintiff to accept the demotion and reduction in pay; by creating a hostile work environment for Plaintiff because of his religion through these and other actions, by escalating their improper and illegal actions against Plaintiff in response to his complaints about these actions internally and to the EEOC, and by constructively discharging Plaintiff by reason of Defendants' refusal to provide a religious accommodation." Dkt. 1 at ¶ 75.<br><br>Defendants also misrepresent Mr. Fazlovic's testimony.  Mr. Fazlovic was asked whether there was "[a]nything else that we've not talked about?" and responded that "I don't remember anything else at this time."  Fazlovic Dep. 295:24-296:3.  Mr. Fazlovic testified to several actions throughout his deposition that were retaliatory.  For example, he filed multiple grievance requesting accommodations but was told the same thing in each response – no accommodations were possible – despite providing evidence to the contrary; he was denied multiple requests to transfer; and he was only offered menial positions as a "clerk" or "office assistant" for significantly less pay.  *See, e.g.,* PSOF 42, 48-50, 55-59, 194-95, 221-25.  In addition, there is other evidence in the record that supports a finding that Defendants retaliated against Mr. Fazlovic.  *See,* |

| No. | Defendants' Statement of Facts | Plaintiff's Response |
|-----|-------------------------------|----------------------|
|     |                               | *e.g.,* Shaw's May 13, 2008 Investigative Memorandum to Fazlovic, attached as Ex. J to the 3/23/12 Pochoda Decl. |

Respectfully submitted this 23rd  day of March, 2012.

By        /s/ Daniel J. Pochoda

Daniel J. Pochoda

ACLU Foundation of Arizona

3707 North 7th Street, Ste. 235

Phoenix, AZ 85014

Attorneys for Plaintiff

CERTIFICATE OF SERVICE

I hereby certify that on March 23, 2012 I caused the attached document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Erin E. Byrnes
Berke Law Firm PLLC
1601 North 7th Street, Suite 360
Phoenix, AZ 85006
*erin@berkelawfirm.com*

*Attorneys for Defendants*

Dated this 23rd day of March, 2012.

/s/   Gloria Torres